UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRICORE, INC. | : | CIVIL ACTION NO. |
| | : | 04-12393 (JGD) |
| | : | |
| VS. | : | |
| | : | |
| SAFECO INSURANCE COMPANY OF | : | |
| AMERICA and R.P. IANNUCCILLO & | : | |
| SONS CONSTRUCTION CO. | : | November 4, 2005 |

## SAFECO INSURANCE COMPANY OF AMERICA'S
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the

Local Rules of the United States District Court for the District of Massachusetts,

Defendant and Crossclaim Defendant, Safeco Insurance Company of America ("Safeco"

or the "Surety") respectfully moves for summary judgment on the crossclaim asserted by

Defendant and Crossclaim Plaintiff, R.P. Iannuccillo & Sons Construction Company.

The Honorable Charles B. Swartwood, United States Magistrate Judge, presided

over a mediation of this matter on July 19, 2005. Count II of RPI's Crossclaim against

Surety, which alleges violations of Massachusetts General Law Chapters 176D ("Chapter

176D") and 93A ("Chapter 93A"), is all that is left of this multi-party, multi-claim

litigation involving RPI, the Surety, and Tricore, Inc. ("Tricore"). All other claims,

counterclaims, and crossclaims have been disposed of as a result of the July 2005

mediation.

The Surety is now entitled to summary judgment as matter of law regarding RPI's

meritless Chapters 176D and 93A claims. In the first instance, the Surety is entitled to

1

judgment as a matter of law regarding RPI's Chapter 176D claim because there is no private right of action in Chapter 176D.

The Surety is likewise entitled to summary judgment as a matter of law regarding RPI's Chapter 93A claim because, as a business engaged in trade or commerce, RPI has no standing to obtain relief under Chapter 176D by and through the provisions of Section 9 of Chapter 93A, which section is limited to individuals.

Assuming, *arguendo*, that RPI does have standing to press its Chapter 176D claim through Chapter 93A, the Surety is nevertheless entitled to summary disposition of RPI's Chapter 93A claim because RPI cannot establish as a matter of law that under the applicable standard liability under its claim was "reasonably clear."

In support of this Motion, Safeco relies upon its Memorandum of Law in Support of Safeco Insurance Company of America's Motion for Summary Judgment and the Local Rule 56.1 Statement of Undisputed Material Facts in support of Safeco Insurance Company of America's Motion for Summary Judgment. Additionally, Safeco attaches as Exhibit A the Affidavit of Paul Jacobson, president of Tricore Inc., in support of Motion for Summary Judgment (with attached Exhibits), the Affidavit of Ira E. Sussman in support of Motion for Summary Judgment (with attached Exhibits) as Exhibit B.

2

WHEREFORE, Safeco respectfully requests that the Court:

(a)    Allow Safeco's Motion for Summary Judgment in its entirety;

(b)    enter judgment in Safeco's favor as to the Crossclaim;

(c)    award Safeco the attorneys' fees and costs that it has incurred in this matter; and

(d)    grant such further relief as the Court may deem just and appropriate.

CROSSCLAIM DEFENDANT,
SAFECO INSURANCE COMPANY
   OF AMERICA

BY _____

Dennis C. Cavanaugh
Patrick M. Birney (Admitted in CT only)
Brown Raysman Millstein Felder &
Steiner LLP
185 Asylum Street
Hartford, CT 06103
(Phone) 860-275-6457
(Facsimile) 860-275-6400
Its Attorneys

3

## CERTIFICATION

This is to certify that on November 4, 2005, a copy of the foregoing was mailed, postage pre-paid or delivered electronically or by facsimile to the following:

Edward Kutchin
Kerry R. Northup
Kutchin & Rufo, PC
155 Federal Street, 17th Floor
Boston, MA 02110-1727
**Tricore, Inc.**

David M. Campbell
Visconti& Boren, LTD
55 Dorrance Street
Providence, RI 02903
**R. P. Iannuccillo & Sons Construction Co.**

Bradford R. Carver, Esq.
Jonathan C. Burwood, Esq.
Hinshaw & Culbertson, LLP
One International Place, 3rd Floor
Boston, MA 02110
**Safeco Insurance Company of America**

Dennis C. Cavanaugh

4

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACUSETTS

| | | |
|---|---|---|
| TRICORE, INC. | : | CIVIL ACTION NO. |
| | : | 04-12393 (MLW) |
| | : | |
| VS. | : | |
| | : | |
| SAFECO INSURANCE COMPANY OF | : | |
| AMERICA and R.P. IANNUCCILLO & | : | |
| SONS CONSTRUCTION CO. | : | |

## AFFIDAVIT OF PAUL JACOBSON IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

1.  I am over the age of eighteen (18) and believe in the obligation of an oath.

2.  I am President of Tricore Inc., the plaintiff in the above-captioned matter.

3.  I make this Affidavit in support of the Safeco Insurance Company of

America's Motion for Summary Judgment and based on my own personal knowledge.

4.  On or about January 2002, Tricore was engaged by Sherrill House, Inc. to

act as the construction manager/general contractor ("CM") with respect to the

renovation and expansion of a nursing home facility in Boston, Massachusetts (the

"Project").

5.  As part of its duties as CM, Tricore was responsible for retaining all the

various subcontractors engaged to work on the Project.

6.  Tricore was required to post, and the Surety (as defined below) did post,

Payment Bond Number 6007619 ("Tricore's Payment Bond") in the original amount of

$7,869,363.00, which secured the payment of subcontracts and material suppliers under

the Project. Tricore's Payment Bond was issued by Safeco Insurance Company of America (the "Surety").

7.  A copy of the Payment Bond is attached hereto and made a part hereof as Exhibit 1.

8.  On or about April 25, 2002, Tricore and RPI entered into a subcontract involving the Project (the "Subcontract").

9.  A copy of the Subcontract is attached hereto and made a part hereof as Exhibit 2.

10. Tricore engaged RPI as the principal concrete subcontractor responsible for forming and placement of all concrete foundations, slabs, and other concrete portions of the Project for the original sum of $863,497.00.

11. During the course of RPI's performance of the Subcontract, Tricore, among others, increasingly became dissatisfied with the quality of RPI's work.

12. The quality issues were not limited to a single portion of the Project, or isolated incidences requiring repair, but rather were numerous and all-encompassing.

13. RPI's quality problems were the rule, not the exception, and ultimately proved to be unaccceptable.

14. Some of the issues exemplifying RPI's substandard performance under the Subcontract included: (1) walls being "out of plumb" (i.e. concave and/or convex rather than straight) and floors having recesses (i.e. curvature or waviness, rather than flat); (2) honeycombing and voids (i.e. concrete with pock-marks or large holes); (3)

2

unacceptable trowel marks and footprints embedded in the concrete and cracks, peeling and flaking in the concrete; (4) unacceptable variations in the placement of concrete, resulting in (a) uneven wall heights; (5) overly wide stairs; (6) misalignment of concrete; (7) improper relief cuts in concrete that were uneven and not to the depth required by the specifications, which resulted in stress cracking of the concrete slabs; (8) improper reglet cutting of concrete, which necessitated hand-cutting and chipping to remedy the work; and (9) concrete spillage, staining and variations in the poured concrete.

15. A copy of the photographs evidencing these various issues is attached hereto and made a part hereof as Exhibit 3.

16. RPI was required under the Subcontract to provide "finished" concrete work, which was not to be painted or otherwise covered. Thus, there were very limited means by which Tricore could disguise RPI's poor workmanship.

17. RPI's substandard performance—including its failure to adhere to required specifications under the Subcontract—resulted in numerous other problems downstream from the concrete work, which in turn delayed the Project and delayed its completion.

18. RPI's gross mismanagement of its portion of the Project was the primary cause of the delay, confusion and additional costs to the Project.

19. For example, RPI's involvement in the Project was plagued by high turnover among its employees and subcontractors. A total of three flatwork cement finishing

subcontractors and two reinforcing subcontractors were utilized in succession by RPI during the approximately 14 months they were involved in the Project.

20. During this same time period, several of RPI's subcontractors and vendors complained that RPI was not providing them with adequate direction regarding the Project and routinely failed to pay them for work the subcontractors performed on a timely basis.

21. Tricore also learned through the shop steward on the Project that RPI had failed to pay benefits packages to the proper union jurisdiction.

22. It became readily apparent that the high turnover rate among RPI's personnel and subcontractors was impacting its ability to properly perform under the Subcontract. Similarly, the high turnover rate resulted in inadequate communications, confusion, and chronic delays in all phases of the concrete work and severely impacted the quality of work performed.

23. RPI failed to order sufficient materials to accomplish its responsibilities with regard to the Project and proceeded as if the Project schedule did not exist.

24. In accordance with the provisions of the Subcontract, RPI was required to warrant and guarantee that title to all work would pass to Tricore free and clear of all liens and claims. Under this provision, RPI was required to submit partial lien waivers and/or affidavits showing that payments had been made in full for labor and materials and on account of all work covered in any application for payment. Several times

4

during the course of the Project, the interim certificates submitted by RPI disclosed that it had paid all of its subcontractors in full for the value of the work performed.

25. In direct reliance upon the interim certificates, Tricore reimbursed RPI specific sums of money that RPI allegedly had paid to its subcontractors. Based upon claims made by RPI's subcontractors and vendors, RPI falsified many of these interim certificates. In fact, RPI had not paid its subcontractors as certified.

26. RPI repeatedly failed to provide Tricore adequate and timely wage reporting documentation, including release of lien forms, which was in clear breach of the terms of the Subcontract

27. As a result, Tricore was unable to accurately verify RPI's performance and progress and was prevented from submitting progress and other reports to the Project owner and architect.

28. RPI was also obligated under the Subcontract to complete the work on the Project in a good and workmanlike manner and to the full satisfaction of the Project architect.

29. This required RPI to supply an adequate number of skilled workmen to complete the concrete component of the Project. RPI failed to do this. RPI continually failed to man the Project with employees or subcontractors who had the necessary skills to properly perform the required work. As a result, a substantial portion of the work performed by RPI was defective and not performed in a timely manner.

30. RPI was also prohibited under the Subcontract from subletting or assigning any of the work at the Project without first obtaining Tricore's written consent. RPI unilaterally and in direct contravention of the plain language of the Subcontract, retained certain subcontractors to aid in the performance of RPI's work under the Subcontract.

31. This conduct adversely affected the progress of the entire Project on one occasion and caused delays. In once instance, the local Cement Finishers Union established a picket line in and around the Project because of RPI's selection of certain subcontractors.

32. A copy of the letter from Tricore to RPI regarding the Cement Finishers Union is attached hereto and made a part hereof as Exhibit 4.

33. As a result of RPI's continual deficient conduct and complete disregard of the terms and conditions of the Subcontract, Tricore notified RPI that RPI was in default due to various violations of the Subcontract.

34. Ultimately, RPI's deficient performance and multiple breaches of the Subcontract were simply too numerous and extensive to permit RPI to remain involved in the Project.

35. On July 1, 2003, with the full consent and agreement of both the Project Owner and Architect, Tricore terminated the Subcontract effective July 3, 2003.

36. The letter dated July 1, 2003 from Attorney Edward D. Kutchin to Bruce R. Iannuccillo, is attached hereto and made a part hereof as Exhibit 5. The letter also served as formal notice of Tricore's claim against RPI's *performance* bond.

37. On July 3, 2003, Tricore sent a follow up notice of default and termination for cause, as required by the Subcontract, and again notified RPI and its bonding company that RPI was to immediately vacate the Project and that the bonding company was to arrange for completion of RPI's work pursuant to its obligations under RPI's performance bond ("RPI Performance Bond").

38. A copy of the notice of default and termination is attached hereto and made a part hereof as Exhibit 6.

39. RPI disputed the termination on July 8, 2003 (several days after being terminated) and made demand on Tricore under Tricore's Payment Bond for a total payment of $124,368.44, which included the sum of $47,025.09. This amount RPI claimed was the entire remaining balance due on its Subcontract, plus the purported outstanding unearned retainage of $77,343.35.

40. Tricore responded on July 30, 2003 to the Surety's investigation and request for information regarding RPI's claim with a detailed, three-page letter with supporting documentation articulating the basis for its termination of RPI.

41. The July 30, 2003 letter from Tricore is attached hereto and made a part hereof as Exhibit 7.

7

42. The letter set forth sixteen (16) items of deficiency that led to RPI's termination.

43. Tricore also proposed escrowing, and did escrow, the outstanding balance due under the Subcontract of $47,025.09 to pay RPI in the event that Tricore's cost to complete did not exceed the outstanding balance.

44. Tricore's damages exceeded the remaining balance of the Subcontract by approximately $400,000.00, which was far in excess of any balance remaining on the Subcontract.

45. Tricore attempted over an extended period of time to negotiate with RPI's performance bond surety as to who would complete RPI's work on the Project. However, negotiations ultimately broke down and therefore Tricore was forced to engage RPI's subcontractors, third party subcontractors and its own employees to complete the work.

46. Tricore's damages included $ 451,023.38 in completion costs and $ 107,070.80 in remediation costs.

47. Copies of documents regarding the damages are attached as Exhibit 8.

48. Following Tricore's termination of the Subcontract on July 3, 2003, RPI made demand on Tricore and the Surety pursuant to the Tricore Payment Bond. The total amount of RPI's claim was $124,368.44.

49. Tricore had declared RPI in default on at least four (4) separate occasions prior to its termination of the Subcontract and therefore was forced to terminate the Subcontract for cause, and declare a default under RPI's performance bond.

50. On or about November 12, 2004, Tricore commenced suit against RPI. Subscribed and sworn to under the pains and penalties of perjury this  $3$  day of November, 2005.

_____
Paul Jacobson

9

EXHIBIT 1

JUL. 16. 2003 12:45PM    Gately. Morgan. Gilfoyle. Insurance    NO. 230    P. 4



**SAFECO**

*AIA Document A312*

# Payment Bond

Conforms with the American Institute of Architects, AIA Document A312.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

| CONTRACTOR (Name and Address): | SURETY (Name and Principal Place of Business): |
|---|---|
| Tricore, Inc. | SAFECO INSURANCE COMPANY OF AMERICA |
| 100 Sharp Street | 3 Speen Street, Suite 350 |
| Hingham, MA 02043 | Framingham, MA 01701 |

OWNER (Name and Address):
Sherrill House, Inc.
135 South Huntington Avenue
Boston, MA 02130

CONSTRUCTION CONTRACT

Date: January 2 2002
Amount: Sixteen Million Nine Hundred Fifty Eight Thousand Two Hundred Twenty Six Dollars Zero Cents ($16,958,226.00)

Description (Name and Location): Renovation and expansion of Sherrill House, located at 135-147 South Huntington Ave., Boston, MA

BOND

Date( Not earlier than Construction Contract Date): June 28, 2002
Amount: Seven Million Eight Hundred Sixty Nine Thousand Three Hundred Sixty Three Dollars Zero Cents ($7,869,363.00)

Modifications to this Bond:      ☐ None                    ☒ See Page 2

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company: Tricore, Inc.            (Corporate Seal) | Company: SAFECO INSURANCE COMPANY OF AMERICA            (Corporate Seal) |

Signature: _____

Name and Title: Paul Jacobson, President
(Any additional signatures appear on page 2.)
(FOR INFORMATION ONLY - Name, Address and Telephone) AGENT or BROKER: Joseph Lane
Gately, Morgan & Gilfoyle Insurance Agency
781.986.4400

Signature: _____

Name and Title: Joseph J. Lane,
Attorney-in-fact
OWNER'S REPRESENTATIVE (Architect, Engineer or other party): Chia-Ming Sze Architect, Inc.
326 A St.
Boston, MA 02210

**1** The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.

**2** With respect to the Owner, this obligation shall be null and void if the Contractor:

**2.1** Promptly makes payment, directly or indirectly, for all sums due Claimants, and

**2.2** Defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity whose claim, demand, lien or suit is for the payment for labor, materials and equipment furnished for use in the performance of the Construction Contract, provided the Owner has promptly notified the Contractor and the Surety (at the address described in Paragraph 12) of any claims, demands, liens or suits and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety, and provided there is no Owner Default.

**3** With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.

**4** The Surety shall have no obligation to Claimants under this Bond until:

**4.1** Claimants who are employed by or have a direct contract with the Contractor have given notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

**4.2** Claimants who do not have a direct contract with the Contractor:

**.1** Have furnished written notice to the Contractor and sent a copy, or notice thereof, to the Owner, within 90 days after having last performed labor or last furnished materials or equipment included in the claim stating, with substantial accuracy, the amount of the claim and the name of the party to whom the materials were furnished or supplied or for whom the labor was done or performed; and

SURETY 5026 (6-92)
S-1653/SAEF 3/00

® Registered trademark of SAFECO Corporation

.,JUL. 16. 2003 12:45PM ejection Gately. Morgan. Gilfoyle. Insurance part of the work is lo NO. 230 after u P. 5 iration of one year

Contractor, or not received within 30 days of furnishing the above notice any communication from the Contractor by which the Contractor has indicated the claim will be paid directly or indirectly; and

.3  Not having been paid within the above 30 days, have sent a written notice to the Surety (at the address described in Paragraph 12) and sent a copy, or notice thereof, to the Owner stating that a claim is being made under this Bond and enclosing a copy of the previous written notice furnished to the Contractor.

5   If a notice required by paragraph 4 is given by Owner to the Contractor or to the Surety, that is sufficient compliance.

6   When the Claimant has satisfied the conditions of Paragraph 4, the Surety shall promptly and at the Surety's expense take the following actions:

6.1  Send an answer to the Claimant, with a copy to the Owner, within 45 days after receipt of the claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed.

6.2  Pay or arrange for payment of any undisputed amounts.

7   The Surety's total obligation shall not exceed the amount of this Bond, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

8   Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any Construction Performance Bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and the Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work.

9   The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for payment of any costs or expenses of any Claimant under this Bond, and shall have under this bond no obligations to make payments to, give notices on behalf of, or otherwise have obligations to Claimants under this Bond.

10  The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

11  No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which

the work is located or after the expiration of one year from the date (l) on which the Claimant gave the notice required by Subparagraph 4.1 or Clause 4.2.3, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (l) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

12  Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page. Actual receipt of notice by Surety, the Owner or the Contractor, however accomplished, shall be sufficient compliance as of the date received at the address shown on the signature page.

13  When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

14  Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor shall promptly furnish a copy of this Bond or shall permit a copy to be made.

15  DEFINITIONS

15.1  Claimant: An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Contract. The intent of this Bond shall be to include without limitation in terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

15.2  Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

15.3  Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

MODIFICATIONS TO THIS BOND ARE AS FOLLOWS: Notwithstanding any other clause in this bond, Surety's obligations hereunder shall be limited to the specific items listed in Exhibit 8.3.1, entitled *Bonding for Work by Construction Manager*, to the contract between Owner and Construction Manager dated January 2, 2002. Under no circumstance shall Surety's liability exceed the penal sum as stated herein.

(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)

| CONTRACTOR AS PRINCIPAL | | SURETY | |
| Company: | (Corporate Seal) | Company: | (Corporate Seal) |
| Signature: | | Signature: | |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

JUL. 16. 2003 12:46PM    Gately. Morgan. Gilfoyle. Insurance    NO. 230    P. 6

## Dual Obligee Rider

**(To be attached to bond at time of issuance)**

TO BE ATTACHED TO AND FORM PART OF

Performance and Payment Bond                                    6007619
                                                 Bond No. _____ .

dated concurrently with the execution of this Rider, issued by  SAFECO Insurance Company Of America,
3 Speen St., Framingham, MA 01701                                       , as Surety, on

behalf of Tricore, Inc., 100 Sharp St., Hingham, MA 02043              as Principal. and

in favor of Sherrill House, Inc., 135 So. Huntington Ave., Boston, MA 02135   and Sovereign Bank,

75 State St., Boston, MA 02109                                          as Obligees.

IT IS HEREBY UNDERSTOOD AND AGREED that the above described bond(s) are hereby amended to include the following paragraph:

Notwithstanding anything contained herein to the contrary, there shall be no liability on the part of the Principal or Surety under this bond to the Obligees, or either of them, unless the Obligees, or either of them, shall make payments to the Principal, or the Surety In case it arranges for completion of the Contract upon default of the Principal, strictly in accordance with the terms of said Contract as to payments, and shall perform all other obligations required to be performed under said Contract at the time and in the manner therein set forth; and

In no event shall the Surety be liable in the aggregate to both Obligees for more than the penalty of the Performance Bond. nor shall it be liable except for a single payment for each single breach or default. At the Surety's election; any payment due to either Obligee may be made by its check issued jointly both.

IT IS FURTHER UNDERSTOOD AND AGREED that nothing herein contained shall be held to change, alter or vary the terms of the above described bond(s) except as hereinafter set forth.

SIGNED; SEALED AND DATED this  28th  day of  June                    A.D. XX  2002  .


                            Tricore, Inc.
                            _____
                                           (Principal)

                       By: _____
                            Paul Jacobson, President
                            SAFECO Insurance Company Of America

                       By: _____
                            Joseph J. Lane     (Attorney-in-Fact)

EXHIBIT 2

## SUBCONTRACT WITH TRICORE, INC.

THIS SUBCONTRACT (hereinafter referred to as "SUBCONTRACT") made this Twenty-Fifth day of April, 2002 by and between RP Iannuccillo & Sons Construction Company, a Corporation having a usual place of business in Providence, RI, hereinafter called the SUBCONTRACTOR (which expression shall include all heirs, executors, administrators, successors, and assigns where the context so requires or admits, it being also understood that the pronoun he, him or his shall apply to the SUBCONTRACTOR whether an individual, joint venture, business trust, partnership or corporation), and TRICORE, INC., a Massachusetts corporation with a usual place of business in Hingham, Massachusetts, hereinafter called the CONTRACTOR (which expression shall include its successors and assigns where the context so requires or admits).

NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which the parties hereby acknowledge, each to the other, the SUBCONTRACTOR and the CONTRACTOR AGREE as follows:

### ARTICLE I: STATEMENT OF WORK

The SUBCONTRACTOR agrees that it shall do, perform, obtain, furnish and provide at its own expense, all work, labor, materials, tools, equipment, scaffolding, all necessary permits, fees and any other item necessary to complete the work as hereinafter described in Attachment A which is incorporated herein by reference (the "Work"), in a good and workmanlike manner and to the full satisfaction of the ARCHITECT (as defined below), CONTRACTOR and the OWNER (as defined below), and in proper cooperation with the CONTRACTOR and other subcontractors so as not to delay or otherwise interfere with or obstruct their work, all in connection with the following project:

| | | |
|---|---|---|
| PROJECT: | Sherrill House-Frank Wood Expansion | (the "Project") |
| OWNER: | Sherrill House, Inc. | (the "Owner") |
| ARCHITECT: | Chia-Ming Sze Architect Inc. | (the "Architect") |

The SUBCONTRACTOR shall perform the Work in strict accordance with the provisions of the Agreement between the CONTRACTOR and the OWNER insofar as applicable and with the Conditions (General, Special, Supplementary)(the "Conditions"), of the agreement between the CONTRACTOR and the OWNER for said Work and the plans, specifications and addenda if any, prepared by the Architect, all of which conditions, plans, specifications and addenda (the "Plans") form a part of the agreement between the CONTRACTOR and the OWNER (the "Owner Agreement") for said Work, and shall be considered a part of this Subcontract. The CONTRACTOR and SUBCONTRACTOR agree to be bound by the terms of said Owner Agreement so far as applicable to this Subcontract, except insofar as otherwise provided in this Subcontract. The SUBCONTRACTOR agrees to be bound to the CONTRACTOR by the terms of said Owner Agreement, including but not limited to paragraph 5.3.1 of A.I.A. Form 201, the General Conditions between OWNER and CONTRACTOR, and to assume and fulfill toward CONTRACTOR all the obligations and responsibilities that CONTRACTOR by those documents assumes toward the OWNER. The CONTRACTOR agrees to be bound to the SUBCONTRACTOR by all the obligations that the OWNER assumes to the CONTRACTOR under said Owner Agreement.

## ARTICLE II:  TIME OF COMPLETION

Time for performance is of the essence of this Subcontract and all Work shall be done at such times and in such a manner as to maintain CONTRACTOR'S Job Progress Schedule which currently calls for this Work to commence and/or materials to be delivered by April 29, 2002 and for all Work to be completed by October 15, 2002. The SUBCONTRACTOR agrees and understands that the Job Progress Schedule is subject to change in accordance with Article V herein, in the sole discretion of the CONTRACTOR, and the SUBCONTRACTOR agrees to be bound by such changes, waiving any claim to damages arising therefrom.

The SUBCONTRACTOR will furnish periodic progress reports of the SUBCONTRACTOR'S Work as mutually agreed including the progress of materials or equipment to be provided under this Agreement which may be in the course of preparation or manufacture.

The SUBCONTRACTOR shall cooperate with the CONTRACTOR and subcontractors whose work may interfere with the SUBCONTRACTOR'S Work and participate in the preparation of coordinated drawings and work schedules in areas of congestion, specifically noting and advising the CONTRACTOR of any interference by other contractors or subcontractors.

The SUBCONTRACTOR specifically agrees that in order to expedite the Work the CONTRACTOR may do any or all of the following:

(a)  Pay for materials already prepared and ready for delivery to the SUBCONTRACTOR and the same  shall be covered by bill of sale or other appropriate paper, and insure the same for the benefit of all parties concerned, charging all costs in connection with such payment and insurance against the amount to be paid under this Subcontract;

(b)  Order the SUBCONTRACTOR, in case progress greater than nominal is desired for any reason, to work overtime in which event the amount to be paid to the SUBCONTRACTOR under this Subcontract shall be governed by Article V below.  Overtime shall be authorized only by an officer of the CONTRACTOR and shall be promptly confirmed in writing to the SUBCONTRACTOR.  Time slips must be approved by the CONTRACTOR'S Authorized Agent at the Job Site; and

(c)  Order the SUBCONTRACTOR, when progress in the completion of the Work is not being maintained in keeping with the then existing Job Progress Schedule, or if, in the opinion of the ARCHITECT (whose opinion shall be final and binding upon CONTRACTOR and SUBCONTRACTOR), SUBCONTRACTOR delays, or is likely to delay, the progress of the Work necessary to complete the Project in accordance with the then existing Job Progress Schedule, to work such overtime as may be necessary to catch up or keep abreast of the general progress of the Work as provided for in the then existing Job Progress Schedule. If the SUBCONTRACTOR fails to comply with any such order given to him by the CONTRACTOR, the CONTRACTOR may furnish the labor and materials and work the necessary overtime on behalf of the SUBCONTRACTOR without terminating this Subcontract. The entire cost and expense incurred by the CONTRACTOR for the furnishing of the labor and materials shall be borne by the SUBCONTRACTOR. The SUBCONTRACTOR shall also bear any added costs incurred by the CONTRACTOR as a result of delays in the progress of the Work caused by the SUBCONTRACTOR.

## ARTICLE III:  CONTRACT PRICE AND PAYMENTS

The CONTRACTOR agrees to pay the SUBCONTRACTOR as full payment for the satisfactory performance of the Work the sum of Eight Hundred Sixty Three Thousand Four Hundred Ninety Seven Dollars ($863,497.00) in current funds.

The SUBCONTRACTOR shall deliver to the CONTRACTOR on or before the twenty-fifth day of each month payroll affidavits and any and all other documents required under the contract between the CONTRACTOR and the OWNER, and a requisition, in a form satisfactory to the CONTRACTOR, covering that portion of the Work completed during that month, and the CONTRACTOR, subject to the approval of the ARCHITECT, will pay Ninety percent (90%) of the same on or about the thirtieth day of the following month.  Failure to submit such a requisition will entitle the CONTRACTOR to postpone payment of any amount due until the next month.  The remaining balance due will be reduced to five percent (5%) upon completion and acceptance of the Project by the CONTRACTOR and the OWNER or his representative, but in no event earlier than 45 days after completion of the Work covered by this SUBCONTRACT, and upon presentation of complete waivers of lien, in the form of Exhibit A which is attached hereto and incorporated herein, and sworn statements of payment.  The remaining five percent (5%) will be released 90 days after completion of the Work covered by this SUBCONTRACT. It is further mutually agreed by the parties hereto that no certificate given or payments made under this Subcontract shall be conclusive evidence of the

2

P-00159

performance of this Subcontract either wholly or in part and that no payment shall be construed to be an acceptance of defective work or improper materials.

As a basis upon which partial payments to the SUBCONTRACTOR may be authorized, the SUBCONTRACTOR shall, prior to the first requisition for payment, forward to the CONTRACTOR a complete itemized breakdown of his Subcontract Price, so arranged as to meet the approval of the CONTRACTOR. Values and unit prices in this trade breakdown are solely for the purpose of making partial payments to the SUBCONTRACTOR and shall not be taken as a basis for any additions or deductions to the Subcontract Price.

The SUBCONTRACTOR warrants and guarantees that title to all Work, materials, and equipment covered by a requisition, whether incorporated in the Project or not, will pass to the CONTRACTOR free and clear of all liens, claims, security interests or encumbrances; and that no Work, materials or equipment covered by a requisition will have been acquired by the SUBCONTRACTOR, or by any other person performing the work at the site or furnishing materials and equipment for the project, subject to an agreement under which an interest therein or an encumbrance thereon is retained by the seller or otherwise imposed by the SUBCONTRACTOR or such other person.

The SUBCONTRACTOR shall, before the second or any succeeding requisition, on demand of the CONTRACTOR, submit receipts, partial lien waivers and/or affidavits showing that payments have been made for labor and materials and on account of all Work covered in any prior Application for Payment, and if requested by the OWNER, cost certification.

Any sum or sums chargeable to the SUBCONTRACTOR under any provision of the Subcontract may, at the election of the CONTRACTOR, be deducted from any payment or payments otherwise due or becoming due to the SUBCONTRACTOR under this or any other subcontract with this SUBCONTRACTOR.

The SUBCONTRACTOR accepts, as between the parties to this Subcontract, exclusive liability for payment and/or withholding of any tax or contributions, federal, state, municipal or otherwise, with respect to compensation wages, or other remuneration for any Work to be performed by the SUBCONTRACTOR or his employees under the terms of this Subcontract, and the SUBCONTRACTOR further agrees to hold the CONTRACTOR harmless and indemnify the CONTRACTOR against all such taxes and contributions and to comply with all governmental or other regulations with respect thereto, including the filing of all necessary reports and returns.

The SUBCONTRACTOR is responsible for and shall pay direct to the State of Massachusetts all sales and/or use taxes for materials furnished to this Project by the SUBCONTRACTOR.

It is specifically understood and agreed by the SUBCONTRACTOR that any payment to the SUBCONTRACTOR as described in this Article, is dependent, as a condition precedent, upon the CONTRACTOR first receiving contract payments, including the retainer, from the OWNER.

## ARTICLE IV: INSURANCE AND SAFETY

The SUBCONTRACTOR shall effect and maintain the following insurance coverages:

| | Coverage | Amount |
|---|---|---|
| (a) | General Public Liability Bodily Injury | 1,000,000 Each Occurrence |
| (b) | General Public Liability Property Damage | 1,000,000 Each Occurrence |
| (c) | Explosion, Collapse and Underground Hazards | 1,000,000 Each Occurrence |
| (d) | Completed Operations Coverage | Maintained one(1) year after Final Payment |
| (e) | Contractual Liability | 1,000,000 Each Occurrence |
| (f) | Broad Form Property Damage | 1,000,000 Each Occurrence |
| (g) | Personal Injury | 1,000,000 Each Occurrence |
| (h) | Automobile Public Liability Bodily Injury | 1,000,000 Each Person |
| (i) | Automobile Public Liability Property Damage | 1,000,000 Each Person |
| (j) | Workmen's Compensation Insurance Coverage | 500,000 Each Occurrence |
| (k) | Umbrella Liability | 5,000,000 Aggregate |

The SUBCONTRACTOR shall comply with all applicable Worker's Compensation Laws regulating the compensation of injured workers. Certificates of all such insurance shall be filed with the CONTRACTOR and must certify that such policies cannot be canceled, amended, extended, or otherwise altered with less than Thirty (30) days notice by registered mail to the CONTRACTOR.

The SUBCONTRACTOR shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work, and agrees further to conform to all CONTRACTOR'S safety

3

regulations and to follow the CONTRACTOR'S safety program. The SUBCONTRACTOR shall conform and comply with all current Local, State and Federal Safety Regulations, including but not limited to the "Federal Occupational Safety and Health Act of 1970" (84 Stat. 1950 et seq.; 29 U.S.C. 651 et. seq.) and /or section 107 of the Contract Work Hours and Safety Standards Act, as amended (83 Stat. 96, 97; 40 U.S.C. 333) and regulations adopted thereunder, as they may pertain to the Work of this Subcontract. The SUBCONTRACTOR shall be responsible for any costs, fines or penalties assessed against the CONTRACTOR for the SUBCONTRACTOR'S failure to comply with such laws and regulations and shall indemnify and hold the CONTRACTOR harmless in accordance with the terms and provisions outlined in Article XIV below from the SUBCONTRACTOR'S failure to comply with said laws and regulations.

Safety helmets are to be worn by all personnel on the site at all times.

SUBCONTRACTOR shall indemnify CONTRACTOR and hold CONTRACTOR harmless in accordance with the terms and provisions of Article XIV below from any and all claims brought against CONTRACTOR by any employee or other persons hired by SUBCONTRACTOR for Work related injury or loss.

If hazardous substances of a type of which an employer is required by law to notify its employees are being used on the site by the SUBCONTRACTOR, the SUBCONTRACTOR'S subsubcontractors or anyone directly or indirectly employed by them, the SUBCONTRACTOR shall, prior to harmful exposure of any employees on the site to such substance, give written notice of the chemical composition thereof to the CONTRACTOR in sufficient detail and time to permit compliance with such laws by the Contractor, other subcontractors and other employers on the site.

In the event the SUBCONTRACTOR encounters on the site material reasonably believed to be asbestos or polychlorinated biphenyl (PCB) which has not been rendered harmless, the SUBCONTRACTOR shall immediately stop work in the area affected and report the condition to the CONTRACTOR in writing. The Work in the affected area shall resume in the absence of asbestos or polychlorinated biphenyl (PCB), or when it has been rendered harmless, by written agreement of the Contractor and SUBCONTRACTOR, or in accordance with final determination by the ARCHITECT on which arbitration has not been demanded, or by arbitration as provided in this Agreement. The SUBCONTRACTOR shall not be required to perform without consent any Work relating to asbestos or polychlorinated biphenyl (PCB).

### ARTICLE V: CHANGES

The CONTRACTOR may, prior to the completion of the Work specified in Article I, order in writing, changes in the said Work or additional Work of a similar kind. When so ordered, the CONTRACTOR and the SUBCONTRACTOR shall, (1) agree upon the value of the Work added or omitted and the amount thereof shall be added to or deducted from the subcontract price, as the case may be, (2) the CONTRACTOR may order the SUBCONTRACTOR to perform additional Work on the basis of cost plus labor and materials. The SUBCONTRACTOR shall perform such Work upon receipt of written notice in accordance with provisions of this subcontract.

The CONTRACTOR will pay the SUBCONTRACTOR as follows:

(1) Actual cost of labor;

(2) Actual cost of materials, equipment rentals and transportation;

(3) Premiums for insurance;

(4) State and federal insurance and taxes (Excluding income taxes);

(5) An allowance of (10)% for overhead on the above;

(6) An allowance of (5)% for profit of the above;

(7) Cost of subcontracts; and

(8) An allowance of (10)% for overhead and profit on subcontracts.

All work so ordered will have labor and material slips approved DAILY by the CONTRACTOR'S Authorized Agent at the Job Site, failing which CONTRACTOR shall have no obligations to pay or reimburse SUBCONTRACTOR.

The SUBCONTRACTOR shall make no claim for additional compensation for any extra work or materials or changes of any kind done by him or by reason of any act of the CONTRACTOR or any of his representatives during the performance of this subcontract unless done in pursuance of a written change order from the Contractor, and notice of all such claims shall be given to the CONTRACTOR in writing before the next ensuing payment under this subcontract after commencement of such additional work or the claims shall be considered as abandoned by the

4                                                                              **P-00161**

SUBCONTRACTOR. The SUBCONTRACTOR understands that no officer, employee or other representative of the CONTRACTOR has authority to waive compliance with this provision, except as authorized by a vote of the directors of the CONTRACTOR. If extra work was ordered by the CONTRACTOR and the SUBCONTRACTOR performed same but did not receive a written change order therefor, the SUBCONTRACTOR shall be deemed to have waived any claim for extra compensation therefor, regardless of any written or verbal protests or claims by the SUBCONTRACTOR. The SUBCONTRACTOR shall be responsible for any costs incurred by the CONTRACTOR for changes of any kind made by the SUBCONTRACTOR that increase the costs of the work for either the CONTRACTOR or other subcontractors when the SUBCONTRACTOR proceeds with such changes without a written change order therefor.

The ARCHITECT will have the authority to order minor changes in the Work not involving an adjustment in the Subcontract price or an extension of the contract time and not inconsistent with the intent of the Conditions. Such changes shall be effected by written order, and shall be binding on the CONTRACTOR and the SUBCONTRACTOR. The SUBCONTRACTOR shall carry out such written orders promptly.

### ARTICLE VI: INFORMATION AND DETAILS

All requests for information or details concerning the SUBCONTRACTOR'S Work must be made through the CONTRACTOR'S office in writing as far in advance of requirements as possible. The CONTRACTOR shall not consider as binding any information or approvals received by the SUBCONTRACTOR verbally or direct from the ARCHITECT or the OWNER.

### ARTICLE VII: SHOP DRAWINGS AND SAMPLES

It is understood and agreed that the SUBCONTRACTOR shall submit necessary drawings in accordance with Paragraph 11 of Attachment A for the ARCHITECT'S and the CONTRACTOR'S approval and supply sufficient approved prints to meet job requirements and furnish samples for the ARCHITECT'S and the CONTRACTOR'S approval. By submitting shop drawings and samples, the SUBCONTRACTOR thereby represents that he has determined all measurements, field construction criteria, materials, catalog numbers and similar data, and that he has checked and coordinated each shop drawing and sample with the requirements of the Work and of the Contract Documents.

Any matters contained in the specifications which have been omitted from the plans or vice versa shall be construed as contained in both. In the event of any discrepancy between the plans and the specifications, or between other contract clauses, the matter shall promptly be brought to the attention of the CONTRACTOR, without whose instructions the SUBCONTRACTOR shall not adjust the matter except at his own risk. Any instructions of the CONTRACTOR hereunder shall be given in writing. If drawings or specifications conflict, the decision of the said ARCHITECT or CONTRACTOR must be obtained before proceeding with the work, otherwise the SUBCONTRACTOR will be held liable to make any change necessary to correct any such conflict without expense to the CONTRACTOR. The approval by the ARCHITECT and/or CONTRACTOR of drawings submitted by the SUBCONTRACTOR shall not relieve the SUBCONTRACTOR from responsibility for changes or deviations not specifically called to the ARCHITECT'S and/or CONTRACTOR'S attention in writing nor for errors therein.

### ARTICLE VIII: LABOR AND EQUAL EMPLOYMENT OPPORTUNITY

The SUBCONTRACTOR will discontinue employment of any of its employees on the Project who may be unsatisfactory to the CONTRACTOR.

The SUBCONTRACTOR shall comply with all provisions of Presidential Executive Order No. 11246 of September 24, 1965 as amended and furnish all information and reports as required by this Presidential Executive Order. The SUBCONTRACTOR is required to comply with the CONTRACTOR'S Affirmative Action Program, applicable to this Project.

During the performance of this Subcontract, the SUBCONTRACTOR agrees as follows:

(a) The SUBCONTRACTOR will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin. The SUBCONTRACTOR will take affirmative action to ensure that applicants are employed, and that employees are fairly treated during employment, without regard to their race, creed, color or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The SUBCONTRACTOR agrees to post in

P-00162

conspicuous places, available to employees and applicants for employment, notices to be approved by the CONTRACTOR setting forth the provisions of this nondiscrimination clause;

(b) The SUBCONTRACTOR will, in all solicitations or advertisements for employees placed by or on behalf of the SUBCONTRACTOR, state that all qualified applicants will receive consideration for employment without regard to race, creed, color or national origin; and

(c) The SUBCONTRACTOR will include the provisions of paragraphs (a) and (b) of this Section in every subsubcontract or purchase order issued by him and will require the inclusion of these provisions in every subsubcontract entered into by any of its subsubcontractors, so that such provisions will be binding upon each subsubcontractor or vendor, as the case may be.

## ARTICLE IX: GUARANTEES

It is agreed that no payment under this subcontract shall be proof of performance of this subcontract, either in whole or in part, nor shall any payment be construed as an acceptance of defective work. The SUBCONTRACTOR guarantees all Work under this Subcontract to be in conformance with the Agreement between OWNER and CONTRACTOR, and CONTRACTOR and SUBCONTRACTOR, and against defective workmanship, materials and equipment for a period of one (1) year from the date of completion of the entire Work unless specifically noted differently in the specifications in which case the specifications shall govern and agrees to provide all labor and materials including compensation for the Architect necessary to correct, without cost to the OWNER or to the CONTRACTOR, any and all defects due to imperfect workmanship or materials which appear or are discovered either before or after acceptance of the Work and any of the Work that is found not to be in conformance with the requirements of the Subcontract. All materials and equipment furnished under this Subcontract shall be new unless otherwise specified. Upon written notice from the CONTRACTOR to the SUBCONTRACTOR of any such defect or damage, the SUBCONTRACTOR will forthwith proceed to cure, repair, restore or otherwise correct the work, eliminating such defects and the damage resulting therefrom. In the event of SUBCONTRACTOR'S failure to do so promptly, the CONTRACTOR will make such repairs, including the work of others, at the SUBCONTRACTOR'S expense. The foregoing guaranty shall not supersede the terms of any other guaranty of the SUBCONTRACTOR but is in addition thereto. This obligation shall survive acceptance of the Work under the Subcontract and termination of the Subcontract. Nothing contained in this Article IX shall be construed to establish a period of limitation with respect to other obligations which the Subcontractor might have under the Subcontract. Establishment of the time period of one year as described herein relates only to the specific obligation of the Subcontractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Subontract documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the SUBCONTRACTOR'S liability with respect to the SUBCONTRACTOR'S obligations other than specifically to correct the Work.

## ARTICLE X: CLEANING UP

The SUBCONTRACTOR shall at all times keep the premises free from waste materials or rubbish caused by his employees, agents or subsubcontractors or other Work and upon completion of the Work the SUBCONTRACTOR, his employees, agents or subsubcontractors, shall leave the premises in a clean and workman like condition. If this provision is not complied with promptly, the CONTRACTOR upon either verbal or written notification to the SUBCONTRACTOR, may perform the necessary cleaning at the SUBCONTRACTOR'S expense in accordance with Paragraph 10 of Attachment A.

## ARTICLE XI: INSPECTION AND APPROVAL

All workmanship and materials shall be subject at all times to the inspection and approval of the CONTRACTOR and ARCHITECT to whom the same shall be made entirely satisfactory and, where applicable, by the duly authorized representatives of all Governmental Bodies and Agencies having jurisdiction thereof. Work done or materials furnished by the SUBCONTRACTOR and not approved by the ARCHITECT, OWNER and CONTRACTOR shall not be accepted. The SUBCONTRACTOR shall proceed to remove from the site or building all materials condemned by the CONTRACTOR, whether worked or unworked within twenty-four (24) hours after receiving written notice from the CONTRACTOR to do so, and to take down all portions of the Work which the

P-00163

ARCHITECT or GOVERNMENTAL ENTITY shall, by like written notice condemn as unsound or improper or as in any way failing to conform to the Plans and Specifications, replacing same with materials and workmanship satisfactory to the ARCHITECT, CONTRACTOR or OWNER, without additional expense to the CONTRACTOR, ARCHITECT or OWNER.

## ARTICLE XII: TERMINATION AND CONTRACTOR'S RIGHT TO DO WORK

Should the SUBCONTRACTOR file for bankruptcy or be adjudged a bankrupt, or make a general assignment for the benefit of creditors, or if a receiver should be appointed on account of its insolvency, or in the exclusive judgment of the CONTRACTOR should the SUBCONTRACTOR at any time refuse or neglect to supply a sufficient number of properly skilled workmen or sufficient materials of the proper quality, or fail in any respect to prosecute the Work with promptness and diligence in keeping with the then existing Job Progress Schedule, or allow a lien to be filed against the building, or cause by any action the stoppage or interference of the work of other trades on the job, or fail in the opinion of the CONTRACTOR in the performance of any of the agreements herein contained, or fail to comply with any order given to it by the CONTRACTOR or ARCHITECT in accordance with the provisions of this Subcontract, the CONTRACTOR shall be entitled to provide, on behalf of the account of the SUBCONTRACTOR and without terminating this Subcontract, any such labor or materials after giving twenty-four (24) hours notice to that effect to the SUBCONTRACTOR and to deduct the cost thereof from any money then due or thereafter to become due to the SUBCONTRACTOR, or the CONTRACTOR in its opinion at any time may terminate this Subcontract after twenty-four (24) hours notice to that effect, and enter into and take possession of the said premises and Work, materials, tools, appliances and equipment and through itself or others provide labor, equipment and materials to prosecute the Work on such terms and conditions as in the sole opinion of the CONTRACTOR shall be deemed necessary, and may discharge all liens without a legal determination of the validity thereof, deducting the cost thereof from any money then due or thereafter to become due the SUBCONTRACTOR under this Subcontract. If the CONTRACTOR so terminates this Subcontract, the SUBCONTRACTOR shall not be entitled to any further payments under this Subcontract until the Work covered by this Subcontract has been completed and accepted by the ARCHITECT or OWNER.

In the event that the unpaid balance due the SUBCONTRACTOR exceeds the expense incurred by the CONTRACTOR, the difference shall be paid to the SUBCONTRACTOR, but if such expense exceeds the balance due, then the SUBCONTRACTOR agrees to pay the difference promptly to the CONTRACTOR.

The SUBCONTRACTOR shall bear also any added costs incurred by the CONTRACTOR as a result of delays in the progress of the Work caused by the SUBCONTRACTOR.

Notice shall be deemed given when mailed if by letter, and when called if by telephone or telegraph.

## ARTICLE XIII: PATENTS

The SUBCONTRACTOR agrees to indemnify and save harmless the CONTRACTOR and the OWNER from all demands or claims of any nature by reason of the use of any patented invention, articles or appliance by the SUBCONTRACTOR that has been or may be adopted or used in the construction called for in this Subcontract.

## ARTICLE XIV: LIENS AND INDEMNIFICATION

The SUBCONTRACTOR shall protect his Work and the building against any claims, attachments, restraining orders or any liens including laborers', mechanics' and materialmen's liens arising out of the Work performed under this Subcontract which if established might render the CONTRACTOR liable or obligated to the OWNER or others to discharge the claim, attachment, restraining order or lien which is chargeable to the SUBCONTRACTOR and should any claim be asserted or any such attachment, restraining order or lien arise or should a supplier of the SUBCONTRACTOR not be paid by the SUBCONTRACTOR, the CONTRACTOR may retain (or in his discretion pay over to the supplier) from any payment then or thereafter due an amount sufficient to indemnify it completely against the same without legal determination of the validity thereof, and should the claim, attachment, restraining order or lien exceed such an amount, the SUBCONTRACTOR shall pay to the CONTRACTOR upon demand all additional moneys paid by the CONTRACTOR to discharge completely said claim, attachment, restraining order or lien. The SUBCONTRACTOR, for himself, his subcontractors and all parties acting through or under him, does hereby covenant and agree that no mechanics' lien, notice of contract or other claims shall

**P-00164**

be filed or maintained by it against the said buildings and improvements and real estate appurtenant thereto for or on account of any work or labor done or materials furnished under this Subcontract or otherwise, for, toward, in or about the erection and construction of said buildings and improvements and that the filing of any lien, notice of contract or other claim shall be grounds for termination of this Subcontract pursuant to the provisions of Article XII above. The SUBCONTRACTOR, for himself, his subcontractors and all parties acting through or under him further covenant and agree that this agreement waiving the right of lien shall be an independent covenant and shall operate and be effective as well with respect to work and labor done and materials furnished under any supplemental contract.

To the fullest extent permitted by law, the SUBCONTRACTOR agrees to indemnify and hold harmless the CONTRACTOR, the OWNER, the ARCHITECT/ENGINEER and all of their agents and employees from and against any and all claims, damages, losses and expenses (including reasonable attorney's fees), arising out of or resulting from the performance, or failure of performance, of the SUBCONTRACTOR under this Subcontract, including but not limited to any such claim, damage, loss or expense attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and which is caused in whole or in part by any negligent act or omission of the SUBCONTRACTOR or anyone directly or indirectly employed by him or anyone for whose acts he may be liable regardless of whether it is caused in part by a party indemnified hereunder. Such obligations shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Article.

In any and all claims against the CONTRACTOR or any of his agents or employees by any employee of the SUBCONTRACTOR, anyone directly or indirectly employed by him or anyone for whose acts he may be liable, the indemnification obligation under this Article shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the SUBCONTRACTOR under Worker' Compensation acts, disability benefit acts or other employee benefit acts.

The CONTRACTOR shall not in any manner be answerable or accountable for any loss or damage that shall or may happen to the said Work or any part thereof, or to any of the materials or other things done, furnished or supplied by the SUBCONTRACTOR or any subcontractor under the SUBCONTRACTOR by reason of any casualty or by reason of any act, default, or omission of any third party or stranger to this Contract, of SUBCONTRACTOR or any subcontractors under him or their agents or employees, or of any other party who may be engaged in furnishing any work or supplying any materials in the Work herein undertaken to be performed, except to the extent of CONTRACTOR'S recovery therefore under the OWNER'S Builders Risk Insurance Policy.

The obligations of the SUBCONTRACTOR under this Article shall not extend to the liability of the ARCHITECT/ENGINEER, his agents or employees, arising out of (a) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (b) the giving of or failure to give directions or instructions by the ARCHITECT/ENGINEER, his agents or employees, provided such giving or failure to give is the primary cause of the injury or damage.

## ARTICLE XV: FEDERAL, STATE AND MUNICIPAL LAWS

The SUBCONTRACTOR agrees that all work performed, and all materials furnished by him under this Subcontract shall comply strictly with the laws and ordinances in force in the locality in which the work is done, and that he will comply promptly with all ordinances, regulation, rules and orders of the city, state and/or federal government and of any and all of its departments and bureaus, and that he will so perform said work and furnish said materials in accordance with such laws and ordinances, and so comply with such ordinances, regulations, rules and orders whether the work and materials for the same are or are not included and provided for in the plans, drawings, and specifications; and all such work and materials made necessary by such laws, ordinances, regulations, rules and orders in order to complete the work contemplated in this contract, shall be performed and furnished without extra charge or expense to the CONTRACTOR. The SUBCONTRACTOR agrees that it will require strict compliance of said law with respect to any agreement entered into by the SUBCONTRACTOR with other subcontractors. The SUBCONTRACTOR will be responsible for a violation of any of such laws, ordinances, rules and orders by the SUBCONTRACTOR and by other subcontractors with which the SUBCONTRACTOR has entered into an agreement with, and will indemnify the CONTRACTOR for any loss or damage resulting to him by reason of any such violation.

## ARTICLE XVI: SUB-LETTING

**P-00165**

8

The SUBCONTRACTOR shall not sub-let or assign the Work covered by this Subcontract or any portion thereof and shall not hypothecate, pledge or assign any payments coming due hereunder without the written consent of the CONTRACTOR.

The SUBCONTRACTOR agrees that he will be responsible for the acts and omissions of his subcontractors and their employees to the same extent that he is responsible for the acts and omissions of persons directly employed by him.

The SUBCONTRACTOR agrees that any attempt to sub-let the Work covered by this Subcontract or any portion thereof without the written consent of the CONTRACTOR shall constitute an abandonment by the SUBCONTRACTOR of this Subcontract, and grounds for termination pursuant to the provisions of Article XII above. The SUBCONTRACTOR shall not sublet this Subcontract or any part thereof without the prior written consent of the CONTRACTOR and shall not assign any benefit, or monies due or to become due to it hereunder or any right, claim or right of action which said SUBCONTRACTOR may have or claim against the CONTRACTOR arising out of this Subcontract, any modification thereof, or for extra work performed or materials furnished, prepared or manufactured, unless the SUBCONTRACTOR shall first have obtained the written consent of the CONTRACTOR to such assignment. Any such assignment made without the written consent of the CONTRACTOR as aforesaid shall be null and void and of no force and effect as against the CONTRACTOR and shall vest the assignee with no interest enforceable against the CONTRACTOR and with no right of action whatsoever, either legal or equitable, against the CONTRACTOR. No conduct or action on the part of the CONTRACTOR of any kind or nature whatsoever shall operate as an estoppel or waiver on the part of the CONTRACTOR and its right under this clause to refuse to recognize an assignment for any purpose.

## ARTICLE XVII: ARBITRATION

The parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this agreement promptly by negotiations between senior executives of the parties who have authority to settle the controversy. The disputing party shall give the other party written notice of the dispute. Within twenty (20) days after receipt of said notice, the receiving party shall submit to the other a written response. The notice and response shall include (a) a statement of each party's position and a summary of the evidence and arguments supporting its position, and (b) the name and title of the executive who will represent that party. The executives shall meet at a mutually acceptable time and place within thirty (30) days of the date of the disputing party's notice and thereafter as often as they reasonably deem necessary to exchange relevant information and to attempt to resolve the dispute.

If the matter has not been resolved within sixty (60) days of the disputing party's notice, or if the party receiving said notice will not meet within thirty (30) days, either party may initiate mediation of the controversy or claim under the Construction Industry Mediation rules of the American Arbitration Association.

If the matter has not been resolved pursuant to the aforesaid mediation procedure within sixty (60) days of the initiation of such procedure, or if either party will not participate in a mediation, the controversy shall be decided by binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association, and judgment upon the Award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Any claim or controversy arising from or related to this Agreement, or the breach thereof, in which the amount in controversy (as stated in the Demand and any counterclaim) is less than $100,000.00, exclusive of interest and costs, shall be resolved by mediation and/or binding arbitration as described above. All other disputes arising from or related to this Agreement may be decided by any court of competent jurisdiction.

In any dispute arising under or relating to this Agreement, the parties agree that any applicable statutes of limitations shall be tolled for a period not to exceed 90 days if either party notifies the other in writing that it wishes to submit the dispute to mediation.

Notwithstanding the foregoing arbitration provision, in any dispute arising under or related to this Agreement, either party may request a temporary restraining order or preliminary injunction from any court of competent jurisdiction without thereby waiving its right to demand arbitration as otherwise provided in this Agreement.

The prevailing party shall be entitled to recover reasonable attorney's fees and costs incurred in connection with the enforcement of the award if it is not paid within thirty (30) days of the issuance of the award. Except as otherwise provided in this Agreement, the parties shall rely solely on the procedures set forth herein to resolve any dispute arising from or related to this Agreement or the breach thereof. If any party to this Agreement files an action

9

in court, or proceeds with litigation that has already been filed, in violation of this Agreement, that party shall indemnify the other party(ies) for their costs and attorney's fees incurred as a result of such violation.

Any arbitration or mediation conducted under this Agreement shall be conducted in English.

In any matter submitted to arbitration, the arbitrator shall be entitled to award attorney's fees, costs, and expenses, if the tribunal shall determine that any party acted in a frivolous manner, exaggerated or inflated any claim, or used dilatory tactics in any regard. It is the intent of the foregoing provisions to insure that any dispute shall be promptly and expeditiously resolved either by the parties reaching agreement or by an independent tribunal before whom each claim or dispute shall be diligently and efficiently prosecuted.

## ARTICLE XVIII: GENERAL PROVISIONS

This Subcontract supersedes and annuls all prior quotations, correspondence and agreements whether verbal or written.

The SUBCONTRACTOR expressly acknowledges that he is an independent contractor, and nothing herein contained shall be construed to constitute SUBCONTRACTOR or any subsubcontractors under him or any of their respective agents, representatives or employees, as an employee of the OWNER or the CONTRACTOR. This Subcontract shall not bind nor purport to bind the OWNER, but may be assigned to the OWNER with the approval of the CONTRACTOR, the OWNER and the ARCHITECT.

The SUBCONTRACTOR agrees to comply with the OWNER'S regulations with reference to his employees employed at the building site.

Should any provision of this Subcontract be invalid as a matter of law, such invalidity shall affect only such provision and shall not invalidate or affect the remaining provisions of this contract.

Nothing contained in this Subcontract shall create any contractual relation between the SUBCONTRACTOR and the OWNER, nor shall it create any obligation on the part of the OWNER to pay or see to the payment of any sums to the SUBCONTRACTOR.

The CONTRACTOR shall have the right to require the SUBCONTRACTOR to furnish bonds covering faithful performance of the Subcontract and payment of obligations arising thereunder. Upon request from any person or entity appearing to be a potential beneficiary of bonds covering payment of obligations arising under the contract, the SUBCONTRACTOR shall promptly furnish a copy of the bonds or shall permit a copy to be made.

This Subcontract constitutes the entire agreement of the parties as to the subject matter hereof and supersedes all previous oral or written agreements between the parties as to the subject matter hereof.

No change, alteration or modification of this Agreement may be made except in a writing signed by the parties hereto.

The rights and obligations of this Subcontract shall be binding upon and inure to the benefit of the parties, and their respective heirs, successors and assigns.

The parties to this Subcontract hereby submit themselves to the personal jurisdiction of the Suffolk County for purposes of the enforcement of a judgment on any claim arising from or relating to this Subcontract or a breach thereof.

The captions herein have been inserted solely for convenience of reference and shall in no way define, limit or describe the scope or substance of any provision of this Subcontract.

All notices and other communications hereunder shall be in writing and shall be deemed to have been given three (3) days after having been mailed by first class, registered or certified mail, or twelve (12) hours after having been delivered or sent by facsimile, to the addresses shown at the head of this Subcontract or to such other addresses as the parties shall have furnished to each other in writing.

This Subcontract may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall be deemed to be one and the same instrument.

The parties warrant and represent that they have read the Subcontract and understand and agree to be bound by its terms, conditions and provisions.

This Subcontract shall be interpreted in accordance with and its performance shall be governed and bound by the laws of the Commonwealth of Massachusetts.

The SUBCONTRACTOR shall furnish to the CONTRACTOR a payment and performance bond covering the faithful performance of the Subcontract and payment of the obligations arising thereunder in an amount not less than the Subcontract sum. Such bonds shall be placed with responsible insurance companies licensed to do business in Massachusetts and shall be acceptable to CONTRACTOR and in a form reasonably satisfactory to

**P-00167**

CONTRACTOR. SUBCONTRACTOR shall deliver to CONTRACTOR certificates of such bonds together with a true copy of such policy at or prior to commencement of construction. All such bonds shall name CONTRACTOR and OWNER as an insured party.

IN WITNESS WHEREOF the said parties have hereunto set their hands and seals the day and year first above written.

SUBCONTRACTOR

RP Iannuccillo & Sons Construction Company

By: _____

Title: _____

*Authorized Agent*

TRICORE, INC.

By: _____

Paul Jacobson
President

P-00168

11

**ATTACHMENT A**

|  |  |
| --- | --- |
| **CONTRACT NO.** | V02A02-PO0009 |
| **DATED** | April 25, 2002 |

Attachment "A" to Subcontract between Tricore, Inc. and RP Iannuccillo & Sons Construction Company.

A. Documents:

1. Plans and Specifications prepared by Chia-Ming Sze Architect, Inc. dated June 22, 2001.
2. Plans and Specifications prepared by Chia-Ming Sze Architect, Inc. General Revisions dated October 1, 2001 and January 28, 2002.
3. RP Iannuccillo & Sons Construction Company Proposal dated March 14, 2002.

B. Scope of Work:
Scope of work of Subcontractor includes, but shall not be limited to, the following:

1. Each Subcontractor is responsible for all the information set forth in the document list established herein.

2. It is the Subcontractor's responsibility to obtain and pay for all taxes, fees and licenses required to perform its scope of work.

3. It is the Subcontractor's responsibility to arrange and provide for all hoisting, staging and rigging required for the performance of its work.

4. It is the Subcontractor's responsibility to remove all debris and surplus materials in conjunction with its work and legally dispose of. On-site dumpsters provided by CONTRACTOR.

5. It is the Subcontractor's responsibility to comply with all local, state, and federal (OSHA) safety standards including OSHA Subpart-R regulations effective January 18, 2002, and all safety programs as directed by the Project Superintendent.

The following fines will be given to any subcontractor whose employee violates the safety program:
1st offense: warning
2nd offense: $100.00

Improper work attire:
1st offense: warning
2nd offense: $100.00

Unsafe behavior
Removal from jobsite

Unsafe equipment
1st offense: warning
2nd offense: $100.00

**P-00169**

8. The Subcontractor shall comply with all provisions of M.G.L. Chapter 111F, the Department of Public Health's Regulations Chapter 105 CMR 670.000, the Department of Labor and Industries Division of Industrial Safety's Regulations Chapter 310 CMR 33.00 and will indemnify and hold the Contractor and the Owner harmless from any and all claims, damages, or loss resulting from a violation by the Subcontractor of any provision of the aforementioned statutes or the regulations

thereunder or of any provisions referred to above. Without limiting the foregoing, Subcontractor shall furnish to the Contractor and, as required by the aforementioned statutes, all Subcontractor's employees for materials covered under the Massachusetts Substance List, a Material Safety Data Sheet on an OSHA Form 20 and shall label all containers containing such substances prior to delivery of such substances on the Project.

9.  Working hours on the project are Monday through Friday 7:00 am to 3:30 pm, with the exception of the four (4) existing nursing floors. Working hours on the four (4) existing nursing floors are Monday through Friday 8:00 am to 4:30 pm.

10. Daily clean up of your work area is the responsibility of this subcontractor. Tricore, Inc. on-site superintendent will issue only one (1) verbal warning to subcontractors concerning clean up of their work area. If there is any debris left after the warning, Tricore, Inc. will clean up and charge the appropriate subcontractor at the rate of $100.00 per hour. NOTE: Any part of an hour will be charged as a full hour.

11. Subcontractor will submit six (6) copies of all shop drawings, submittals and product information to Tricore, Inc. Submittals must be submitted NO LATER than 14 working days after the Subcontract is issued. The Subcontractor must insure that the above is reviewed for contract compliance with the drawings and specifications. Failure to comply with the above will result in the following charges for reproduction:

> $ 5.00 per page for product submittals
> $20.00 per page for shop drawings.

Shop drawings must be clearly marked by page number and title of what is contained on the sheet. A two (2) week approval on shop drawings from Architects/Engineers is anticipated.

12. Every effort is made to work within a cooperative and professional manner. Individuals within the Subcontractor's employ, who in the sole judgment and discretion of Tricore, Inc. do not conform within acceptable standards or perform their work in a rude and/or unruly manner, will be discharged immediately from the Project at the request of Tricore, Inc.

**P-00170**

EXHIBIT 3

# Sherrill House, Inc.
# Frank Wood Expansion Project

## *****

## Concrete Documentation

Paul Jacobson
Tricore, Inc.
100 Sharp Street
Hingham, MA  02043
(781) 331-4949

P-00651



Ground floor garage floor drain located at elevation 45.50 +/-. Showing saw cut through bowl rim. Drain will need to be removed and replaced.

Exhibit #1

P-00652



Ground floor garage floor drain clean out located at elevation 45.50+/-. 1-1/4" below finish concrete

Exhibit #2

P-00653



Ground floor garage floor drain clean out
located at elevation 45.50 to 37 +/-
between Garage B and C line. 1-3/8" below
finish concrete

Exhibit #3

P-00654



Garage southwest stairwell at elevation 49.50 to 37+/-. Proposed stairwell opening width of 8'-6" with stair width of 4'-0" each side. Present stair width is 4'-3" each side.

Exhibit #4

P-00655



Garage southwest stairwell at elevation
49.50 to 37.50+/-. Stair treads showing
concrete spalding, typical.

Exhibit #5

P-00656



Garage southwest stairwell at elevation 49.50 to 37.50+/-. Stair treads showing concrete spalling, typical.

Exhibit #6



Garage southwest stairwell at elevation 49.50 to 37.50+/-. Stair treads showing concrete spalling, typical.

Exhibit #7



Garage southwest stairwell at elevation
49.50 to 37.50+/-. Stair treads showing
concrete flaking, typical.

Exhibit #8

P-00659



Ground floor concrete pier P2 at E 3 line.

Exhibit #9

P-00660



Ground floor concrete pier P2 at E 2 line.

Exhibit #10

P-00661



Ground floor concrete pier P2 at E 2 line.

Exhibit #11

P-00662



Ground floor concrete pier P1 at E 1 line.

Exhibit #12

P-00663



Ground floor concrete pier P2 at E 3 line.

Exhibit #13

P-00664



Patio west wall. Straight edge used to show extreme inconsistencies of concrete. Both horizontal and vertical are typical.

Exhibit #14

P-00665



Patio west wall. Straight edge used to show extreme inconsistencies of concrete. Both horizontal and vertical are typical.

Exhibit #15

P-00666



Patio south wall.

Exhibit #16

P-00667



Patio south wall.

Exhibit #17

P-00668



Patio west wall.

Exhibit #18

P-00669



Patio west wall. Area needed bush hammering.

Exhibit #19

P-00670

EXHIBIT 3



Patio west wall. Mason required extension beyond wall line for clearance.

Exhibit #20

P-00671



Patio west wall. Shows area of bush hammering required for clearance of masonry.

Exhibit #21

P-00672

Patio west wall. Shows area of bush
hammering required for clearance of
masonry.

Exhibit #22

P-00673



Ground floor garage floor ramp finish concrete at elevation 45.50 to 37+/- with embedded footprint.

Exhibit #23

P-00674



Ground floor garage floor ramp finish concrete at elevation 45.50 to 37+/- with embedded footprint.

Exhibit #24

P-00675



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #25

P-00676



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #26

P-00677



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #27

P-00678



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #28

P-00679



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #29



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #30

P-00681



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #31

P-00682



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #32

P-00683



Ground floor garage floor ramp finish
concrete at elevation 45.50 to 37+/.
Unacceptable trowel marks.

Exhibit #33

P-00684



Ground floor core test drill of concrete
floor at ramp elevation 45.50 to 37+/-.

Exhibit #34

P-00685



Ground floor core test drill of concrete floor at ramp elevation 45.50 to 37+/-.

Exhibit #35

P-00686



Garage west wall southwest corner
adjacent to areaway.

Exhibit #36

P-00687



Garage west wall showing honeycomb and voids, typical.

Exhibit #37

P-00688



Garage south wall.

Exhibit #38

P-00689



Garage southwest corner brick shelf and honeycomb.

Exhibit #39

P-00690

EXHIBIT 3



Garage west wall looking north. Showing height variations.

Exhibit #40

P-00691



Garage west wall areaway. Concrete placement variation of 7/8" within 5'+/-.

Exhibit #41

P-00692



Garage west wall. Concrete placement variation, typical.

Exhibit #42

P-00693



Garage west wall. Concrete placement variation, typical.

Exhibit #43

P-00694



Garage south wall. Straight line pulled corner to corner flush with concrete. This is to show wall out of plumb ½".

Exhibit #44

P-00695



Garage south wall. Straight line pulled
corner to corner flush with concrete. This is
to show wall out of plumb 1-1/4".

Exhibit #45

P-00696



Garage south wall. Straight line pulled corner to corner flush with concrete. This is to show wall out of plumb 1-3/8".

Exhibit #46

P-00697



Garage south wall. Straight line pulled corner to corner flush with concrete. This is to show wall out of plumb 1-1/4".

Exhibit #47

P-00698



Ground floor ramp slab on grade control
joint at elevation 47+/-. 1/8" X 1" deep saw
joint required. ¼" +/- typical throughout.
Reference drawing SKA12.

Exhibit #48

P-00699



Ground floor slab on grade control joint at
elevation 45.50+/-. 1/8" X 1" deep saw
joint required. ¼" +/- typical throughout.
Reference drawing SKA12.

Exhibit #49

P-00700



Ground floor slab on grade control joint at elevation 45.50+/-. 1/8" X 1" deep saw joint required. ¼" +/- typical throughout. Reference drawing SKA12.

Exhibit #50

P-00701



Ground floor slab on grade control joint at elevation 45.50+/-. 1/8" X 1" deep saw joint required. ¼" +/- typical throughout. Reference drawing SKA12.

Exhibit #51

P-00702



Ground floor ramp slab on grade control joint at slope elevation 45.50 to 37+/-. 1/8" X 1" deep saw joint required. ¼" +/- typical throughout. Reference drawing SKA12.

Exhibit #52

P-00703



Ground floor ramp slab on grade control joint at slope elevation 45.50 to 37+/-. 1/8" X 1" deep saw joint required. ¼" +/- typical throughout. Reference drawing SKA12. Concrete finish unacceptable.

Exhibit #53

P-00704



Ground floor slab on grade control joint at elevation 37+/-. 1/8" X 1" deep saw joint required. ¼" +/- typical throughout. Reference drawing SKA12.

Exhibit #54



Ground floor slab on grade control joint at
elevation 37+/-. 1/8" X 1" deep saw joint
required. ¼" +/- typical throughout.
Reference drawing SKA12.

Exhibit #55

P-00706



Ground floor slab on grade control joint at elevation 37+/-. 1/8" X 1" deep saw joint required. ¼" +/- typical throughout. Reference drawing SKA12.
Note control joint marked but not cut at garage storage doorway.

Exhibit #56

P-00707



Upper level garage ramp B 2 line at
elevation 54+/-.

Exhibit #57

P-00708



Upper level garage ramp at elevation 52+/-
Crack extends from patio south wall to
garage south wall.

Exhibit #58

P-00709



Upper level garage ramp at elevation 52+/-
Crack extends from patio south wall to
garage south wall.

Exhibit #59

P-00710

EXHIBIT 3



Upper level garage ramp at elevation 52+/-
Crack extends from patio south wall to
garage south wall.

Exhibit #60

P-00711



Ground floor garage east wall. Rebar lap required 40 times diameter.

Exhibit #61

P-00712



Entry floor east wall at elevation 58.50+/-.
Top of concrete wall down to slab needs to
be cut from nothing at southeast corner to
7/8" at the entry as shown.

Exhibit #62

P-00713



Entry floor east wall at elevation 58.50+/-.
Top of concrete wall down to slab needs to
be cut from nothing at northeast corner to
3/4" at the entry as shown.

Replace waterproof membrane.

Exhibit #63

P-00714



East wall inside of elevators #3 and #4 shaft. Note wall out of alignment by 3/4".

Rear of preceding slide Exhibit # 63.

Exhibit #64

P-00715



East wall inside of elevators #3 and #4 shaft. Note wall out of alignment by 3/4".

Rear of preceding slide Exhibit # 63.

Exhibit #65



Ground floor garage floor at ramp
elevation 45.50 to 37+/-. Concrete recess
area.

Exhibit #66

P-00717



Ground floor garage floor at ramp
elevation 45.50 to 37+/-. Concrete recess
area.

Exhibit #67



Ground floor garage floor at ramp
elevation 45.50 to 37+/-. Concrete recess
area.

Exhibit #68

P-00719



Ground floor garage floor at ramp elevation 45.50 to 37+/-. Concrete recess area.

Exhibit #69

P-00720

Ground floor garage beam pocket, building east wall. Showing the top had to be chipped out to receive the beam, typical.

Exhibit #70

P-00721



Ground floor garage beam pocket, building east wall. Showing the bottom had to be raised, typical.

Exhibit #71

P-00722



Ground floor garage wall Garage E and B
line beam pocket at elevation 57+/-. Shows
the pocket had to be dropped 4-1/2"+/-.

Exhibit #72

P-00723



Ground floor garage wall Garage E and B
line beam pocket at elevation 57+/-. Shows
the pocket had to be dropped 4-1/2"+/-.

Exhibit #73

P-00724



Building south wall, southeast corner.
Brick shelf correctly starts at 4".

Exhibit #74

P-00725



Building south wall. Brick shelf at 3-1/2"
due to wall out of plumb and misalignment.

Exhibit #75

P-00726



Building south wall. Brick shelf at 3-1/4"
due to wall out of plumb and misalignment.

Exhibit #76

P-00727



Building south wall. Brick shelf at 2-7/8"
due to wall out of plumb and misalignment.

Exhibit #77

P-00728



Building south wall. Form ties need to be broken off.

Exhibit #78

P-00729



Northwest garage stairs at elevation 49+/-.
6 risers required, 5 risers installed.

Exhibit #79

P-00730

EXHIBIT 3



North wall garage stairway landing at
elevation 49+/-. Crack in slab.

Exhibit #80

P-00731



North wall garage stairway landing at elevation 49+/-. Concrete spald next to dovetail anchor slot.

Exhibit #81

P-00732



North wall garage stairway landing at
elevation 49+/-. Concrete fill in.

Exhibit #82

P-00733



Ground floor south building wall.
Unfinished beam pocket.

Exhibit #83

P-00734



Garage utility room. Unfinished beam pockets, typical.

Exhibit #84

P-00735



Ground floor north garage wall between
Garage D and E at Garage 6 line. Non
parged wall and parged wall.

Exhibit #85

P-00736

Ground floor garage west wall. Partially parged wall.

Exhibit #86

P-00737



Ground floor garage west wall. Partially parged wall.

Exhibit #87

P-00738



Ground floor garage north wall. Partially parged wall.

Exhibit #88



Ground floor garage west wall. Partially parged wall.

Exhibit #89



Ground floor pier 1 at E 1 line. Partially parged pier and wall.

Exhibit #90

P-00741



Ground floor pier 2 at E 2 line. Partially
parged pier and wall.

Exhibit #91

P-00742



Ground floor pier 2 at E 3 line. Partially parged pier and wall.

Exhibit #92

P-00743



Ground floor garage north wall on Garage
6 line. Non-parged wall and parged wall at
vertical control joint.

Exhibit #93



Ground floor garage north wall lower level
at elevation 37+/-. Variations in concrete.

Exhibit #94

P-00745



Ground floor garage north wall lower level
at elevation 37+/-. Variations in concrete.

Exhibit #95

P-00746



Ground floor garage north wall lower level
at elevation 37+/-. Variations in concrete.

Exhibit #96

P-00747



Ground floor north wall upper level sidewalk at elevation 46+/-. Concrete spillage and staining, typical.

Exhibit #97

P-00748



Ground floor north wall upper level sidewalk at elevation 46+/-. Concrete spillage and staining, typical.

Exhibit #98

P-00749



Ground floor north wall upper level
sidewalk at elevation 46+/-. Concrete
spillage and staining, typical.

Exhibit #99

P-00750

EXHIBIT 3



Ground floor north wall upper level
sidewalk at elevation 46+/-. Concrete
spillage and staining, typical.

Exhibit #100

P-00751



Ground floor doorway leading from garage upper level to elevator lobby. Level is held in middle of opening.

Exhibit #101

P-00752



Ground floor doorway leading from garage upper level to elevator lobby. Level is held in middle of opening.

Exhibit #102

P-00753



Garage south wall , north face on slope
elevation 53 to 48.50+/-. Uneven reglet cut.

Exhibit #103

P-00754



Garage south wall , north face at elevation 48.50+/-. Uneven reglet cut.

Exhibit #104

P-00755



Garage north wall, south face at elevation 48.50+/-. Metal reglet distorted and moved during concrete placement.

Exhibit #105

P-00756



Garage west wall southwest corner. Wall distorted at west areaway.

Exhibit #106

P-00757



Garage ramp at elevation 50+/- starting at patio west wall. Concrete metal stop misalignment caused from slick line pulsating against it during concrete placement.

Exhibit #107

P-00758



Garage ramp at elevation 50+/- starting at patio west wall. Concrete metal stop misalignment caused from slick line pulsating against it during concrete placement.

Exhibit #108

P-00759



Garage ramp at elevation 50+/- starting at patio west wall. Concrete metal stop misalignment caused from slick line pulsating against it during concrete placement.

Exhibit #109

P-00760



Garage patio west wall at elevation 56+/-.
Lack of dovetail anchoring slots for
fastening masonry to wall.

Exhibit #110

P-00761



Pier 1 and wall at E 1 line north face.
Needed to be cut back to allow proper
installation of masonry.

Exhibit #111

P-00762



Ground floor garage ramp drain at base of slope elevation 49 to 45.50+/-. Improper pitch leading away from drain causing puddling at ramp base.

Exhibit #112

P-00763



Ground floor garage ramp at base of slope
elevation 49 to 45.50+/-. Improper pitch
leading away from drain causing puddling
at ramp base.

Exhibit #113

P-00764



Ground floor garage ramp at base of slope
elevation 49 to 45.50+/-. Improper pitch
leading away from drain causing puddling
at ramp base.

Exhibit #114



Ground floor garage ramp at base of slope
elevation 49 to 45.50+/-. Improper pitch
leading away from drain causing puddling
at ramp base.

Exhibit #115

P-00766



Ground floor pier 6 at D 2 line. Rod
protruding from concrete and unfinished
concrete.

Exhibit #116

P-00767



Ground floor pier 6 at D 2 line. Rod protruding from concrete and unfinished concrete.

Exhibit #117

P-00768



Entry level patio northwest corner 6" offset layout lines. Note location in relation to wall.

Exhibit #118

P-00769



Entry level patio west wall 6" offset layout line. Note location in relation to wall.

Exhibit #119

EXHIBIT 3



Entry level patio west wall 6" offset layout line.

Exhibit #120

P-00771



Entry level patio west wall 6" offset layout line. Note location in relation to wall.

Exhibit #121

P-00772



Garage north wall at areaway. Tape reading 11".

Exhibit #122

P-00773



Garage north wall at areaway. Tape reading 11-1/2".

Exhibit #123



Ground floor level at Garage D and
Garage 4 Line. Electrical piping and
standoffs have unacceptable overspill due
to poor workmanship.

Exhibit #124

P-00775



Ground floor level at Garage D and
Garage 4 Line. Electrical piping and
standoffs have unacceptable overspill due
to poor workmanship.

Exhibit #125

P-00776



Ground floor level at Garage D and Garage 4 Line. Electrical piping and standoffs have unacceptable overspill due to poor workmanship.

Exhibit #126

P-00777



Ground floor level at Garage D and
Garage 4 Line. Electrical piping and
standoffs have unacceptable overspill due
to poor workmanship.

Exhibit #127



Ground floor garage east wall. Control joint width increases towards underside of deck.

Exhibit #128



Entrance level building C 2 line concrete wall out of plumb ¾"+/- within 6'.

Exhibit #129



North areaway. Missing concrete wall extending from areaway to existing building.

Exhibit #130

P-00781

EXHIBIT 4



INC

*General Contracting ~ Asphalt Paving ~ Utilities*

March 21, 2003                                          Via Certified Mail and Facsimile

Mr. Bruce R. Iannuccillo
R.P. Iannuccillo & Sons Construction Co.
70 Calverly Street
Providence, RI 02908                                    C   O   P   Y

RE:    Contract #V02A02-PO0009
       Sherrill House-Frank Wood Center

Dear Mr. Iannuccillo,

As required in *Article XVIII: General Provisions*, notice is hereby given to deficiencies pertaining to Sub-Letting. At this time, the following item needs to be addressed as soon as possible to avoid *Article XII: Termination and Contractor's Right to do Work*.

1. *Article XVI: Sub-Letting* "The Subcontractor will be responsible for the acts and omissions of his subcontractors and their employees". In addition, "The Subcontractor agrees that any attempt to sub-let the Work covered by this Subcontract or any portion thereof without the written consent of the Contractor shall constitute an abandonment by the Subcontractor of this Subcontract, and grounds for termination pursuant to the provisions of Article XII".

This morning at 5:30 A.M. the Cement Finishers Local No. 534 established a picket line of approximately twenty (25) people. According to Mr. Stephen M. Uva, Business Manager for Local No. 534, their reasoning for the picket line was due to your Subcontractors' choice of having prevailing wage open shop laborers install the balance of wire mesh on the project. It is our understanding and Local No. 534's that Aztec, a union steel subcontractor, installed wire mesh on the entrance floor for Frias Concrete Floors. In addition, Mr. Uva stated that Frias Concrete Floors is not signatory with Local 534 in regards to cement finishing and would picket in the future if the situation is not resolved.

Obviously, this issue is a major embarrassment to Tricore and Sherrill House. The delay with all the trade's people this morning and the meeting, which I now have to attend at Sherrill House to explain the work stoppage, is unacceptable. Furthermore, the scheduled concrete placement for Monday, Tuesday, and Wednesday is now in jeopardy.

Please respond in writing as soon as possible as to how your firm intends to address these union issues, and delays, to avoid termination.

Sincerely,

Paul Jacobson
President

Cc:    Mr. Richard Moore, Sovereign Bank
       Mr. Richard Benka, Sherrill House, Inc. President
       Mr. Peter Brady, Tricore, Inc., Project Manager

**P-00003**

EXHIBIT 5

# KUTCHIN & RUFO, P.C.

COUNSELLORS AT LAW
175 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110-2210

(617) 542-3000
FACSIMILE (617) 542-3001

Edward D. Kutchin, Esq.
ekutchin@kutchinrufo.com

July 1, 2003

VIA FACSIMILE AND
FEDEX
Bruce R. Iannuccillo
President
R.P. Iannuccillo & Sons Construction Co.
70 Calverly Street
Providence, RI 02908

> Re: Subcontract between Tricore, Inc. and R.P. Iannuccillo &
> Sons Construction Co.

Dear Mr. Iannuccillo:

Please be advised that this law firm represents Tricore, Inc. ("Tricore"). In that regard, Tricore has informed us about the conduct of R.P. Iannuccillo & Sons Construction Co. ("Iannuccillo") in connection with the Subcontract ("Subcontract") entered into between Tricore and Iannuccillo on April 25, 2002 relative to the Sherrill House-Frankwood Expansion ("Project") with Sherrill House, Inc. as owner ("Owner"). In accordance with the terms of Article I of the Subcontract, Iannuccillo is obligated to perform the Work on the Project in a good and workmanlike manner and to the full satisfaction of Tricore and Owner.

Furthermore, Article II of the Subcontract provides that all Work shall be done at such times and in such a manner to maintain Tricore's job progress schedule. However, as you are aware, Tricore has notified you on at least three (3) prior occasions of Iannuccillo's failure to fulfill its contractual obligations by continually delaying the progress of the Project and by failing to provide Work on the Project in a good and workmanlike manner. In view of Iannuccillo's continual failure to fulfill it's contractual obligations, forty-eight (48) hour notice is hereby given under the provisions of Article XII of the Subcontract that the Subcontract is being terminated by Tricore. As stated above, this notice of termination is being issued as a result of Iannuccillo's failure to prosecute the Work with promptness and diligence in keeping with the then existing job progress schedule and its failure to fulfill its obligations under the Subcontract. Upon the expiration of forty-eight (48) hours from the issuance of this notice, the Subcontract shall terminate and Tricore intends to take possession of all Work previously provided

KUTCHIN & RUFO, P.C.

Bruce R. Iannuccillo, President
R.P. Iannuccillo & Sons Construction Co.
July 1, 2003
Page 2

on the Project by Iannuccillo and to contact Safeco Surety Company and make a
claim upon the performance bond issued to Iannuccillo so that the Work can be
prosecuted to completion. As the Subcontract provides, Iannuccillo shall not be
entitled to any further payments under the Subcontract until the Work covered by
the Subcontract has been completed and accepted by the architect or Owner.

Furthermore, as provided under Article XII of the Subcontract, Iannuccillo
shall be responsible for any and all additional costs incurred by Tricore as a result
of delays in the progress of the Work, its failure to properly complete the Work in
a good and workmanlike fashion or any damages incurred by Tricore.

By virtue of a copy of this letter, notice is being sent to your bonding
company of Tricore's claim being asserted against the bond.

Very truly yours,

Edward D. Kutchin

EDK/nml

cc:  Paul Jacobson, President
     Tricore, Inc.
     Patty Catanese (via FedEx)
     Safeco Surety

F:\2345\LETTERS\Iannuccillo2.DOC

**P-00010**

EXHIBIT 6

# TRICORE
## INC

*General Contracting ~ Asphalt Paving ~ Utilities*

July 3, 2003

VIA FACSIMILE AND
FEDEX
Bruce R. Iannuccillo
President
R.P. Iannuccillo & Sons Construction Co.
70 Calverly Street
Providence, RI 02908

> Re: Subcontract between Tricore, Inc. and R.P. Iannuccillo &
>     Sons Construction Co.

Dear Mr. Iannuccillo:

In view of the fact that notice to terminate in connection with the
Subcontract ("Subcontract") entered into between Tricore and Iannuccillo on
April 25, 2002 relative to the Sherrill House-Frankwood Expansion ("Project")
with Sherrill House, Inc. as owner ("Owner") was given to R.P. Iannuccillo &
Sons Construction Co. ("Iannuccillo") by letter from our law firm sent by
facsimile at 3:18 pm on July 1, 2003, the Subcontract is terminated effective as of
3:18 pm today, July 3, 2003. Therefore, in accordance with the terms of the
Subcontract, Iannuccillo shall vacate the Project immediately and Tricore, Inc.
("Tricore") hereby notifies you that it intends to take possession of all Work
previously provided on the Project by Iannuccillo, to contact Safeco Surety
Company and make a claim upon the performance bond issued to Iannuccillo and
to prosecute the Work to completion.

Very truly yours,

Paul Jacobson
President

cc:  Edward D. Kutchin, Esq.
     Patty Catanese (via FedEx)
     Safeco Surety

F:\2345\LETTERS\Iannuccillo3.DOC

**P-00201**

... ... ... Street • Brighton, MA 02135  •  (781) 331-4949 • Fax (781) 331-4956

EXHIBIT 7

# KUTCHIN & RUFO, P.C.

COUNSELLORS AT LAW

175 FEDERAL STREET

BOSTON, MASSACHUSETTS 02110-2210

(617) 542-3000

FACSIMILE (617) 542-3001

Edward D. Kutchin, Esq.
ekutchin@kutchinrufo.com

July 30, 2003

VIA FEDEX
Ira Sussman
Safeco Surety
Northern Region Office
2800 W. Higgins Road, Suite 1100
Hoffman Estates, IL 60195-5205

> Re:  Principal:    Tricore, Inc. ("Tricore")
>       Claim #:     12E 03196 0258
>       Bond#:       6007619
>       Claimant:    R.P. Iannuccillo & Sons ("Iannuccillo")
>       Project:     Sherrill House-Frank Wood Expansion, Boston, MA
>       Surety:      SAFECO Insurance Company of America

Dear Mr. Sussman:

Please be advised that this office represents Tricore, Inc. ("Tricore"). In that regard, I am in receipt of your letter to Tricore dated July 15, 2003 and wish to respond. You request that Tricore review the letter and supporting documentation enclosed with your letter which you received from Iannuccillo. At the outset, I wish to inform you that the position annunciated in Iannuccillo's July 8, 2003 letter is totally incorrect. A review of my letter to Iannuccillo dated July 1, 2003 and Tricore's letter to Iannuccillo dated July 3, 2003, copies of which I have attached, indicate that its subcontract was terminated as a direct result of its failure to perform its obligations under the terms of the subcontract.

Additionally, I will now list in summary format some of the reasons why Iannuccillo was terminated:

- Letter dated March 13, 2003 from Tricore to Iannuccillo pertaining to deficiencies to project schedule
- Response letter from Iannuccillo to Tricore dated March 14, 2003.
- Picket line set up by Cement Finishers Local 534, March 21, 2003 due to Iannuccillo subcontracting of concrete flat work to non-union subcontractor.
- Letter dated March 21, 2003 from Tricore to Iannuccillo pertaining to deficiencies of subcontracting concrete flat work (no response letter was received).
- To date three (3) different concrete floor companies have performed work on site:
  1. Lampasona Concrete Corp. placed and finished the concrete floor at the elevator pit slab.

**P-00022**

# KUTCHIN & RUFO, P.C.

Ira Sussman
July 30, 2003
Page 2

2. Frias Concrete Floors placed and finished the concrete slabs in the building and a portion of the top garage slabs and also placed and finished the laundry room, storage room and elevator lobby on the ground floor.

3. DeMello Concrete Floors placed and finished the concrete for the first phase at the laundry area upper deck, a portion of the upstairs at the southwest corner of the garage and the underground garage slabs and sidewalks.

In each case the subcontractors would not return either due to not being paid on time or being mislead by Iannuccillo's project management team.

- Continuous field labor changes on the project lead to the next person not knowing where the previous person left off. This has created constant hand holding throughout the project wasting valuable time and money.
- Constant shortages of materials and equipment on site during duration of project leading to additional delays.
- Wage reports not submitted with monthly requisitions. Hourly wages established on project are not being paid to workers leading to possible liability in future.
- Benefit package of hourly rates is not paid to proper union jurisdiction. Carpenter steward on project notifies Iannuccillo's office and site foreman. This caused delays and controversy.
- Wage reports still have not been received from Iannuccillo's subcontractors.
- Release of liens was held (please see attached spread sheet for dates) leading to delays of payments to subcontractors.
- Delay charges were received from C&I Steel, Inc. due to foundations not done on time.
- Additional charges from masonry subcontractor due to walls being installed out of plumb. All the precast cap at garage wall will have to be recast causing delays again to the project.
- Additional upcharges from other trades possible due to further delays.
- DeMello Concrete personnel on site Sunday, June 29, 2003 without permission. (Have tape showing trades people jumping fence) They tried to fix the slab which they knew was unacceptable.
- Concrete material supplied for underground garage slab was not a pumpable mix therefore deviating from specifications.

I also wish to address Iannucillo's comments in its July 8 letter to you wherein it states that Tricore breached the subcontract by refusing to enter into arbitration. It is apparent from the contents of its letter that Iannucillo does not understand what the intention or purpose of Article XVII entitled "Arbitration" is. The purpose for this clause is that in the event either party has a claim against the other, the parties must attempt in good faith to negotiate the controversy before mediation is commenced. This provision of the subcontract <u>does not</u> prevent Tricore from terminating Iannucillo's contract, nor does it require that prior to termination, the parties negotiate.

I am also enclosing a copy of Iannucillo's application and certificate for payment no. 11 which shows that a current payment of $47,025.09 is due from Tricore to Iannucilio. As a good faith gesture, my client has sent me a check in this amount, a copy of which I have enclosed, and it is being deposited into my clients fund account in escrow

P-00023

KUTCHIN & RUFO, P.C.

Ira Sussman
July 30, 2003
Page 3

to be held until Tricore completes its evaluation of the work performed by Iannucillo and the amount of the damages incurred by Tricore are determined.

As I am sure you will agree after reviewing the enclosed documentation, Tricore has adhered to the letter of the subcontract and has gone above and beyond in attempting to work with Iannucillo. Please contact me at the above address after you have had an opportunity to review the enclosed documentation so that we can discuss how you want to proceed with this matter.

Very truly yours,

Edward D. Kutchin

EDK/nml
Enclosures
cc: Paul Jacobson, President (w/o encls.)
       Tricore, Inc.
F:\4229\Letters\sussman.doc

P-00024

EXHIBIT 8

**Tricore, Inc.**
**Safeco Surety**
**Project - The Frank Wood Center - Sherrill House Expansion**

| | |
|---|---:|
| Costs incurred as of 07/31/05 | $547,389.29 |
| Add: | |
| Estimate from Forcon dated June 15, 2004 (remediation work - cost to prepare and paint existing concrete wall surfaces and repair stairs) | 35,824.00 |
| Subtotal | $583,213.29 |
| Less: | |
| Requisition #11 | (47,025.09) |
| Retainage | (77,343.35) |
| Actual damages | $458,844.85 |

Printed 11/03/2005, 9:26 AM

JC Recap with Interest

Tricore, Inc.
Safeco Surety
Project - The Frank Wood Center - Sherrill House Expansion

| Month Ended | Legal Fees | Contract Completion | Testing | Remediation | Costs to Investigate Nature and Extent of Defects | Total | Cummulative Balance | | Interest Rate 12.00% | Interest | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/31/2003 | 1,919.90 | - | 573.61 | - | 9,508.34 | 12,001.86 | 12,001.86 | 31 | 12.00% | 124.02 | 12,125.88 |
| 08/31/2003 | - | - | - | 5,895.23 | 2,088.52 | 7,983.74 | 19,985.60 | 31 | 12.00% | 206.52 | 20,316.14 |
| 09/30/2003 | 80.06 | - | 1,320.00 | - | - | 1,400.06 | 21,385.66 | 30 | 12.00% | 213.86 | 21,930.05 |
| 10/31/2003 | 1,051.89 | 11,659.60 | - | 3,536.32 | 2,839.78 | 15,551.26 | 36,936.92 | 31 | 12.00% | 381.68 | 37,863.00 |
| 11/30/2003 | 227.09 | 19,490.00 | - | - | - | 23,253.41 | 60,190.33 | 30 | 12.00% | 601.90 | 61,718.31 |
| 12/31/2003 | 1,809.16 | 518.08 | - | - | - | 2,327.24 | 62,517.57 | 31 | 12.00% | 646.01 | 64,691.56 |
| 01/31/2004 | 1,803.00 | 1,359.28 | - | - | 63.72 | 13,246.90 | 75,764.46 | 31 | 12.00% | 782.90 | 78,721.36 |
| 02/28/2004 | 1,133.90 | 366.28 | - | 10,020.00 | - | 1,500.18 | 77,264.64 | 28 | 12.00% | 721.14 | 80,942.67 |
| 03/31/2004 | 175.28 | 23,973.64 | - | 18,000.00 | - | 42,148.92 | 119,413.56 | 31 | 12.00% | 1,273.74 | 124,365.33 |
| 04/30/2004 | 1,588.36 | 119,111.92 | - | - | - | 120,700.28 | 240,113.83 | 30 | 12.00% | 2,401.14 | 247,466.74 |
| 05/31/2004 | 258.88 | 7,220.42 | - | - | - | 7,479.30 | 247,593.14 | 32 | 12.00% | 2,558.46 | 257,504.51 |
| 06/30/2004 | 1,262.76 | 33,246.97 | - | 1,576.90 | - | 36,086.63 | 283,679.76 | 31 | 12.00% | 2,836.80 | 296,427.94 |
| 07/31/2004 | 2,368.21 | 27,210.76 | - | - | - | 29,578.97 | 313,258.73 | 30 | 12.00% | 3,237.01 | 329,243.91 |
| 08/31/2004 | 1,676.40 | 37,273.54 | - | - | - | 38,949.94 | 352,208.67 | 31 | 12.00% | 3,639.49 | 371,833.33 |
| 09/30/2004 | 1,204.73 | 17,847.60 | - | - | - | 19,052.33 | 371,261.00 | 30 | 12.00% | 3,712.61 | 394,598.27 |
| 10/31/2004 | 3,132.17 | 66,272.12 | - | - | - | 69,404.29 | 440,665.29 | 31 | 12.00% | 4,553.54 | 468,556.11 |
| 11/30/2004 | 3,099.38 | 57,655.07 | - | 17,718.00 | - | 78,472.45 | 519,137.74 | 30 | 12.00% | 5,191.38 | 552,219.94 |
| 12/31/2004 | 1,880.38 | 28,549.45 | - | - | - | 30,429.83 | 549,567.57 | 31 | 12.00% | 5,678.86 | 588,328.63 |
| 01/31/2005 | 2,352.26 | (731.33) | - | - | - | 1,620.93 | 551,188.50 | 31 | 12.00% | 5,695.61 | 595,645.18 |
| 02/28/2005 | 373.22 | - | - | - | - | 373.22 | 551,561.72 | 28 | 12.00% | 5,147.91 | 601,166.31 |
| 03/31/2005 | 887.06 | - | - | - | - | 887.06 | 552,448.78 | 31 | 12.00% | 5,708.64 | 607,762.01 |
| 04/30/2005 | 1,740.53 | - | - | - | - | 1,740.53 | 554,189.31 | 31 | 12.00% | 5,541.89 | 615,044.43 |
| 05/31/2005 | 5,357.45 | - | - | - | - | 5,357.45 | 559,546.76 | 30 | 12.00% | 5,781.98 | 626,183.86 |
| 06/30/2005 | 1,851.27 | - | - | - | - | 1,851.27 | 561,398.03 | 31 | 12.00% | 5,613.98 | 633,649.11 |
| 07/31/2005 | - | - | - | - | - | - | 561,398.03 | 31 | 12.00% | 5,801.11 | 639,450.23 |
| Balance to complete | 37,234.24 | 451,023.38 | 1,893.61 | 56,746.44 | 14,500.36 | 561,398.03 | | | | 78,052.19 | 639,450.23 |
| RP Iannucillo Contract | | (92,060.94) | | | | (92,060.94) | | | | | (92,060.94) |
| | 37,234.24 | 358,962.44 | 1,893.61 | 56,746.44 | 14,500.36 | 469,337.09 | | | | 78,052.19 | 547,389.29 |

R.P. Iannucillo Contract        860,494.38
Billed to date (06/30/03)     (768,433.44)
Balance to Complete              92,060.94

JC Recap with Interest

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACUSETTS

| | | |
|---|---|---|
| TRICORE, INC. | : | CIVIL ACTION NO. |
| | : | 04-12393 (MLW) |
| | : | |
| VS. | : | |
| | : | |
| SAFECO INSURANCE COMPANY OF | : | |
| AMERICA and R.P. IANNUCCILLO & | : | |
| SONS CONSTRUCTION CO. | : | October 27, 2005 |

## AFFIDAVIT IN OF IRA E. SUSSMAN IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

1.      I am over the age of eighteen (18) and believe in the obligation of an oath.

2.      I am a Surety Claims Representative of Safeco Insurance Company (the "Surety"), a party in the above-captioned matter.

3.      I make this Affidavit in support of the Safeco Insurance Company of America's Motion for Summary Judgment and based on my own personal knowledge. The Surety issued Payment Bond 6007619 to Tricore in the amount of Sixteen Million Nine Hundred Fifty Eight Thousand Two Hundred Twenty Six Dollars ($16,958,226.00) (Tricore's Payment Bond")

4.      On or about July 8, 2003 RPI made demand on Surety pursuant to Tricore's Payment Bond for a total payment of $124,368.00, which included $47,025.00, the amount RPI claimed was the balance due on its subcontract, plus the purported outstanding retainage of $77.343.00.

5.    Upon receipt of the claim, the Surety followed standard industry protocol in investigating the claim. Within a week of receiving RPI's letter with documentation, the Surety contacted the Claimant, RPI, to acknowledge receipt of RPI's letter, and to advise that it would be contacting Tricore for the Principal's response.

6.    The July 15, 2005 Letter from Surety to RPI is attached as Exhibit 1.

7.    The Surety also investigated with Tricore as to Tricore's position regarding RPI's demand.

8.    On August 19, 2003, the Surety forwarded correspondence from Tricore, with supporting documentation to RPI. The Surety asked RPI to respond. In response, RPI provided the Surety a general denial without *any* articulation.

9.    Based on the facts and the law, the Surety denied RPI's claim on the basis that the Surety liability was not reasonably clear because of the good faith dispute between RPI and Tricore.

10.    The letter denying the claim is attached hereto and made a part hereof as Exhibit 2.

11.    Over the next several months the Surety was advised that Tricore and RPI continued to negotiate regarding the resumption of the completion of the Subcontract and the completion of the work.

12.    At no time during this process did RPI ever substantiate that it was not in default under the Subcontract or that Tricore wrongfully terminated RPI.

2

13. In fact RPI made no further demands on the Surety under the Tricore Payment Bond until after RPI was sued by Tricore in the instant action and filed a crossclaim against the Surety.

14. Payment Bond 600617 was issued by Safeco Insurance Company, as surety, to RPI as a condition precedent to entering into the Subcontract with Tricore.

15. RPI cannot make a claim on Payment Bond 600617, as that bond does not obligate Safeco to pay RPI for the labor and materials provided by RPI under the Subcontract.

16. Payment Bond 600617 provides a mechanism for payment by Safeco Insurance Company to RPI's subcontractors and material suppliers if RPI (not Tricore), as Principal, does not pay for labor or materials provided pursuant to a direct contract between RPI and its subcontractors, and those claimants timely make demand on the Payment Bond 600617

17. The sole remaining count in this action is RPI's extra contractual claims against the Surety under Chapters 176D and 93A for alleged unfair settlement practices related to RPI's bond claims.

3

_____
Ira E. Sussman


STATE OF ___Illinois___ )
                          ) SS.:
COUNTY OF ___Cook___ )

On this _3rd_ day of _November_, 2005 before me personally appeared _Ira Sussman_, to me known and known to me to be the individual described in, and who executed the foregoing instrument, and that he/she has acknowledged to me that he/she has executed the same.

[SEAL]

_____
Notary Public
My commission expires: _7/6/2006_

```
"OFFICIAL SEAL"
ADELE GATTUSO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/6/2006
```

4

EXHIBIT 1

 **SAFECO**

**SAFECO SURETY**

Northern Region Office
2800 W Higgins Road Ste 1100
Hoffman Estates, IL 60195-5205

Phone:    (847) 490-2317
Fax:      (847) 490-2231

July 15, 2003

Bruce Iannuccillo, President
R.P. Iannuccillo & Sons Const.
70 Calverly St.
Providence, RI 02908

RE:     Principal:   Tricore, Inc.
        Obligee:     Sherrill House, Inc.
        Claim #:     12E 03196 0258
        Project #:   Frank Wood Expansion, Boston, MA
        Bond#:       6007619
        Surety:      Safeco Insurance Company of America

Dear Mr. Iannuccillo:

As an authorized representative of the above captioned surety we hereby acknowledge receipt of
your letter and supporting documentation dated July 8,2003.

As part of our investigation this documentation is now being forwarded to our principal, Tricore,
Inc., so that we may determine its position with regard to your claim. As soon as the Principal
responds we will get back to you with our decision.

This correspondence and all prior or subsequent communication is made with express reservation
of all rights and defenses that may be available to Surety or Tricore, Inc. at law or in equity
under the terms and provisions of the bond and contract documents.

Sincerely,

Ira Sussman
Northern Region Claims
Irasus@safeco.com

Att.
Dg
CC: Tricore, Inc.
        Patty Catanese via e-mail
        Gately, Morgan & Gilfoyle Ins. 11-56-3158

EXHIBIT 2

 **SAFECO**

SAFECO SURETY

Northern Region Office
2800 W Higgins Road Ste 1100
Hoffman Estates, IL 60195-5205

Phone:   (847) 490-2317
Fax:     (847) 490-2231

December 5, 2003

Bruce Iannuccillo, President
R.P. Iannuccillo & Sons Const.
70 Calverly St.
Providence, RI 02908

Sent by facsimile and US mail

RE:     Principal:  Tricore, Inc.
        Obligee:    Sherrill House, Inc.
        Claim #:    12E 03196 0258
        Project #:  Frank Wood Expansion, Boston, MA
        Bond#:      6007619
        Surety:     Safeco Insurance Company of America

Dear Mr. Iannuccillo:

We have had an opportunity to review your claim, our Principal Tricore's response to the claim, as well as various letters sent between R.P. Iannuccillo and our principal Tricore, Inc as well as supporting documentation from you and our Principal.

Based upon the respective positions of R.P. Iannuccillo and Tricore, Inc. there is a bona fide dispute between the two parties. Unfortunately, SAFECO is not in a position where it can resolve this dispute and SAFECO will not agree to pay the claim.

Tricore alleges that your company failed to comply with the subcontract and elected to terminate R.P. Iannuccillo pursuant to your subcontract. Tricore has made a claim against your company's performance bond, is looking to hire a completion contractor to correct defective work and is in the process of investigating back charges against your contract.

We understand that you dispute the termination and feel you were terminated without cause and without being afforded the opportunity to repair or replace any allegedly deficient work. However, the issues as to whether the termination was proper and whether or not your company is entitled to its remaining contract funds or Tricore can assess back charges can only be resolved by a court or arbitrator.

Consequently SAFECO denies your companies claim.

**P-00047**

Page 2

This correspondence and all prior or subsequent communication is made with express reservation of all rights and defenses that may be available to Surety or Tricore, Inc. -- at law or in equity under the terms and provisions of the bond and contract documents.

Sincerely,

Ira E. Sussman
Safeco Surety
Northern Region
Direct Line (847) 490-2306
irasus@safeco.com

cc:

Edward D. Kutchin
Kutchin & Rufo
Counselors at Law
155 Federal Street
Boston, Massachusetts 02110-1727

David M. Campbell
Visconti and Boren LTD
55 Dorrance Street
Providence, Rhode Island 02903-2219

Patty Cantanese-Safeco

P-00048