UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TRICORE, INC. | : | CIVIL ACTION NO. |
| | : | 04-12393 (JGD) |
| | : | |
| VS. | : | |
| | : | |
| SAFECO INSURANCE COMPANY OF | : | |
| AMERICA and R.P. IANNUCCILLO & | : | |
| SONS CONSTRUCTION CO. | : | November 4, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF SAFECO INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Dennis C. Cavanaugh (BBO # 639556)
Patrick M. Birney (Admitted in CT only)
BROWN RAYSMAN MILLSTEIN
FELDER & STEINER, LLP
CityPlace II, 185 Asylum Street
Hartford, CT  06103
(860) 275-6400
(860) 275-6410

*Attorneys For Defendants*

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts and Rule 56 of the Federal Rules of Civil Procedure, the Crossclaim Defendant, Safeco Insurance Company of America ("Safeco" or the "Surety"), respectfully submits this Memorandum of Law in Support of Motion for Summary Judgment, Affidavit of Paul Jacobson, President of Tricore, Inc. in Support of Motion for Summary Judgment ("Jacobson Aff.") (attached as Exhibit A to the Motion for Summary Judgment), Affidavit of Ira E. Sussman in Support of Motion for Summary Judgment ("Sussman Aff.") (attached as Exhibit B to the Motion for Summary Judgment), and Rule 56.1 Statement of Facts, which are being filed in support of the Surety's Motion for Summary Judgment filed against the Crossclaim Plaintiff, R. P. Iannuccillo & Sons Construction Co. ("RPI").

## I.    INTRODUCTION

The Honorable Charles B. Swartwood, United States Magistrate Judge, presided over a mediation of this matter on July 19, 2005. Count II of RPI's Crossclaim against the Surety, which alleges violations of Massachusetts General Law Chapters 176D ("Chapter 176D") and 93A ("Chapter 93A"), is all that is left of this multi-party, multi-claim litigation involving RPI, the Surety, and Tricore, Inc. ("Tricore"). All other claims, counterclaims, and crossclaims have been disposed of after the July 2005 mediation.

The Surety is now entitled to summary judgment as a matter of law regarding RPI's meritless Chapters 176D and 93A claims. In the first instance, the Surety is entitled to judgment as a matter of law regarding RPI's Chapter 176D claim because there is no private right of action under Chapter 176D.

The Surety is likewise entitled to summary judgment as a matter of law regarding RPI's Chapter 93A claim because, as a business engaged in trade or commerce, RPI has no

standing to obtain relief under Chapter 176D by and through the provisions of Section 9 of Chapter 93A, which section is limited to individuals.

Assuming, *arguendo*, that RPI does have standing to press its Chapter 176D claim through Chapter 93A, the Surety is nevertheless entitled to summary disposition of RPI's Chapter 93A claim because RPI cannot establish under the applicable standard that liability under its claim was "reasonably clear" as a matter of law.

## II.    FACTUAL BACKGROUND

### A.    THE PROJECT

On or about January 2002, Tricore was engaged by Sherrill House, Inc. to act as the construction manager/general contractor ("CM") with respect to the renovation and expansion of a nursing home facility in Boston, Massachusetts (the "Project"). See Jacobson Aff., ¶ 4. As part of its duties as CM, Tricore was responsible for retaining the various subcontractors engaged to work on the Project. See Jacobson Aff., ¶ 5.

As a condition precedent to the execution of Tricore's contract with Sherrill House, Inc., Tricore was required to post, and the Surety did post, Payment Bond Number 6007619 ("Tricore's Payment Bond") in the amount of $16,958,226.00, which secured the payment of Tricore's subcontractors and material suppliers under the Project. See id., ¶ 6. A copy of the Payment Bond is attached to Jacobson Aff. as Exhibit 1.

On or about April 25, 2002, Tricore and RPI entered into a subcontract involving the Project (the "Subcontract"). See Jacobson Aff., ¶ 8. A copy of the Subcontract is attached to the Jacobson Aff. as Exhibit 2. Tricore engaged RPI as the principal concrete subcontractor responsible for formation and placement of all foundations, slabs, and other concrete portions

2

of the Project for the original sum of $863,497.00.  See Jacobson Aff., ¶ 10; see also Exhibit 2.[1]

Subsequently, Tricore terminated the Subcontract and instituted the instant suit, claiming that RPI failed to adequately and timely perform under the Subcontract.  In turn, RPI filed a counterclaim against Tricore and a crossclaim against the Surety. See id., ¶ 35. The sole remaining count in this multi-party litigation involves RPI's extra-contractual claims against the Surety under Chapters 176D and 93A for alleged unfair settlement practices related to RPI's bond claims. See Sussman Aff., ¶ 17.

### B.    RPI'S MULTIPLE DEFAULTS UNDER THE SUBCONRACT

#### 1.  RPI'S Defective Workmanship and Gross Mismanagement of the Project

The information presented by Tricore in this case shows that during the course of RPI's performance of the Subcontract, Tricore, among others, increasingly became dissatisfied with the quality of RPI's work.  See Jacobson Aff., ¶ 11.  According to Tricore, the quality issues were not limited to a single portion of the Project, or isolated incidences requiring repair, but rather were numerous and all-encompassing.  See id., ¶ 12.  Tricore believed that RPI's quality problems were the rule, not the exception, and ultimately proved to be unacceptable. See id., ¶ 13.  Indeed, according to Tricore, some of the issues exemplifying RPI's substandard performance under the Subcontract included: (1) walls being "out of plumb" (i.e. concave and/or convex rather than straight) and floors having recesses (i.e. curvatures or waviness, rather than flat); (2) honeycoming and voids (i.e. concrete with pock-marks or large holes); (3) unacceptable trowel marks and footprints embedded in the concrete; cracks, peeling and flecking in the concrete; (4) unacceptable variations in the placement of concrete,

---

[1] Pursuant to the Subcontract, RPI was required to post a performance bond guaranteeing its performance under the

resulting uneven wall heights; (5) overly wide stairs; (6) misalignment of concrete; (7)

improper relief cuts in concrete that were uneven and not to the depth required by the

specifications, which resulted in stress cracking and cracking of the concrete slabs; (8)

improper reglet cutting of concrete, which necessitated hand-cutting and chipping to remedy

the work; and (9) concrete spillage and staining and variations in the poured concrete. See

id., ¶ 14. A copy of the photographs evidencing these various issues is attached to the

Jacobson Aff. as Exhibit 3.

Notably, RPI was required under the Subcontract to provide "finished" concrete work,

which was not to be painted or otherwise covered. See Jacobson Aff., ¶ 16. In the end, this

became quite problematic because there were very limited means by which Tricore could

disguise RPI's poor workmanship. See id., ¶ 16.

Additionally, information presented by Tricore indicated that RPI's substandard

performance—including its failure to adhere to required specifications under the

Subcontract—resulted in numerous other problems downstream from the concrete work,

which in turn delayed the Project's progress and completion. See id., ¶ 17.

According to Tricore, RPI's gross mismanagement of its portion of the Project was the

primary cause of the delay, confusion and additional costs for the Project. See id., ¶ 18. For

example, RPI's involvement in the Project was plagued by high turnover among its

employees and subcontractors. See id., ¶ 19. A total of three flatwork cement finishing

subcontractors and two reinforcing subcontractors were utilized in succession by RPI during

the approximately 14 months they were involved in the Project. See id., ¶ 19. Tricore stated

during this same time period that several of RPI's subcontractors and vendors complained

---

Subcontract. Safeco also posted the performance bond for RPI. See Sussman Aff., ¶ 14.

that RPI was not providing them with adequate direction regarding the Project and routinely failed to pay them for work the subcontractors performed on a timely basis. See id., ¶ 20. Tricore also learned through the shop steward on the project that RPI had failed to pay benefits packages to the proper union jurisdiction. See id., ¶ 21.

It became readily apparent to Tricore that the high turnover rate among RPI's personnel and subcontractors was impacting its ability to properly perform under the Subcontract. See id., ¶ 22. Similarly, the high turnover rate resulted in inadequate communications, confusion, and chronic delays in all phases of the concrete work and severely impacted the quality of work performed. See id., ¶ 22.

RPI also failed to order sufficient materials to accomplish its responsibilities with regard to the Project and proceeded as if the Project schedule did not exist. See id., ¶ 23.

### 2.    RPI'S Submittal of Falsified Interim Certificates and Failure to Provide Adequate Documentation

In accordance with the provisions of the Subcontract, RPI was required to warrant and guarantee that title to all work would pass to Tricore free and clear of all liens and claims. See Jacobson Aff., ¶ 24; Exhibit 2. Under this provision, RPI was required to submit partial lien waivers and/or affidavits showing that payments had been made in full for labor and materials and on account of all work covered in any application for payment. See id., ¶ 24. During the course of the Project, the interim certificates submitted by RPI disclosed that it had paid all of its subcontractors in full for the value of the work performed. See id., ¶ 24. In direct reliance upon the interim certificates, Tricore reimbursed RPI specific sums of money that RPI allegedly had paid to its subcontractors. See id., ¶ 25. Based upon the claims by RPI's subcontractors and vendors, it appeared that RPI falsified many of these interim certificates and that RPI had not paid its subcontractors as certified. See id., ¶ 25.

5

Moreover, the information presented by Tricore indicates that RPI repeatedly failed to provide Tricore adequate and timely wage reporting documentation, including release of lien forms, which was in clear breach of the terms of the Subcontract  See id., ¶ 26. As a result, Tricore was unable to accurately verify RPI's performance and progress and was prevented from submitting progress and other reports to the Project owner and architect. See id., ¶ 27.

### 3.  RPI'S Failure to Adhere to the Skilled Workmen and Subcontractor Requirements Under the Subcontract

RPI was also obligated under the Subcontract to complete the work on the Project in a good and workmanlike manner and to the full satisfaction of the Project architect. See Jacobson Aff., ¶ 28. This required RPI to supply an adequate number of skilled workmen to complete the concrete component of the Project. See id., ¶ 29. According to Tricore, RPI failed here, too. RPI continually failed to staff the Project with employees or subcontractors who had the necessary skills to properly perform the required work. See id., ¶ 29. As a result, a substantial portion of the work performed by RPI was defective and not performed in a timely manner. See id., ¶ 29.

RPI was also prohibited under the Subcontract from subletting or assigning any of the work at the Project without first obtaining Tricore's written consent. See id., ¶ 30. Notwithstanding this provision, according to Tricore, RPI unilaterally and in direct contravention of the plain language of the Subcontract retained certain subcontractors to aid in the performance of RPI's work under the Subcontract. See id., ¶ 30. Tricore stated that

6

this conduct adversely affected the progress of the entire Project and on one occasion, caused delays. See id., ¶ 31.[2]

### 4.    Tricore's Termination of the Subcontract

As a result of RPI's continual deficient conduct and complete disregard of the terms and conditions of the Subcontract, Tricore notified RPI that RPI was in default due to various violations of the Subcontract. See Jacobson Aff., ¶ 33. Ultimately, Tricore believed that RPI's deficient performance and multiple breaches of the Subcontract were simply too numerous and extensive to permit RPI to remain involved in the Project. See id., ¶ 34. On July 1, 2003, with the full consent and agreement of both the Project Owner and Architect, Tricore terminated the Subcontract effective July 3, 2003. See id., ¶ 35; see also Letter dated July 1, 2003 from the Attorney for Tricore to the President of RPI attached to the Jacobson Aff. as Exhibit 5. The letter also served as formal notice of claim against RPI's *performance* bond. See Jacobson Aff., ¶ 36.

### C.    RPI'S CLAIM ON TRICOR'S PAYMENT BOND AND THE SURETY'S INVESTIGATION

On July 3, 2003, Tricore sent a follow up notice of default and termination for cause, as required by the Subcontract, and again notified RPI and its bonding company[3] that RPI was to vacate the project and the bonding company was to arrange for completion of RPI's work pursuant to the obligation under RPI's performance bond ("RPI Performance Bond"). See Jacobson Aff., ¶ 37. A copy of the Notice of Default and Termination is attached to the Jacobson Aff. as Exhibit 6.

---

[2] For example, in one instance, the local Cement Finishers Union established a picket line in or around the Project because of RPI's selection of certain subcontractors, which were not in compliance with the Union's regulations. See Jacobson Aff. , ¶ 31; see also Copy of the letter from Tricor to RPI regarding Cement Finishers Union, which is attached to the Jacobson Aff. as Exhibit 3.

[3] As discussed, supra, RPI's bonding company was also Safeco.

RPI disputed the termination and, not surprisingly, several days after being terminated, sent a letter making demand on Tricore and the Surety[4] for a total payment of $124,368.00, which included $47,025.00, the amount RPI claimed was the balance due on its subcontract, plus the purported unearned retainage of $77.343.00. See Jacobson Aff.; ¶ 39; see also Sussman Aff., ¶ 4.

Upon receipt of the letter regarding RPI's claim, the Surety followed the standard industry protocol in investigating the claim. See Sussman Aff., ¶ 5. First, within a week of receiving RPI's letter with documentation, the Surety contacted the claimant, RPI, to acknowledge receipt of RPI's letter, and to advise that it would be contacting Tricore for the Principal's response. See id., ¶ 5; see also July 15, 2005 Letter from the Surety to RPI, which is attached to the Sussman Aff. as Exhibit 1. In the meantime, the Surety also investigated with Tricore as to Tricore's position regarding RPI's demand. See id., ¶ 7.

Notably, by the time RPI sent a letter regarding its claim on the bond, Tricore had already declared RPI in default on at least four (4) separate occasions, had terminated RPI's contract for cause, and had declared a default on RPI's *performance* Bond. See Jacobson Aff., ¶ 49.

Furthermore, Tricore responded on July 30, 2003, with a detailed, three-page letter with supporting documentation articulating the basis of its termination of RPI. See Jacobson Aff., ¶ 40; see also July 30, 200 Letter from Tricore, which is attached to the Jacobson Aff. as Exhibit 7. The letter set forth sixteen (16) items of deficiency that led to RPI's termination. See id., ¶ 42. As a sign of Tricore's good faith, it also proposed escrowing, and did escrow, the outstanding balance under the Subcontract to pay RPI in the event that Tricore's cost to

---

[4] See Note 6, infra.

8

complete did not exceed the outstanding balance.[5]  See id., ¶ 43.

On August 19, 2003, the Surety forwarded correspondence from Tricore with supporting documentation to RPI. See Sussman Aff., ¶ 8.  The Surety asked RPI to respond. See id., ¶ 8.  In response, RPI provided the Surety a general denial without *any* articulation of any basis therefore. See id., ¶ 8.  Tricore's damages exceeded $400,000.00, which was far in excess of any balance remaining on the Subcontract. See Jacobson Aff., ¶ 44.

Based on the facts and the law, the Surety denied RPI's claim on the basis that the Surety's liability was not reasonably clear because of the good faith dispute between RPI and Tricore. See Sussman Aff., ¶ 9; see also Letter from the Surety to RPI attached as Exhibit 2 to the Sussman Aff.

Over the next several months, the Surety was advised that Tricore and RPI continued to negotiate regarding the resumption of the completion of the Subcontract and the completion of the work. See Sussman Aff., ¶ 11.  At no time during this process did RPI ever substantiate that it was not in default under the Subcontract or that Tricore wrongfully terminated RPI. See Sussman Aff., ¶ 12.  In fact, RPI made no further demands on the Surety until after RPI was sued by Tricore in the instant action and filed a crossclaim against the Surety. See id., ¶ 13.

## III.    PROCEDURAL BACKGROUND

On or about November 12, 2004, Tricore filed a Six-Count Complaint against RPI and the Surety, as the issuer of RPI's Performance Bond.  Tricore sought damages from RPI for breach of the Subcontract, for alleged violations Chapter 93A, and for breach of

---

[5] The escrow would be released to RPI if the cost to complete did not exceed that balance.  Tricore did not set aside retainage because under the Subcontract, retainage was not due until the work was complete.

9

the covenant of good faith and fair dealing. See Tricore Complaint, Counts V through VII.

In response, RPI counterclaimed against Tricore for Tricore's alleged breach of the Subcontract, Quantum Meruit, and for alleged violations of Chapter 93A. See RPI's Answer, Counterclaim, and Crossclaim.

RPI also asserted a Crossclaim against the Surety, which was amended along with its Answer and Counterclaim on May 5, 2005. The Crossclaim vaguely attempts to assert causes of action against the Surety for payment under a certain payment bond[6] and for violations of Chapters 93A and 176D (Count II). See id.; see also RPI's Amended Answer, Counterclaim, and Crossclaim.

Regarding RPI's Chapters 93A and 176D claims, RPI alleges in conclusory fashion that the Surety "failed and refused to conduct a reasonable, independent investigation [of RPI's claim]; failed to effectuate the prompt and fair settlement of [RPI's claim]; and refus[ed] to acknowledge any liability and asserting defenses with no basis in law or fact." See Amended Answer, Counterclaim, and Crossclaim at Crossclaim Count II, ¶¶ 5-6. RPI alleges that the Surety's ill defined conduct represents "unfair settlement practices in violation of Chapter 176D and unfair and/or deceptive acts in violation of Chapter 93A." Id. at ¶ 8.

---

[6] RPI incorporates the allegations contained in its Counterclaim against Tricore into its Crossclaim against the Surety. See Crossclaim, ¶¶ 21, 24. In RPI's Counterclaim and Crossclaim, it identifies only Payment Bond 600617 as that bond upon which its claims are based. See Amended Answer, Counterclaim, and Crossclaim, ¶ 3. Payment Bond 600617 was issued by Safeco, as surety, to RPI as a condition precedent to entering into the Subcontract with Tricore. See Sussman Aff., ¶ 14. RPI alleges that Payment Bond 600617 obligates Safeco to pay RPI for the labor and materials provided to Tricore on the Project. See Amended Answer, Counterclaim, and Crossclaim, ¶ 22. This is wrong. RPI cannot make a claim on Payment Bond 600617, as that bond does not obligate Safeco to pay RPI for the labor and materials provided by RPI under the Subcontract. See Sussman Aff., ¶ 15. Rather, Payment Bond 600617 provides a mechanism for payment by Safeco to RPI's subcontractors and material suppliers if RPI (not Tricore), as Principal, does not pay for labor or materials provided to the Project pursuant to a direct contract between RPI and its subcontractors, and those claimants timely make demand on the Payment Bond 600617. Because RPI has never sued on Tricore's Payment Bond, they are now barred by the applicable statute of limitations from making any such claim. In moving for summary judgment here, the Surety does not waive and hereby preserves its right to seek dismissal of RPI's claims in *toto* due to RPI's failure to timely make a claim on Tricore's Payment Bond.

The Honorable Charles B. Swartwood, United States Magistrate Judge, presided over a mediation of this matter on July 19, 2005. All but RPI's Chapters 93A and 176D claims against the Surety were resolved at the mediation.

Inasmuch as there are no genuine issues of material fact regarding RPI's Chapter 93A and 176D claims against the Surety, the Surety now moves under Rule 56.1 of the Local Rules of the United States District Court for the District of Massachusetts and Rule 56 of the Federal Rules of Civil Procedure for judgment as a matter of law.

## IV.  **ARGUMENT**

### A.  **STANDARD OF REVIEW**

A court should grant summary judgment where the record, including the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, shows that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). In adjudicating a motion for summary judgment, a district court construes the facts in the light most favorable to the nonmovant and indulges reasonable inferences in its favor. See DePoutot v. Raffaelly, 424 F.3d. 112, 117 (1st Cir. 2005). The Civil Rules empower the court to render summary judgment when this portrait of the case depicts no genuine issue as to any material fact and establishes that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); see also DePoutot, 424 F.3d at 117. A factual issue is "genuine" if "it may reasonably be resolved in favor of either party" and, therefore, requires the finder of fact to make "a choice between the parties' differing versions of the truth at trial." DePoutat 424 at 117 (citations and internal quotation marks omitted). Material facts are those that "possess the capacity to sway the outcome of the

11

litigation under the applicable law." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir.1997) (citation and internal quotation marks omitted).

A party seeking to establish a genuine issue of material fact must offer more than "effusive rhetoric and optimistic surmise." Id. Rather, the party must demonstrate, through submissions of evidentiary quality, that a trial-worthy issue persists. Id. Factual specificity is required; a conglomeration of "conclusory allegations, improbable inferences, and unsupported speculation" is insufficient to discharge the nonmovant's burden. Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

**B.    THE SURETY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW REGARDING RPI'S CHAPTER 176D CLAIM BECAUSE NO PRIVATE RIGHT OF ACTION EXISTS**

RPI has alleged that the Surety has "failed and refused to conduct a reasonable, independent investigation of the claim made by RPI against the payment bond [and] failed to effectuate the prompt and fair settlement of the claim made by RPI, [which] represents 'unfair claims settlement practices' violative of Chapter 176D." See RPI's Answer, Counterclaim, and Crossclaim, ¶¶ 25, 26, 28.

Chapter 176D is intended to deter unfair and deceptive acts or practices in the business of insurance. See Chapter 176D, § 2. Section 3(9) of Chapter 176D defines the unfair settlement practices that are considered a violation of Chapter 176D.[7]

However, it is black letter law in Massachusetts that Chapter 176D does not provide a private right of action for individuals injured by alleged unfair settlement practices. See DeMatteo v. Century Indemnity Co., 182 F.Supp.2d 146, 159 (D. Mass 2001)("[T]he

---

[7] A copy of Chapter 176D, is attached hereto as Exhibit A.

insurer's assertion that Chapter 176D does not create a private cause of action for injured parties is correct."); see also Ryan v. Fallon Cmty Health Plan, Inc., 921 F.Supp. 34, 38 (D. Mass 1996); Parriseau v. Albany Int'l Corp., 822 F.Supp. 843, 845 (D. Mass 1993); Dodd v. Commercial Union Ins. Co., 373 Mass. 72 (1977). Sections 6 and 7 of Chapter 176D afford the Commissioner of Insurance, alone, exclusive authority to enforce alleged violations of Chapter 176D. See MASS. GEN. LAWS CH. 176D, §§ 6-7; see also Dematteo, 182 F.Supp.2d at 160.

"Chapter 176D does not provide a cause of action for an individual who suffers damages as a result of an insurer's violation of the statute. Instead, '[a]ny person whose rights have been affected by an insurance practice that violates Chapter 176D, § 3(9), [must] sue under Chapter 93A.'" Murphy v. National Union Fire Ins. Co., 438 Mass. 529, 532 n. 5 (2003).

As there is no basis in law for private relief under Chapter 176D; see MASS. GEN. LAWS CH. 176D, §§ 6-7; see also Dematteo, 182 F.Supp.2d at 160; the Surety is entitled to judgment as a matter of law as to Count II, to the extent it seeks relief under Chapter 176D.

## C.    THE SURETY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW REGARDING RPI'S CHAPTER 93A CLAIM

### 1.    RPI HAS NO STANDING TO ASSERT A CLAIM UNDER CHAPTER 93A BASED ON AN ALLEGED VIOLATION OF THE UNFAIR SETTLEMENT PRACTICES PROVISIONS CONTAINED IN CHAPTER 176D

RPI has also sought relief under Chapter 93A. See RPI's Answer, Counterclaim, and Crossclaim, ¶ 28. In Count II, RPI alleges that the Surety's "handling of RPI's payment bond claim represents 'unfair settlement practices violative of Chapter 176D and unfair and/or deceptive acts in violation of Chapter 93A.'" Id.

13

Chapter 93A—the Massachusetts consumer protection statute—provides a right of action to anyone who suffered a loss of money or property as a result of an unfair or deceptive business practice. See Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co., 220 F.3d 1, 9 (1st Cir. 2000). It generally protects consumers from unfair business practices that are "immoral, unethical, oppressive, or unscrupulous; or within the bounds of some statutory, common-law or other established concept of unfairness." Id. (citing Ellis v. Safety Ins. Co., 41 Mass.App.Ct. 630 (1996)).

Because there is no private right of action under Chapter 176D; see discussion, Section III, B, supra; see also MASS. GEN. LAWS CH. 176D, §§ 6-7; Dematteo, 182 F.Supp.2d at 159; the Massachusetts Legislature amended Section 9 of Chapter 93A to make violations of the unfair settlement practices contained in Section 3(9) of Chapter 176D actionable under Chapter 93A. See Van Dyke v. St. Paul Fire & Marine Ins. Co., 388 Mass 671, 675 (1983).

In amending Chapter 93A, however, the legislature limited the cause of action for unfair settlement practices to only individuals suing under Chapter 93A, Section 9. See MASS. GEN. LAWS CH. 93A, § 9[8]; see also Northern Kare Facilities/Kingdom Kare, LLC v. Benefirst LLC, 344 F.Supp.2d 283, 289 (D. Mass 2004)(recognizing that only individuals can bring an action under Chapter 93A for alleged unfair settlement practices under Chapter 176D); Transamerica Ins. Group v. Turner Const. Co., 33 Mass.App. 446, 452 (1992)(same).

The legislature did not similarly amend Chapter 93A, Section 11. Section 11 of Chapter 93A provides a cause of action by business plaintiffs injured by unfair and deceptive

---

[8] In pertinent part Chapter 93A, Section 9 states that "(1) Any person, **other than a person entitled to bring action under section eleven of this chapter**...whose rights are affected by another person violating the provisions of clause (9) of section three of [Chapter 179D] may bring an action in the superior court..." See MASS. GEN. LAWS CH. 93A §9 (emphasis added). A copy of Chapter 93A is attached hereto as Exhibit B.

14

acts proscribed in Section 2 of Chapter 93A. <u>See</u> MASS. GEN. LAWS CH. 93A, §11.[9]  Section 11 of Chapter 93A contains no similar right to bring an action under Chapter 176D.

RPI can only seek relief under Section 11 of Chapter 93A. RPI is a corporation duly organized and existing under the laws of the state of Rhode Island with a principal place of business at 70 Calverly Street, Providence Rhode Island. <u>See</u> RPI Answer, Counterclaim, and Cross Claim, ¶ 3. RPI was engaged in trade or commerce when it entered into the Subcontract with Tricore. <u>See generally,</u> Answer. Because RPI is an entity engaged in trade or commerce for purposes of Chapter 93A, as a matter of law, RPI can only sue under Section 11 of Chapter 93A for a violation of Section 2 of that Chapter. <u>See DeMatteo</u>, 182 F.Supp.2d, at 159 ("[S]ection 11 of Chapter 93A omits any reference to the ability of a Section 11 plaintiff to recover for violations of Section 9 of Chapter 176D."); <u>Poloroid Corp. v. Travelers Indem. Co.</u>, 414 Mass 747, 754 (1993) ("[Section] 11 does not grant an independent right to recover for violations of Chapter 176D") <u>Transamerica</u>  33 Mass.App. at 452 (same). Thus, RPI has no standing to sue under Section 9 of Chapter 93A for alleged unfair settlement practices under Chapter 176D. <u>See DeMatteo</u>, 182 F.Supp.2d at 159; <u>Benefirst</u>, 344 F.Supp.2d at 289 (agreeing that plaintiffs, as business entities, had no standing to bring an action under Chapter 176D, Section 3(9), through Chapter 93A, § 11).

Thus, RPI has no standing to prosecute an action under Chapter 96A, Section 9 based on the unfair settlement practice provisions under Chapter 176D—and has alleged no other

---

[9] In pertinent part Chapter 93A, Section 11 states that "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court…"

basis for RPI's Chapter 96A Claim.[10]  Accordingly, this Court lacks subject matter
jurisdiction over Count II and the Surety is entitled to judgment on this claim as a matter of
law.

### 2.    RPI'S COUNT II MUST FAIL AS A MATTER OF LAW IN ANY EVENT BECAUSE RPI CANNOT MEET ITS BURDEN UNDER SECTION 2 OF CHAPTER 93A

Assuming, arguendo, that RPI has standing to prosecute its Chapter 93A claim, the
Surety is entitled to judgment in any event because RPI cannot establish under the applicable
"reasonable person" standard that liability under its claim was "reasonably clear" as a matter
of law.

Section 11 of Chapter 93A provides a cause of action by business plaintiffs
injured by unfair and deceptive acts proscribed in Section 2 of Chapter 93A.  See MASS. GEN.
LAWS CH. 93A §11.  A violation of Chapter 176D is not automatically actionable under
Section 11 of Chapter 93A.  See Brazas 220 F.3d at 9 (citing Polaroid, 414 Mass at 754-55).
Nevertheless, in some instances conduct that violates Chapter 176D may independently be an
unfair trade practice actionable under Chapter 93A, Section 11.  Id.; see also J.E. Pierce
Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc., 365 F.Supp.2d 119, 143 (D. Mass.
2005)("To say that Section 11 of 93A does not incorporate 176D is not to say that *conduct*
that happens to violate 176D may never be 'unfair or deceptive within the meaning of
Section 2 of Chapter 92A, and thus, actionable under Section 11.").

Generally, "[s]uch 'unfair practices' must attain a level of rascality that would raise an
eyebrow of someone inured to the rough and tumble world of commerce;" Harvard Pilgrim,
365 F.Supp.2d at 143; or have a "rancid flavor of unfairness." See Atkinson v. Rosenthal, 22

---

[10] Again, RPI has limited its claim under Chapter 96A to the Surety's purported unlawful settlement practices

Mass.App.Ct. 219, 226 (1992). "Massachusetts courts 'focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a Chapter 93A fairness determination.'" F&F Tool Co., Inc. v. Sloan Valve Co, Inc., No. 01-30154, 2002 WL 31371963, * 4 (D. Mass. October 17, 2002)(Ponsor, J.)(Exhibit C).

Additionally, in the context of claims settlements, an unfair or deceptive act or practice under Chapter 93A may occur if a surety fails to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. See DeMatteo, 182 F.Supp.2d at 163 (citing Ferrara & DeMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43, 56 (1st Cir. 1999))(emphasis added). In determining whether an insurer's liability was reasonably clear, "[t]he test is whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the [surety] was liable." DeMatteo 182 F.Supp.2d at 163.

Courts have had occasion to dispose of Chapter 93A claims based on the "unfair settlement" provisions contained in Chapter 176D by way of summary judgment.[11]

---

regarding RPI's claim against the Tricore Payment Bond.  See Answer, counterclaim, Crossclaim, Count II.
[11] See e.g F&F Tool Co., Inc., 2002 WL 31371963, * 5 (holding that an insured was entitled to summary judgment on plaintiffs Chapter 93A claim because "a reasonable fact finder could not objectively conclude that [the insurer's] liability was never reasonably clear.); McMillan v. Wesport Ins. Co., No. 03-6107H, 2004 WL 3106733, *2-3 (Mass Super. Ct. December 10, 2004)(Botsford, J.)(Exhibit D)(holding that insured was entitled to judgment as a matter of law on plaintiff's Chapter 93A claim because a review of the record indicates that liability was never reasonably clear as a matter of law."); see also DeMatteo, 182 F.Supp. at 163 ("[b]ecause liability under the policy is not clear, the Insurers are entitled to summary judgment on [plaintiff's] Chapter 93A, Section 11 Claim as a matter of law.")(Gabler, J.); Gillespie, D.C. v. Allianz Life Ins. Co. of North America, No. 03-10298, 2004 WL 2660636, *3-4 (D. Mass., November 18, 2004)(Gabler, J.)(Exhibit E)("As [the insurer's] termination of [the insured's] benefits under the policy was legally correct, and the record shows that liability to pay total disability benefits for a right shoulder injury was not reasonably clear, [the insurer] is entitled to summary judgment on [the insured's] unfair practice claim."); Rossi v. Norfolk & Dedham Group, No 012587B, 2003 WL 22700352, (Mass Super. Ct. July 17, 2003)(Exhibit F)(holding that the insurer had a reasonable basis to deny coverage as a matter of law and therefore was entitled to summary judgment on the plaintiff's Chapters 93A and 176D claims).

Under this standard, it is plain that liability was not reasonably clear and RPI cannot establish that the Surety violated Chapter 93A in denying RPI's claim as a matter of law.

As discussed at great length in Section II, supra, Tricore notified RPI it was in default due to its countless violations of the Subcontract. See Section II, supra. Following Tricore's termination of the Subcontract on July 3, 2003, RPI made demand on Tricore and the Surety. The total amount of RPI's claim was $124,368.00. See Jacobson Aff., ¶ 48. See also Sussman Aff., ¶ 4.

Upon receipt of the claim, the Surety followed standard industry protocol in investigating the claim. See Sussman Aff., ¶ 5. Within the first seven days following receipt of RPI's claim, the Surety wrote to RPI to acknowledge receipt of the claim, and to advise that the Surety would be contacting Tricore for the Principal's response. See id., ¶ 5. In the meantime, the Surety contacted Tricore to inquire as to Tricore's position regarding RPI's demand. See id., ¶ 7. Again, Tricore had declared RPI in default on at least four (4) separate occasions prior to its termination of the Subcontract and, ultimately, had terminated RPI's contract for cause, and had declared a default on RPI's *performance* Bond. See Jacobson Aff., ¶ 49.

On July 30, 2003, Tricore provided a detailed, three-page letter with supporting documentation articulating the basis of its termination of RPI. See Jacobson Aff., ¶ 40; and Exhibit 7. The letter set forth at least sixteen (16) items of deficiency that led to the termination. See id., ¶ 42. Shortly thereafter, the Surety forwarded correspondence from Tricore with supporting documentation to RPI. See Sussman Aff., ¶ 8. The Surety asked RPI to respond. See id., ¶ 8. At no time during this process did RPI ever substantiate its claim that it was not in default under the Subcontract or that Tricore wrongfully terminated

18

RPI. See id., ¶ 12. All the while, Tricore determined that the added costs resulting from the termination of RPI exceeded $400,000.00, which was far in excess of any balance remaining on the Subcontract. See Jacobson Aff., ¶ 44.

In view of the multiple defaults under the Subcontract, the deficiencies that culminated in the termination of the Subcontract, and RPI's complete failure to provide the Surety with any basis in fact or law to support its claim against a bond,[12] no reasonable person, with knowledge of the relevant facts and law, could conclude that the Surety was liable for RPI's claim. DeMatteo 182 F.Supp.2d at 163. Indeed, the Surety's liability was not reasonably clear!

Because the Surety's liability for RPI's claim under Tricore's Payment Bond was anything but reasonably clear, RPI cannot establish a violation under Section 11 of Chapter 93A as a matter of law. Accordingly, the Surety is entitled to judgment regarding RPI's Chapter 93A claim—assuming, arguendo, that RPI has standing to prosecute its Chapter 176D claim through Chapter 93A—as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Safeco respectfully requests that the Court grant the Surety's Motion for Summary Judgment with regard to the sole remaining claim in this action (Count II) filed by RPI.

---

[12] See Note 6, supra, regarding RPI's claim against its own payment bond and its failure to make a claim against the Tricore Payment Bond.

Specifically, the Surety is entitled to summary judgment as a matter of law regarding RPI's Chapter 176D claim because there is no private right of action in Chapter 176D. The Surety is likewise entitled to summary judgment as a matter of law regarding RPI's Chapter 93A claim because, as a business engaged in trade or commerce, RPI has no standing to obtain relief under Chapter 176D by and through Section 9 of Chapter 93A, which section is limited to only individuals. Assuming that RPI does have standing to press its Chapter 176D claim through Chapter 93A, the Surety is nevertheless entitled to summary disposition of RPI's Chapter 93A claim because RPI cannot establish, as a matter of law, that under the applicable "reasonable person" standard the Surety's liability was reasonably clear and that it engaged in unfair or deceptive business practices.

CROSSCLAIM DEFENDANT,
SAFECO INSURANCE COMPANY
OF AMERICA

By
Dennis C. Cavanaugh (BBO # 639556)
Patrick M. Birney (Admitted in CT only)
Brown Raysman Millstein Felder
  & Steiner LLP
185 Asylum Street
Hartford, CT 06103
860-275-6457
Its Attorneys

## **CERTIFICATION**

This is to certify that on November 4, 2005, a copy of the foregoing was mailed, postage pre-paid or delivered electronically or by facsimile to the following:

Edward Kutchin
Kerry R. Northup
Kutchin & Rufo, PC
155 Federal Street, 17th Floor
Boston, MA 02110-1727
**Tricore, Inc.**

David M. Campbell
Visconti & Boren, LTD
55 Dorrance Street
Providence, RI 02903
**R. P. Iannuccillo & Sons Construction Co**

Bradford R. Carver, Esq.
Jonathan C. Burwood, Esq.
Hinshaw & Culbertson, LLP
One International Place, 3rd Floor
Boston, MA 02110
**Safeco Insurance Company of America**

Dennis C. Cavanaugh

EXHIBIT A



Massachusetts General Laws Annotated Currentness
  Part I. Administration of the Government
    Title XXII. Corporations
      → Chapter 176D. Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance (Refs & Annos)

### § 1. Definitions

When used in this chapter, the following words shall have the following meanings except as otherwise specifically provided:

(a) "Person", any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, operators of any medical service plan and hospital service plan as defined in chapters 176B, 176C, 176E and 176F, carriers and health maintenance organizations as defined in chapter 176G, insurers and sponsors of a legal services plan as defined in chapter 176H, any other legal entity or self insurer which is engaged in the business of insurance, including agents, brokers, and adjusters, the Massachusetts Insurers Insolvency Fund and any joint underwriting association established pursuant to law. For purposes of this chapter, operators of any such medical and hospital service plans and carriers and such health maintenance organizations shall be engaged in the business of insurance.

(b) "Commissioner", the commissioner of insurance.

(c) "Insurance policy" or "insurance contract", any contract or insurance, indemnity, medical or hospital service, dental or optometric, suretyship, or annuity issued, proposed for issuance or intended for issuance by any person.

### § 2. Unfair trade practices

No person shall engage in this commonwealth in any trade practice which is defined in this chapter as, or determined pursuant to section six of this chapter to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

### § 3. Unfair methods of competition and unfair or deceptive acts or practices

The following are hereby defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance:--

(1) Misrepresentations and false advertising of insurance policies: making, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement which:--

(a) Misrepresents the benefits, advantages, conditions, or terms of any insurance policy;

(b) Misrepresents the dividends or shares of the surplus to be received on any insurance policy;

(c) Makes any false or misleading statements as to the dividends or share or surplus previously paid on any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurance policy;

(d) Misleads or misrepresents the financial condition of any person or the legal reserve system upon which any life insurer operates;

(e) Uses any name or title of any insurance policy or class of insurance policies misrepresenting the true nature thereof;

(f) Misrepresents for the purpose of inducing or tending to induce the lapse, forfeiture, exchange, conversion, or surrender of any insurance policy;

(g) Misrepresents for the purpose of effecting a pledge or assignment of or effecting a loan against any insurance policy; or

(h) Misrepresents any insurance policy as being shares of stock.

(2) False information and advertising generally: making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in newspaper, magazine or other publication, or in the form of a notice, circular, pamphlet, letter or poster or over any radio or television station, or in any other way, an advertisement, announcement or statement containing any assertion, representation or statement with respect to the business of insurance or with respect to any person in the conduct of his insurance business, which is untrue, deceptive or misleading.

(3) Defamation: making, publishing, disseminating, or circulating, directly or indirectly, or aiding, abetting or encouraging the making, publishing, disseminating or circulating of any oral or written statement or any pamphlet, circular, article or literature which is false, or maliciously critical of or derogatory to the financial condition of any person, and which is calculated to injure such person.

(4) Boycott, coercion and intimidation: entering into any agreement to commit, or by any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance; any refusal by a nonprofit hospital service corporation, medical service corporation, insurance or health maintenance organization to negotiate, contract or affiliate with a health care facility or provider because of such facility's or provider's contracts or affiliations with any other nonprofit hospital service corporation, medical service corporation, insurance company or health maintenance organization; or any nonprofit hospital service corporation, medical service corporation, insurance company or health maintenance organization establishing the price to be paid to any health care facility or provider at a level equal to the lowest price paid to such facility or provider under a contract with any other nonprofit hospital service corporation, medical service corporation, insurance company, health maintenance organization or government payor.

(5) False statements and entries: (a) knowingly filing with any supervisory or other public official, or knowingly making, publishing, disseminating, circulating or delivering to any person, or placing before the public, or knowingly causing directly or indirectly, to be made, published, disseminated, circulated, delivered to any person, or placed before the public, any false material statement of fact as to the financial condition of a person; or (b) knowingly making any false entry of a material fact in any book, report or statement of any person or knowingly omitting to make a true entry of any material fact pertaining to the business of such person in any book, report or statement of such person.

(6) Stock operations and advisory board contracts: issuing or delivering or permitting agents, officers or employees to issue or deliver, agency company stock or other capital stock, or benefit certificates or shares in any common-law corporation, securities or any special or advisory board contracts or other contracts of any kind promising returns and profits as an inducement to insurance.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(7) Unfair discrimination: (a) making or permitting any unfair discrimination between individuals of the same class and equal expectation of life in the rates charged for any contract of life insurance or of life annuity or in the dividends or other benefits payable thereon, or in any other of the terms and conditions of such contract; or (b) making or permitting any unfair discrimination between individuals of the same class and of essentially the same hazard in the amount of premium, policy fees, or rates charged for any policy or contract of accident or health insurance or in the benefits payable thereunder, or in any of the terms or conditions of such contract, or in any other manner whatever.

(8) Rebates: Except as otherwise expressly provided by law, knowingly permitting or offering to make or making any insurance contract, including but not limited to a contract for life insurance, life annuity or accident and health insurance, or agreement as to such contract other than as plainly expressed in the insurance contract issued thereon, or paying or allowing, or giving or offering to pay, allow, or give, directly or indirectly, as inducement to such insurance or annuity any rebate of premiums payable on the contract, or any special favor or advantage in the dividends or other benefits thereon, or any valuable consideration or inducement whatever not specified in the contract; or giving, or selling, or purchasing or offering to give, sell, or purchase as inducement to such insurance contract, or annuity or in connection therewith, any stocks, bonds, or other securities of any insurance company or other corporation, association, or partnership, or any dividends or profits accrued thereon, or anything of value whatsoever not specified in the contract.

Nothing in clauses (7) or (8) of this subsection shall be construed as including within the definition of discrimination or rebates any of the following practices:--(i) in the case of any contract of life insurance or life annuity, paying bonuses to policyholders or otherwise abating their premiums in whole or in part out of surplus accumulated from nonparticipating insurance, provided that any such bonuses or abatement of premiums shall be fair and equitable to policyholders and for the best interests of the company and its policyholders; (ii) in the case of life insurance policies issued on the industrial debit plan, making allowance to policyholders who have continuously for a specified period made premium payment directly to an office of the insurer in the amount which fairly represents the saving in collection expenses; (iii) readjustment of the rate of premium for a group insurance policy based on the loss or expense experienced thereunder, at the end of the first or any subsequent policy year of insurance thereunder, which may be made retroactive only for such policy year.

(9) Unfair claim settlement practices: An unfair claim settlement practice shall consist of any of the following acts or omissions:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(b) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(c) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(e) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(f) Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(g) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(h) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(i) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(j) Making claims payments to insured or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made;

(k) Making known to insured or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements of compromises less than the amount awarded in arbitration;

(l) Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(m) Failing to settle claims promptly, where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; or

(n) Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

(10) Failure to maintain complaint handling procedures; failure of any person to maintain a complete record of all of the complaints which it has received since the date of its last examination, which record shall indicate in such form and detail as the commissioner may from time to time prescribe, the total number of complaints, their classification by line of insurance, and the nature, disposition, and time of processing of each complaint. For purposes of this subsection, "complaint" shall mean any written communication primarily expressing a grievance. Agents, brokers and adjusters shall maintain any written communications received by them which express a grievance for a period of two years from receipt, with a record of their disposition, which shall be available for examination by the commissioner at any time.

(11) Misrepresentation in insurance applications: making false or fraudulent statements or representations on or relative to an application for an insurance policy, for the purpose of obtaining a fee, commission, money, or other benefit from any insurers, agent, broker, or individual.

(12) Any violation of sections ninety-five, two B, one hundred eighty-one, one hundred eighty-two, one hundred eighty-three, one hundred eighty-seven B, one hundred eighty-seven C, one hundred eighty-seven D, one hundred eighty-nine, one hundred ninety-three E, or one hundred ninety-three K of chapter one hundred seventy-five.

### § 3A. Unfair methods of competition and unfair or deceptive acts or practices; certain business entities

The following are defined as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance by entities organized under chapters one hundred and seventy-six A, one hundred and seventy-six B, one hundred and seventy-six G, and one hundred and seventy-six I, or licensed under chapter one hundred and seventy-five: (i) entering into any agreement to commit or by any concerted action committing any act of, boycott, coercion, intimidation resulting in or tending to result in unreasonable restraint of, or monopoly in, the business of insurance; (ii) refusal to enter into a contract with a health care facility on the basis of the facility's religious affiliation; (iii) seeking to set the price to be paid to any health care facility by reference to the lowest price paid that provider under contract with any other nonprofit hospital service corporation, medical service corporation,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

insurance company, health maintenance organization, or preferred provider arrangement; (iv) refusal to contract or affiliate with a health care facility solely because the facility does not provide a specific service or range of services, provided, however, that the selection of health care facilities shall be based primarily on cost, availability and quality of covered services; (v) refusal to enter into a contract with a health care facility solely on the basis of the facility's governmental affiliation.

### § 3B. Requirements for carriers offering pharmacy networks; arrangements between carriers and non-network pharmacies; definitions

A carrier that offers insureds a restricted pharmacy network shall, in soliciting, arranging, competitively bidding and contracting for such a network, comply with the following requirements for the purpose of promoting fair and competitive bidding:

(1) provide notice to eligible bidders of the carrier's intent to solicit bids for participation in a restricted pharmacy network;

(2) inform eligible bidders of the date such bids will be solicited at least thirty days prior to such solicitation;

(3) provide eligible bidders with information on an identical, equal and uniform basis, including, but not limited to, bid procedure information, financial and utilization information needed to make an informed competitive bid, criteria to be used in awarding a restricted pharmacy network contract and proposed contractual requirements for the restricted pharmacy network;

(4) provide eligible bidders with at least thirty days to prepare and submit bids between the bid solicitation date and the bid submission deadline; and

(5) open all bids (a) at a previously specified time, which shall not be more than thirty days after the bid submission deadline, and (b) in a public manner, provided that certain information contained in said bids may be held as confidential from public review consistent with regulations promulgated by the commissioner regarding the disclosure of proprietary data or information submitted by any bidders.

A carrier shall neither exclude nor favor any individual pharmacy, or group or class of pharmacies, in the design of a competitive bid involving restricted or nonrestricted pharmacy networks in compliance with the requirements of this section. An entity that assists a carrier in the development or management of said design, network contracts, bid specifications or the bid process, or assists in the review or evaluation of said bids, shall be prohibited from bidding on such a contract.

A retail pharmacy registered pursuant to sections thirty-eight and thirty-nine of chapter one hundred twelve, or an association of such pharmacies whose purpose is to promote participation in restricted pharmacy networks, which are not offered or are not participating in a carrier's restricted pharmacy network contract shall nevertheless have the right to provide drug benefits to the carrier's insureds provided that such non-network pharmacies reach the following agreements with the carrier:

(1) to accept as the carrier's payment in full the lowest price required of any pharmacy in the carrier's restricted pharmacy network;

(2) to bill to the insured up to and not in excess of any copayment, coinsurance, deductible or other amount required of an insured by the carrier;

(3) to be reimbursed on the same methodological basis, including, but not limited to capitation or other risk-sharing methodology, as required of any pharmacy in the carrier's restricted pharmacy network;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(4) to participate in the carrier's utilization review and quality assurance programs, including utilization and drug management reports as required of any pharmacy in the carrier's restricted pharmacy network;

(5) to provide computerized on-line eligibility determinations and claims submissions as required of any pharmacy in the carrier's restricted pharmacy network;

(6) to participate in the carrier's satisfaction surveys and complaint resolution programs for its insureds;

(7) to protect the carrier's proprietary information and an insured's confidentiality and privacy;

(8) to abide by the carrier's performance standards with respect to waiting times, fill rates and inventory management, including formulary restrictions;

(9) to comply with the carrier's claims audit provisions; and

(10) to certify, using audit results or accountant statements, the fiscal soundness of the non-network pharmacy.

A carrier may waive any of the aforementioned agreements in arranging for the provision of pharmaceutical drug benefits to insureds through a non-network pharmacy. A carrier may impose a cost-sharing charge for the use of a non-network pharmacy not to exceed five percent more than the charge for using any pharmacy in the carrier's restricted pharmacy network. A carrier shall not impose any agreements, terms or conditions on any non-network pharmacy, or on any association of pharmacies, which are more restrictive than those required of any pharmacy in the carrier's restricted pharmacy network. The failure of a non-network pharmacy to abide by the aforementioned agreements may, at the option of the carrier, serve as the basis for cancellation of the non-network pharmacy's participation agreement.

The provisions of this section shall not apply to arrangements for the provision of pharmaceutical drug benefits to insureds between a carrier and a mail order pharmacy, a hospital-based pharmacy which is not a retail pharmacy, a pharmacy maintained by a physician group practice or clinic which is not a retail pharmacy or a pharmacy wholly-owned by a carrier.

Nothing in this section shall be construed to require or preclude the provision of pharmacy services to insureds through a restricted pharmacy network nor any other arrangement for the provision of prescription drug benefits.

The provisions of this section shall not apply to the establishment of any restricted pharmacy network in a geographical area, approved by the commissioner, which is served solely by a single provider of pharmaceutical services.

For purposes of this section, the term "carrier" shall mean an insurer operating pursuant to the provisions of chapter one hundred and seventy-five, a hospital service corporation operating pursuant to the provisions of chapter one hundred and seventy-six A, a medical service corporation operating pursuant to the provisions of chapter one hundred and seventy-six B, a health maintenance organization operating pursuant to the provisions of chapter one hundred and seventy-six G, and a preferred provider arrangement operating pursuant to the provisions of chapter one hundred and seventy-six I, or a wholly-owned subsidiary or affiliate under common ownership thereof. The term "insured" shall mean a person whose health care services and benefits are provided by, or indemnified by or otherwise covered by a carrier's group or individual insurance policy, or certificate, agreement or contract and shall include subscribers, enrollees or members. The term "eligible bidder" shall mean a retail pharmacy, community pharmacy or pharmacy department registered pursuant to sections thirty-eight and thirty-nine of chapter one hundred and twelve, irrespective of corporate structure or number of locations at which it conducts business, located within the geographical service area of a carrier and willing to bid for participation in a restricted pharmacy network contract. The term "restricted pharmacy network" shall mean an arrangement for the provision of pharmaceutical drug benefits to insureds which under the terms of a carrier's policy, certificate, contract or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agreement of insurance or coverage requires an insured or creates a financial incentive for an insured to obtain prescription drug benefits from one or more participating pharmacies that have entered into, a specific contractual relationship with the carrier pursuant to a competitive bidding process.

The commissioner of the division of insurance shall have authority to enforce the provisions of this section.

### § 4. Prohibited requirements and conditions in lending of money or extension of credit and renewals thereof

No person may: (a) require, as a condition precedent to the lending of money or extension of credit, or any renewal thereof, that the person to whom such money or credit is extended or whose obligation the creditor is to acquire or finance, negotiate any policy or contract of insurance through a particular insurer or group of insurers or agent or broker or group of agents or brokers;

(b) unreasonably disapprove an insurance policy provided by a borrower for the protection of property securing a credit or lien. Such disapproval shall be deemed unreasonable if it is not based solely on reasonable standards uniformly applied, relating to the extent of coverage required and the financial soundness and the services of an insurer. Such standards shall not discriminate against any particular type of insurer, nor shall such standards call for the disapproval of an insurance policy because such policy contains coverage in addition to that required;

(c) require, directly or indirectly, that any borrower, mortgagor, purchaser, insurer, broker, or agent pay a separate charge to substitute the insurance policy of one insurer for that of another. Interest on premium loans or premium advancements in accordance with a security instrument shall not be considered such a separate charge; or

(d) use or disclose information resulting from a requirement that a borrower, mortgagor or purchaser furnish insurance of any kind or real property being conveyed or used as collateral security to a loan, when such information is to the advantage of the mortgagee, vendor, or lender, or is to the detriment of the borrower, mortgagor, purchaser, insurer, or the agent or broker complying with such a requirement.

For the purposes of this section, "person" includes any individual, corporation, association, partnership, or other legal entity whatsoever.

### § 5. Investigation of insurance business

The commissioner shall have the power to examine and investigate into the affairs of every person engaged in the business of insurance in this commonwealth in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by section two.

### § 6. Proceeding to determine violation; notice of hearing; practice, pleading and evidence

Whenever the commissioner shall have reason to believe that any such person has engaged or is engaging in this commonwealth in any unfair method of competition or any unfair or deceptive act or practice whether or not defined in sections three or four and that a proceeding by him in respect thereto would be to the interest of the public, he shall issue and serve upon such person a statement of the charges in that respect and a notice of a hearing thereon to be held at a time and place fixed in the notice, which shall not be less than twenty-one days after the date of the service thereof.

At the time and place fixed for such hearing, such person shall have an opportunity to be heard and to show cause why an order should not be made by the commissioner requiring such person to cease and desist from the acts, methods or practices so complained of. Upon good cause shown, the commissioner shall permit any person to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 8

intervene, appear and be heard by counsel or in person.

Nothing contained in this chapter shall require the observance at any such hearing of formal rules of pleading or evidence.

The commissioner, upon such hearing, may administer oaths, examine and cross-examine witnesses, receive oral and documentary evidence, and shall have the power to subpoena witnesses, compel their attendance, and require the production of books, papers, records, correspondence, or other documents which he deems relevant to the inquiry. The commissioner upon such hearings, may, and upon the request of any party shall, cause to be made a stenographic record of all the evidence and all the proceedings had at such hearing. If no stenographic record is made and if a judicial review is sought, the commissioner shall prepare a statement of the evidence and proceeding for use on review. In case of a refusal of any person to comply with any subpoena issued hereunder or to testify with respect to any matter concerning which he may be lawfully interrogated, the superior court of Suffolk county or the county where such party resides, on application of the commissioner, may issue an order requiring such person to comply with such subpoena and to testify; and any failure to obey any such order of the court may be punished by the court as a contempt thereof.

Statements of charges, notices, orders, and other processes of the commissioner under this chapter may be served by anyone duly authorized by the commissioner, either in the manner provided by law for service of process in civil actions, or by registering and mailing a copy thereof to the person affected by such statement, notice, order, or other process at his or its residence or principal office or place of business. The verified return by the person so serving such statement, notice, order, or other process, setting forth the manner of such services, shall be proof of the same, and the return postcard receipt for such statement, notice, order or other process, registered and mailed as aforesaid, shall be proof of the service of the same.

### § 7. Determination of violation; suspension or revocation of license; restitution; damages; review

If after such hearing, the commissioner shall determine that the person charged has engaged in an unfair or deceptive act or practice he shall reduce his findings to writing and shall issue and cause to be served upon the person charged with the violation a copy of such findings and an order requiring such person to cease and desist from engaging in such method of competition, act or practice and if the act or practice is a violation of sections three or four, the commissioner may suspend or in the case of repeated violations revoke the license of such a party and impose conditions for the reinstatement thereof. In addition whoever commits such an act or practice shall be punished by a fine of not more than one thousand dollars for each and every act or practice.

In addition to any other powers provided in this section, the commissioner may order that restitution be made by an insurer or its agent to any claimant who has suffered actual economic damage as a result of a violation of this chapter.

In any action to recover on an insurance policy, a court may award punitive damages, in addition to the amount of the claim, not to exceed twenty-five per cent of said claim if the court finds that the party seeking to recover on the insurance policy has been damaged by a violation of sections three or four that has been determined such by the commissioner.

Until the expiration of the time allowed under section eight for filing a petition for review if no such petition has been filed within such time or, if a petition for review has been filed within such time, then until the transcript of the record in the proceeding has been filed in the supreme judicial court, as hereinafter provided, the commissioner may at any time, upon such notice and in such manner as he shall deem proper, modify or set aside in whole or in part any order issued by him under this section.

After the expiration of the time allowed for filing such a petition for review if no petition has been duly filed within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such time, the commissioner may at any time, after notice and opportunity for hearing, reopen and alter, modify or set aside, in whole or in part, any order issued by him under this section, whenever in his opinion conditions of fact or of law have so changed as to require such action or if the public interest shall so require.

### § 8. Review by supreme judicial court

Any person required by an order of the commissioner under section six to cease and desist from engaging in any unfair method of competition or any unfair or deceptive act or practice may obtain a review of such order by filing in the supreme judicial court, within thirty days from the date of the service of such order, a written petition praying that the order of the commissioner be set aside. A copy of such petition shall be forthwith served upon the commissioner, and thereupon the commissioner forthwith shall certify and file in such court a transcript of the entire record in the proceeding, including all the evidence taken and the report and order of the commissioner. Upon such filing of the petition and transcript such court shall have jurisdiction of the proceeding and of the question determined therein, shall determine whether the filing of such petition shall operate as a stay of such order of the commissioner, and shall have power to make and enter upon the pleadings, evidence, and proceedings set forth in such transcript a decree modifying, affirming or reversing the order of the commissioner, in whole or in part. The findings of the commissioner as to the facts, if supported by a fair preponderance of the evidence, shall be conclusive.

To the extent that the order of the commissioner is affirmed the court shall thereupon issue its own order commanding obedience to the terms of such order of the commissioner. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the commissioner, the court may order such additional evidence to be taken before the commissioner and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The commissioner may modify his findings of fact, or make new findings by reason of the additional evidence so taken, and he shall file such modified or new findings which if supported by a fair preponderance of the evidence, shall be conclusive, and his recommendation, if any, for the modification or setting aside of his original order, with the return of such additional evidence.

A cease and desist order issued by the commissioner under section six shall become final:--

(1) Upon the expiration of the time allowed for filing a petition for review if no such petition has been duly filed within such time; except that the commissioner may thereafter modify or set aside his order to the extent provided in section six; or

(2) Upon the final decision of the court if the court directs that the order of the commissioner be affirmed or the petition for review dismissed.

No order of the commissioner under this chapter or order of a court to enforce the same shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this commonwealth.

### § 9. Petition of an intervenor for review by supreme judicial court

If after any hearing under sections six or ten the report of the commissioner does not charge a violation of this chapter, then any intervenor in the proceedings may within thirty days after the service of such report, cause a petition to be filed in the supreme judicial court for a review of such report. Upon such review, the court shall have authority to issue appropriate orders and decrees in connection therewith, including, if the court finds that it is to the interest of the public, orders enjoining and restraining the continuance of any method of competition, act or practice which it finds, notwithstanding such report of the commissioner, constitutes a violation of this chapter and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

containing penalties pursuant to section seven.

### § 10. Violation of cease and desist orders; penalty; suspension or revocation of license

Any person who violates a cease and desist order of the commissioner under section seven after it has become final, and while such order is in effect, shall forfeit and pay to the commonwealth a sum not to exceed ten thousand dollars for each violation, which sum may be recovered in a civil action. Upon order of the commissioner such person shall be subject to suspension or revocation of such person's license or such other relief as is reasonable and appropriate.

### § 11. Rules and regulations

The commissioner may in accordance with provisions of chapter thirty A, after notice and hearing, promulgate reasonable rules and regulations, as are necessary or proper to identify specific methods of competition or acts or practices which are prohibited by sections three or four but the regulations shall not enlarge upon or extend the provisions of said sections.

### § 12. Scope of commissioner's powers

The powers vested in the commissioner by this chapter, shall be additional to any other powers to enforce any penalties, fines or forfeitures authorized by law with respect to the methods, acts, and practices hereby declared to be unfair or deceptive.

### § 13. Giving incriminating testimony; immunity from prosecution

If any person shall ask to be excused from attending and testifying or from producing any books, papers, records, correspondence or other documents at any hearing on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture, and shall notwithstanding be directed to give such testimony or produce such evidence, he must nonetheless comply with such direction, but he shall not thereafter be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify or produce evidence thereto, and no testimony so given or evidence produced shall be received against him upon any criminal action, investigation or proceeding, provided, however, that no such individual so testifying shall be exempt from prosecution or punishment for any perjury committed by him while so testifying and the testimony or evidence so given or produced shall be admissible against him upon any criminal action, investigation or proceeding concerning such perjury, nor shall he be exempt from the refusal, revocation or suspension of any license, permission or authority conferred, or to be conferred, pursuant to the insurance law of this commonwealth. Any such individual may execute, acknowledge and file in the office of the commissioner a statement expressly waiving such immunity or privilege in respect to any transaction, matter or thing specified in such statement and thereupon the testimony of such person or such evidence in relation to such transaction, matter or thing may be received or produced before any judge or justice, court, tribunal, grand jury or otherwise, and if so received or produced such individual shall not be entitled to any immunity or privilege on account of any testimony he may so give or evidence so produced.

### § 14. Severability

If any provision of this chapter, or the application of such provision to any person or circumstances, shall be held invalid, the remainder of the chapter, and the application of such provision to person or circumstances other than

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

those as to which it is held invalid, shall not be affected thereby.

Current through Ch. 120 of the 2005 1st Annual Sess.
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT B



Massachusetts General Laws Annotated Currentness
  Part I. Administration of the Government
    Title XV. Regulation of Trade
      → Chapter 93A. Regulation of Business Practices for Consumers Protection (Refs & Annos)

### § 1. Definitions

The following words, as used in this chapter unless the text otherwise requires or a different meaning is specifically required, shall mean--

(a) "Person" shall include, where applicable, natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.

(b) "Trade" and "commerce" shall include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

(c) "Documentary material" shall include the original or a copy of any book, record, report, memorandum, paper, communication, tabulation, map, chart, photograph, mechanical transcription, or other tangible document or recording, wherever situate.

(d) "Examination of documentary material", the inspection, study, or copying of any such material, and the taking of testimony under oath or acknowledgment in respect of any such documentary material.

### § 2. Unfair practices; legislative intent; rules and regulations

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

(c) The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter. Such rules and regulations shall not be inconsistent with the rules, regulations and decisions of the Federal Trade Commission and the Federal Courts interpreting the provisions of 15 U.S.C. 45(a)(1) (The Federal Trade Commission Act), as from time to time amended.

### § 3. Exempted transactions

Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regulatory board or officer acting under statutory authority of the commonwealth or of the United States.

For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions.

### § 4. Actions by attorney general; notice; venue; injunctions

Whenever the attorney general has reason to believe that any person is using or is about to use any method, act, or practice declared by section two to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the commonwealth against such person to restrain by temporary restraining order or preliminary or permanent injunction the use of such method, act or practice. The action may be brought in the superior court of the county in which such person resides or has his principal place of business, or the action may be brought in the superior court of Suffolk county with the consent of the parties or if the person has no place of business within the commonwealth. If more than one person is joined as a defendant, such action may be brought in the superior court of the county where any one defendant resides or has his principal place of business, or in Suffolk county. Said court may issue temporary restraining orders or preliminary or permanent injunctions and make such other orders or judgments as may be necessary to restore to any person who has suffered any ascertainable loss by reason of the use or employment of such unlawful method, act or practice any moneys or property, real or personal, which may have been acquired by means of such method, act, or practice. If the court finds that a person has employed any method, act or practice which he knew or should have known to be in violation of said section two, the court may require such person to pay to the commonwealth a civil penalty of not more than five thousand dollars for each such violation and also may require the said person to pay the reasonable costs of investigation and litigation of such violation, including reasonable attorneys' fees. If the court finds any method, act, or practice unlawful with regard to any security or any contract of sale of a commodity for future delivery as defined in section two, the court may issue such orders or judgments as may be necessary to restore any person who has suffered any ascertainable loss of any moneys or property, real or personal, or up to three but not less than two times that amount if the court finds that the use of the act or practice was a willful violation of said section two, a civil penalty to be paid to the commonwealth of not more than five thousand dollars for each such violation, and also may require said person to pay the reasonable costs of investigation and litigation of such violation, including reasonable attorneys fees.

At least five days prior to the commencement of any action brought under this section, except when a temporary restraining order is sought, the attorney general shall notify the person of his intended action, and give the person an opportunity to confer with the attorney general in person or by counsel or other representative as to the proposed action. Such notice shall be given the person by mail, postage prepaid, to his usual place of business, or if he has no usual place of business, to his last known address.

Any district attorney or law enforcement officer receiving notice of any alleged violation of this chapter or of any violation of an injunction or order issued in an action brought under this section shall immediately forward written notice of the same together with any information that he may have to the office of the attorney general.

Any person who violates the terms of an injunction or other order issued under this section shall forfeit and pay to the commonwealth a civil penalty of not more than ten thousand dollars for each violation. For the purposes of this section, the court issuing such an injunction or order shall retain jurisdiction, and the cause shall be continued, and in such case the attorney general acting in the name of the commonwealth may petition for recovery of such civil penalty.

### § 5. Assurance of discontinuance of unlawful method or practice

In any case where the attorney general has authority to institute an action or proceeding under section four, in lieu

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

thereof he may accept an assurance of discontinuance of any method, act or practice in violation of this chapter from any person alleged to be engaged or to have been engaged in such method, act or practice. Such assurance may, among other terms, include a stipulation for the voluntary payment by such person of the costs of investigation, or of an amount to be held in escrow pending the outcome of an action or as restitution to aggrieved buyers, or both. Any such assurance of discontinuance shall be in writing and be filed with the superior court of Suffolk county. Matters thus closed may at any time be reopened by the attorney general for further proceedings in the public interest. Evidence of a violation of such assurance shall be prima facie evidence of a violation of section two in any subsequent proceeding brought by the attorney general.

**§ 6. Examination of books and records; attendance of persons; notice**

(1) The attorney general, whenever he believes a person has engaged in or is engaging in any method, act or practice declared to be unlawful by this chapter, may conduct an investigation to ascertain whether in fact such person has engaged in or is engaging in such method, act or practice. In conducting such investigation he may (a) take testimony under oath concerning such alleged unlawful method, act or practice; (b) examine or cause to be examined any documentary material of whatever nature relevant to such alleged unlawful method, act or practice; and (c) require attendance during such examination of documentary material of any person having knowledge of the documentary material and take testimony under oath or acknowledgment in respect of any such documentary material. Such testimony and examination shall take place in the county where such person resides or has a place of business or, if the parties consent or such person is a nonresident or has no place of business within the commonwealth, in Suffolk county.

(2) Notice of the time, place and cause of such taking of testimony, examination or attendance shall be given by the attorney general at least ten days prior to the date of such taking of testimony or examination.

(3) Service of any such notice may be made by (a) delivering a duly executed copy thereof to the person to be served or to a partner or to any officer or agent authorized by appointment or by law to receive service of process on behalf of such person; (b) delivering a duly executed copy thereof to the principal place of business in the commonwealth of the person to be served; or (c) mailing by registered or certified mail a duly executed copy thereof addressed to the person to be served at the principal place of business in the commonwealth or, if said person has no place of business in the commonwealth, to his principal office or place of business.

(4) Each such notice shall (a) state the time and place for the taking of testimony or the examination and the name and address of each person to be examined, if known, and, if the name is not known, a general description sufficient to identify him or the particular class or group to which he belongs; (b) state the statute and section thereof, the alleged violation of which is under investigation and the general subject matter of the investigation; (c) describe the class or classes of documentary material to be produced thereunder with reasonable specificity, so as fairly to indicate the material demanded; (d ) prescribe a return date within which the documentary material is to be produced; and (e) identify the members of the attorney general's staff to whom such documentary material is to be made available for inspection and copying.

(5) No such notice shall contain any requirement which would be unreasonable or improper if contained in a subpoena duces tecum issued by a court of the commonwealth; or require the disclosure of any documentary material which would be privileged, or which for any other reason would not be required by a subpoena duces tecum issued by a court of the commonwealth.

(6) Any documentary material or other information produced by any person pursuant to this section shall not, unless otherwise ordered by a court of the commonwealth for good cause shown, be disclosed to any person other than the authorized agent or representative of the attorney general, unless with the consent of the person producing the same; provided, however, that such material or information may be disclosed by the attorney general in court pleadings or other papers filed in court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(7) At any time prior to the date specified in the notice, or within twenty-one days after the notice has been served, whichever period is shorter, the court may, upon motion for good cause shown, extend such reporting date or modify or set aside such demand or grant a protective order in accordance with the standards set forth in Rule 26(c) of the Massachusetts Rules of Civil Procedure. The motion may be filed in the superior court of the county in which the person served resides or has his usual place of business, or in Suffolk county. This section shall not be applicable to any criminal proceeding nor shall information obtained under the authority of this section be admissible in evidence in any criminal prosecution for substantially identical transactions.

### § 7. Failure to appear or to comply with notice

A person upon whom a notice is served pursuant to the provisions of section six shall comply with the terms thereof unless otherwise provided by the order of a court of the commonwealth. Any person who fails to appear, or with intent to avoid, evade, or prevent compliance, in whole or in part, with any civil investigation under this chapter, removes from any place, conceals, withholds, or destroys, mutilates, alters, or by any other means falsifies any documentary material in the possession, custody or control of any person subject to any such notice, or knowingly conceals any relevant information, shall be assessed a civil penalty of not more than five thousand dollars.

The attorney general may file in the superior court of the county in which such person resides or has his principal place of business, or of Suffolk county if such person is a nonresident or has no principal place of business in the commonwealth, and serve upon such person, in the same manner as provided in section six, a petition for an order of such court for the enforcement of this section and section six. Any disobedience of any final order entered under this section by any court shall be punished as a contempt thereof.

### § 8. Habitual violation of injunctions

Upon petition by the attorney general, the court may for habitual violation of injunctions issued pursuant to section four order the dissolution, or suspension or forfeiture of franchise of any corporation or the right of any individual or foreign corporation to do business in the commonwealth.

### § 9. Civil actions and remedies; class action; demand for relief; damages; costs; exhausting administrative remedies

(1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder or any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

(2) Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such manner as the court directs.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The demand requirements of this paragraph shall not apply if the claim is asserted by way of counterclaim or cross-claim, or if the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth, but such respondent may otherwise employ the provisions of this section by making a written offer of relief and paying the rejected tender into court as soon as practicable after receiving notice of an action commenced under this section. Notwithstanding any other provision to the contrary, if the court finds any method, act or practice unlawful with regard to any security or any contract of sale of a commodity for future delivery as defined in section two, and if the court finds for the petitioner, recovery shall be in the amount of actual damages.

<[ Paragraph (3A) applicable as provided by 2004, 252, Sec. 23.]>

(3A) A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as herein provided. The demand requirements and provision for tender of offer of settlement provided in paragraph (3) shall also be applicable under this paragraph, except that no rights to equitable relief shall be created under this paragraph, nor shall a person asserting a claim hereunder be able to assert any claim on behalf of other similarly injured and situated persons as provided in paragraph (2).

(4) If the court finds in any action commenced hereunder that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorney's fees and costs incurred in connection with said action; provided, however, the court shall deny recovery of attorney's fees and costs which are incurred after the rejection of a reasonable written offer of settlement made within thirty days of the mailing or delivery of the written demand for relief required by this section.

<[ There is no paragraph (5).]>

(6) Any person entitled to bring an action under this section shall not be required to initiate, pursue or exhaust any remedy established by any regulation, administrative procedure, local, state or federal law or statute or the common law in order to bring an action under this section or to obtain injunctive relief or recover damages or attorney's fees or costs or other relief as provided in this section. Failure to exhaust administrative remedies shall not be a defense to any proceeding under this section, except as provided in paragraph seven.

(7) The court may upon motion by the respondent before the time for answering and after a hearing suspend proceedings brought under this section to permit the respondent to initiate action in which the petitioner shall be named a party before any appropriate regulatory board or officer providing adjudicatory hearings to complaints if the respondent's evidence indicates that:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(a) there is a substantial likelihood that final action by the court favorable to the petitioner would require of the respondent conduct or practices that would disrupt or be inconsistent with a regulatory scheme that regulates or covers the actions or transactions complained of by the petitioner established and administered under law by any state or federal regulatory board or officer acting under statutory authority of the commonwealth or of the United States; or

(b) that said regulatory board or officer has a substantial interest in reviewing said transactions or actions prior to judicial action under this chapter and that the said regulatory board or officer has the power to provide substantially the relief sought by the petitioner and the class, if any, which the petitioner represents, under this section.

Upon suspending proceedings under this section the court may enter any interlocutory or temporary orders it deems necessary and proper pending final action by the regulatory board or officer and trial, if any, in the court, including issuance of injunctions, certification of a class, and orders concerning the presentation of the matter to the regulatory board or officer. The court shall issue appropriate interlocutory orders, decrees and injunctions to preserve the status quo between the parties pending final action by the regulatory board or officer and trial and shall stay all proceedings in any court or before any regulatory board or officer in which petitioner and respondent are necessarily involved. The court may issue further orders, injunctions or other relief while the matter is before the regulatory board or officer and shall terminate the suspension and bring the matter forward for trial if it finds (a) that proceedings before the regulatory board or officer are unreasonably delayed or otherwise unreasonably prejudicial to the interests of a party before the court, or (b) that the regulatory board or officer has not taken final action within six months of the beginning of the order suspending proceedings under this chapter.

(8) Except as provided in section ten, recovering or failing to recover an award of damages or other relief in any administrative or judicial proceeding, except proceedings authorized by this section, by any person entitled to bring an action under this section, shall not constitute a bar to, or limitation upon relief authorized by this section.

### § 10. Notice to attorney general; injunction, prima facie evidence

Upon commencement of any action brought under section nine or section eleven, the clerk of the court shall mail a copy of the bill in equity to the attorney general and, upon entry of any judgment or decree in the action, the clerk of the court shall mail a copy of such judgment or decree to the attorney general.

Any permanent injunction or order of the court made under section four shall be prima facie evidence in an action brought under section nine or section eleven that the respondent used or employed an unfair or deceptive act or practice declared unlawful by section two.

### § 11. Persons engaged in business; actions for unfair trade practices; class actions; damages; injunction; costs

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

Such person, if he has not suffered any loss of money or property, may obtain such an injunction if it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Any persons entitled to bring such action may, if the use or employment of the unfair method of competition or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective, practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such a manner as the court directs.

A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as hereinafter provided, with provision for tendering by the person against whom the claim is asserted of a written offer of settlement for single damages, also as hereinafter provided. No rights to equitable relief shall be created under this paragraph, nor shall a person asserting such claim be able to assert any claim on behalf of other similarly injured and situated persons as provided in the preceding paragraph. The provisions of sections ninety-five to one hundred and ten, inclusive, of chapter two hundred and thirty-one, where applicable, shall apply to a claim under this section, except that the provisions for remand, removal and transfer shall be controlled by the amount of single damages claimed hereunder.

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The respondent may tender with his answer in any such action a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

In any action brought under this section, in addition to the provisions of paragraph (b) of section two, the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act.

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

Current through Ch. 120 of the 2005 1st Annual Sess.
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**(Cite as: 2002 WL 31371963 (D.Mass.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
F & D TOOL COMPANY, INC., Plaintiff
v.
SLOAN VALVE COMPANY, INC. and Federal
Insurance Company, Defendants
**No. Civ.A. 01-30154-MAP.**

Oct. 17, 2002.

*MEMORANDUM REGARDING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT*

PONSOR, J.

I. *INTRODUCTION*
*1 Plaintiff F & D Tool Company, Inc. ("F & D")
has sued Sloan Valve Company, Inc. ("Sloan"), and
Federal Insurance Company ("Federal") for water
damage to its business property and machines when
a toilet overflowed due to an allegedly defective
Sloan-made toilet component. F & D contends 1)
that Sloan was negligent in designing and
manufacturing their Flushmate toilet; 2) that Sloan
failed to adequately warn F & D of the dangerous
propensities of the Flushmate; 3) that Sloan
breached its implied warranty of merchantability
under Mass. Gen. Laws ch. 106 §§ 2-314 through
2-318; 4) that Sloan violated Mass. Gen. Laws ch.
93A; and 5) that Federal, Sloan's insurer, violated
Mass. Gen. Laws chs. 93A and 176D by failing to
make a fair and reasonable offer of settlement.
Sloan has moved for summary judgment on Counts
One through Four and Federal has moved for
summary judgment on Count Five. For the reasons
set forth below, Sloan's and Federal's motions for

summary judgment will be ALLOWED.

II. *FACTS*
The facts, viewed in the light most favorable to the
plaintiff, are as follows. On November 17, 1999, a
toilet on F & D's business property overflowed and
caused water damage to F & D's manufacturing
facility and machines. Plaintiff alleges that the
overflow of water was caused by a faulty
component in the toilet manufactured by Sloan. On
December 29, 1999, J.E. Hill & Associates., Inc.
("Hill") provided a report of their inspection of the
water damages suffered by F & D to F & D's
insurer, American Motorist Insurance Company
("AMICO"). Hill's inspection concluded that there
was "very little damage to the equipment claimed
damaged. All machines and accessories are without
a doubt repairable." (Docket No. 14, Exhibit 1 at 3).

On April 6, 2000, F & D submitted a proof of loss
statement to AMICO for $720,834.64; AMICO
rejected this statement. On April 13, 2000, Hill
estimated the replacement cost of the damaged F &
D machines at $103,750.00, the actual cash value of
the machines at $25,009.00 and the repair cost at
$84,000.00.

F & D agreed to accept $156,500.00 for its losses
from AMICO on October 4, 2000. The parties'
"Compromise and Settlement Agreement and Full
Release" provides in part that,
  The parties hereto desire and intend to settle fully
  and finally any and all claims and demands and
  all potential claims and demands F & D has or
  may have arising out of the water loss and/or the
  Policy;
  F & D and AMICO recognize and agree that the
  consideration expressed herein is a fair
  compromise of all claims relating in any way to
  the water loss and/or Policy;
(Docket No. 18, Exhibit B at 1). The agreement
also addressed AMICO's release, stating that in
consideration for AMICO's payment to F & D,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**(Cite as: 2002 WL 31371963 (D.Mass.))**

Page 2

plaintiff released AMICO and its successors from all claims. This language reads:

F & D agrees to and hereby releases, acquits and forever discharges AMICO, as well as AMICO's ... successors, and assigns ... from any and all past, present, future, and unknown claims, actions and suits ... losses and damages ... F & D ever had, has or ever can, shall or may have ... by reason of any and all matters, claims, or contentions arising from or concerning in any way the water loss and/or the Policy.

*2 Nothing contained in this Agreement shall be deemed to inure to the benefit of any person or entity which is not a Party to this Agreement. No person or entity other than the Parties hereto shall have any legally enforceable rights under this Agreement. All rights of action for any breach of the Agreement are hereby reserved to the Parties hereto.

(Docket No. 18, Exhibit B at 3).

F & D's president contends that he did not believe that this settlement actually reflected his company's entire loss from the water damage. He now states that he only agreed to the AMICO settlement because it provided F & D the money to allow the business to continue to operate.

Following the settlement with F & D, AMICO sought recovery of the payments it made to F & D from Federal, Sloan's insurer, on the theory that the real cause of the loss was the defective Flushmate. On May 17, 2001, AMICO and Federal settled; Federal paid AMICO $130,000.00 and the parties agreed on a "Release of all Claims." F & D was not a party to this release and refused to sign a consent to the AMICO and Federal settlement. F & D commenced this action against both Sloan and Federal on August 17, 2001.

In response to discovery, the plaintiff has only produced invoices for repairs, purchases of new machines and expenses in connection with the water damage totaling $140,941.41. In other words, F & D's documented losses are *less* that the $156,500.00 it received from AMICO. Moreover, Philip Duda, ("Duda") president of F & D and his employees estimated that $35,750.00 of the $140,941.41

comprised the value of labor and repairs performed by F & D employees themselves. In addition, some of the receipts supporting the $140,941.41 figure were for expenses incurred *prior to* the water overflow on November 17, 1999. In his deposition Duda explained that such expenses reflected previously purchased parts used in the ordinary course of maintenance at the facility that had to be used to repair the machines damaged on November 17, 1999.

Plaintiff has anchored its claim for damages above the $156,500.00 on two estimates from Continental Machinery Company, Inc ., ("Continental") for the total cost of cleaning and repairing the damaged F & D machines. Continental's first December 29, 1999 estimate was $552,383.00. The second revised estimate of April 7, 2000 was $281,585.00.

During the hearing on the defendants' motions for summary judgment on June 28, 2002, the court indicated that both of these expert estimates were inadmissable hearsay and, therefore, failed to meet the standard of Fed.R.Civ.P. 56(e), which requires that, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." The court gave the plaintiff additional time to submit affidavits from Continental that would comport with Fed.R.Civ.P. 56(e).

*3 On July 12, 2002, plaintiff submitted an affidavit from Jeff Williams of Continental. The affidavit states only that Continental "stands by" its original estimate of $582,383.00, maintains that this estimate is accurate and is ready to contract for repair at this price. The affidavit also states that Continental prepared the second estimate of $281,585.00 for settlement and negotiation purposes and did not take into account additional latent damages.

F & D has not retained Continental for any work at F & D and Duda has testified that "[he] did not hire Continental Machinery to repair the machines, and [he] would not do that." Duda stated that the repairs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**(Cite as: 2002 WL 31371963 (D.Mass.))**

contemplated in Continental's estimate would, if performed, necessitate shutting down F & D's business for six months to a year and that the company could not afford such a suspension in business.

### III. *DISCUSSION*

A. *Standard of Review*

A motion for summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the Supreme Court, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Furthermore, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). Rule 56(e) requires the opposing party to meet this burden with admissible evidence. "Hearsay evidence, inadmissible at trial, cannot be considered

on a motion for summary judgment." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Likewise, "the First Circuit will reject responses by nonmovants that adduce statements not based on personal knowledge or that adduce conjectural or conclusory allegations." *Nicholson v. Promotors on Listings,* 159 F.R.D. 343, 348 (D.Mass.1994).

B. *Federal's Motion for Summary Judgment*

**\*4** Federal is charged only in Count V. Plaintiff has alleged that Federal violated Mass. Gen. Laws chs. 93A and 176D by failing to make a fair and reasonable settlement offer when liability was reasonably clear. On March 22, 2001, plaintiff sent a demand letter to Federal stating that its offer of $150,000.00 was unfair and deceptive under Mass. Gen. Laws chs. 93A and 176D. Plaintiff argues that a reasonable person would conclude that since Sloan made a repair kit to fix the component that caused the flood, it knew about the part malfunctioning and is therefore liable for any damages caused by the defective part. More significantly, plaintiff asserts that the agreement and release between AMICO and F & D does not bar the plaintiff from seeking damages against Sloan.

Federal responds that Sloan's liability to F & D is not only *not* clear, but is, in fact, nonexistent, given the agreement and release between AMICO, and F & D's full compensation for its loss though its settlement with AMICO.

The Massachusetts Consumer Protection Act makes unlawful any, "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce...." Mass. Gen. Laws ch. 93A § 2(a). Sections 9 and 11 of ch. 93A provide private causes of action for violations of § 2, but for different classes of plaintiffs. A plaintiff under § 9 is, "[a]ny person, other than a person entitled to bring action under section eleven of this chapter ..." A plaintiff under § 11 is, "[a]ny person who engages in the conduct of any trade or commerce ..." All that is required for a plaintiff to fall within the ambit of § 11 is some transaction in a business context. *International Fidelity Ins. Co. v. Wilson,* 387 Mass. 841, 852 (1983).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**(Cite as: 2002 WL 31371963 (D.Mass.))**

The relationship between plaintiff and defendants was commercial. F & D has brought a claim for property damage to its place of business as a result of a component manufactured by Sloan. F & D's claim is not a consumer claim but a "business against business 93A claim." *DiVenunti v. Reardon,* 37 Mass.App.Ct. 73, 79 (1994). Therefore, 93A § 11 applies here, not § 9. Nor does 93A § 3 apply here, since it only covers exemptions to 93A, none of which apply in this situation.

In order to establish that Federal violated 93A § 11 , F & D must show that Federal's actions were so objectionable as to "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce," *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 504 (1979), or had a "rancid flavor of unfairness," *Atkinson v. Rosenthal,* 33 Mass.App.Ct. 219, 226 (1992). Additionally, Massachusetts courts "focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination." *Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc.,* 420 Mass. 39, 42 (1995).

Here, the uncontroverted facts do not support a 93A § 11 violation. Federal had previously paid AMICO, F & D's insurer, $130,000.00 for damage arising from the toilet overflow. F & D was not able to produce admissible evidence establishing that its costs associated with the water damage were more than $140,941.41. In light of these facts, Federal's settlement offer of $150,000.00 to the plaintiff was, in fact, generous. Federal's refusal to settle again--and for more--cannot reasonably be viewed as so unfair as to rise to the level of unsavory behavior that is the target of this statute.

**\*5** Chapter 176D addresses unfair or deceptive acts or practices in the business of insurance. 176D § 3(9)(f) states, "An unfair claim settlement practice shall consist of any of the following acts or omissions: Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear ." Mass. Gen. Laws ch. 176D § 3(9)(f). An insurer is obligated to settle

under this statute when "liability becomes reasonably clear." *Clegg v. Butler,* 424 Mass. 413, 421 (1997). Whether liability is reasonably clear is determined by an objective standard; the appropriate test is "whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." *Demeo v. State Farm Mut. Auto. Ins. Co.,* 38 Mass.App.Ct. 955, 956-57 (1995).

Applying the objective test set out in *Demeo* here, no reasonable person could conclude that Federal was liable to F & D under ch. 176D. Federal reasonably concluded that AMICO and F & D's agreement meant what it stated: that F & D released all claims and potential claims associated with the water damage. Federal paid $130,000.00 to AMICO on its subrogation claim. A reasonable fact finder could not objectively conclude that Federal's liability was reasonably clear.

The plaintiff argues that the agreement between AMICO and F & D did not discuss subrogation and that the agreement reserved F & D's right to recover from Sloan. Generally in Massachusetts, however, when an insurer pays an insured's claim under its insurance contract, any rights of action the insured may have against the alleged tortfeasor will be transferred to the insurer. *Liberty Mutual Ins. Co. v. National Consolidated Warehouses, Inc.,* 34 Mass.App.Ct. 293, 296 (1993). An insurer who pays the insured for the entire loss suffered may bring a subrogation action in its own name, or on behalf of an insured against a tortfeasor. *Travelers Ins. Co. v. Graye,* 358 Mass. 238, 240-241 (1970). But where an insurer reimburses the insured partially, "both insurer and insured would be the real parties in interest with the insurer a subrogee to the extent of its payment." *Liberty Mutual,* at 297, quoting, 16 Couch, Insurance, § 61:26 (rev. ed.1983).

Here, the insurer, AMICO did not pay the insured F & D for only part of its loss, but for F & D's *entire* loss. The parties' agreement clearly stated that AMICO and F & D "desire and intend to settle fully and finally any and all claims" F & D had or would

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**(Cite as: 2002 WL 31371963 (D.Mass.))**

Page 5

have arising out of the water loss. (Docket 18, Exhibit B at 1). Although the plaintiff argues that it did not *believe* that the settlement reflected all of the loss it suffered, the plaintiff nevertheless agreed and accepted this amount. The agreement obviously did not indicate that AMICO's payment only covered part of the losses that F & D suffered. Put simply, F & D cannot inherit a claim it has already settled.

\*6 Apart from its inherent unfairness, plaintiff's claim flies in the face of the presumption in Massachusetts against claim splitting.

[T]he general rule is that a single negligent action causing damage to an individual can be the basis of only one cause of action in his [or her] behalf which cannot be divided or split into ... separate suits, so that a recovery for part of the loss will bar subsequent suit to recover for other elements of damage.

*Liberty Mutual* at 297, quoting 16 Couch, Insurance, § 61:206. An exception to this rule is recognized only when a tortfeasor expressly or impliedly acquiesces to splitting the claim. *Id.* at 297. In *Liberty Mutual* an insured lost property in a fire and was paid its policy limit by the insurer. Both the insured and insurer brought separate actions against the tortfeasor. The tortfeasor and the insured settled and the tortfeasor brought a motion for summary judgment against the insurer. Denying the motion for summary judgment, the court held that the tortfeasor had "acquiesced" to the splitting of the claim through the release and settlement agreement between the insured and the tortfeasor. The relevant agreement in *Liberty Mutual* explicitly stated, "[i]t is expressly understood that this Release shall not affect in any way, the rights of [insurer] in its claims for negligence against [tortfeasor]." *Id.* at 298.

Here, the tortfeasor, Sloan, never acquiesced to the splitting of the claim arising from the water damage, and therefore, the rule *against* claim splitting, and not the exception, applies. The agreement between AMICO and Sloan is conclusive. As the release stated, AMICO,

hereby forever release[s] and discharge[s], Sloan ... from any and all actions, suits, controversies

and proceedings for reimbursement or payment of any monies, expenses, costs ... including ... those which arise directly or indirectly out of or relate directly or indirectly to a first-party claim brought by F & D Tool Company against [AMICO] ... said first-party claim was settled by [AMICO] ... this payment was made in full and final settlement of F & D Tool Company's claim for economic damages and or loss allegedly incurred as a result of [the water loss].

(Docket No. 18, Exhibit C at 1-2). In sum, as a matter of law, F & D has no claim under either ch. 93A or ch. 176D against Federal.

C. *Defendant Sloan's Motion for Summary Judgment*

F & D's direct claim against Sloan fails due to the absence of any cognizable evidence of damage beyond the $156,500.00 it has already received. As noted, F & D has presented documentation totaling no more than $140,951.21 for costs associated with the water damage.

The estimates for repair from Continental for $552,383.00 and $281,585.00, as originally submitted, were inadmissible. In an effort to correct this deficiency, plaintiff submitted the affidavit of Jeff Williams of Continental. Although the affidavit to some extent cures the hearsay problem, other fatal defects remain.

\*7 Under Fed.R.Civ.P. 56(e), "expert opinion is admissible and may defeat summary judgment only where it appears that the affiant is competent to give an expert opinion." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). "It is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion ... [thus] an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v.. Sun Co.,* 87 F.3d 1467, 1474 (1st Cir.1996) (internal quotation marks omitted).

The affidavit of Jeff Williams of Continental does not meet the standard of Fed.R.Civ.P. 56(e), and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**(Cite as: 2002 WL 31371963 (D.Mass.))**

therefore the evidence of damages the plaintiff has proffered is not sufficient to defeat Sloan's motion for summary judgment. For example, the plaintiff has not offered any evidence concerning the methodology of the calculation of the two estimates except to indicate that Williams conducted a "visual inspection" of F & D. This deficiency is especially glaring given the enormous difference between the two estimates. Nor does the affidavit, or any other evidence the plaintiff has presented, provide the court with information concerning the qualifications or expertise of Continental, making it impossible for the court to determine if Continental is "qualified as an expert by knowledge, skill, experience, training or education ..." Fed.R.Evid. 702. In sum, on these facts, in order to survive defendant's motion, plaintiff was obliged to proffer much more than the casual effort made here in support of the claimed damages.

Since F & D cannot point to facts of record adequate to support any claims for damages beyond what it has a already received, Sloan's Motion for Summary Judgment must be allowed.

### IV. *CONCLUSION*
For the reasons detailed above, defendants' motions for summary judgment are hereby ALLOWED.

A separate order will issue.

### *ORDER*
For the reasons stated in the accompanying Memorandum, defendant Sloan' Motion for Summary Judgment (Docket No. 10) and defendant Federal's Motion for Summary Judgment (Docket No. 13) are hereby ALLOWED.

It is so Ordered.

Not Reported in F.Supp.2d, 2002 WL 31371963 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 3:01CV30154 (Docket)

(Aug. 17, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT D

Westlaw.

Not Reported in N.E.2d

Not Reported in N.E.2d, 2004 WL 3106733 (Mass.Super.)

**(Cite as: 2004 WL 3106733 (Mass.Super.))**

**H**

Only the Westlaw citation is currently available.

Massachusetts Superior Court, County..
David MCMILLAN
v.
WESTPORT INSURANCE CORPORATION and
another [FN1]

FN1. Diamond State Insurance Company

**No. Civ.A. 03-6107H.**

Dec. 10, 2004.

*MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT*

BOTSFORD, J.

**\*1** The plaintiff David McMillan (McMillan) filed this action against the defendant insurance companies, alleging unfair or deceptive acts in violation of G.L. c. 93A, §§ 2, 9, 11 and G.L. c. 176D, on the grounds that the insurers failed to settle in a timely manner claims against their respective insureds even though liability was reasonably clear. The defendant, Westport Insurance Corporation ("Westport") has moved for summary judgment. [FN2] For the reasons stated below, Westport's motion for summary judgment is allowed.

> FN2. The claim against the other defendant, Diamond State Insurance Company, which insured Leslie Bloomenthal, Esquire, has apparently been resolved. In any event, it is not before the court at the present time.

BACKGROUND

Westport insured the attorneys comprising the law firm of Keane, Kline & Duffey (collectively referred to as "KK & D"). KK & D had represented the plaintiff McMillan in a wrongful death action he brought against Sears Roebuck & Company, Inc. (Sears), which related to the death of his wife in a fire at the McMillan home in June 1993 . [FN3] That action had been dismissed by the Superior Court in January 2000 on the grounds that the claims against Sears were barred by the statute of repose. [FN4] The dismissal was affirmed by the Appeals Court in July 2002, and the Supreme Judicial Court denied review.

> FN3. *David McMillan vs. Sears Roebuck & Company, Inc., et al.,* Middlesex Superior Court, C.A. No. 96-1871.

> FN4. McMillan's claims against Sears related to work done by Sears on a bathroom renovation project in McMillan's home.

McMillan learned in approximately April of 2000 that the Superior Court's had dismissed his case against Sears. About one month later, in approximately June of 2000, McMillan contacted Attorney Charles Lessa about KK & D's handling of the case. [FN5] KK & D, however, continued to represent McMillan throughout the appeals process

> FN5. In his deposition on December 18, 2003 (taken in the malpractice case against KK & D), McMillan stated that he visited Attorney Lessa after he learned the case was dismissed. (McMillan Dep. 140-144). During the conversation with Attorney Lessa, he conveyed concern about how the case had been handled. In his deposition on February 18, 2004, Attorney Lessa confirmed that McMillan visited him sometime "after the case was dismissed up until 2000, might have been 2001" because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

McMillan "was very unhappy with the result" of the case. (Lessa Dep. 68-69). McMillan had originally contacted Attorney Lessa soon after the fire in July 1993. Attorney Lessa then referred the case to Attorney Leslie E. Bloomenthal in or about March 1994, who then referred the case to KK & D in September of 1995.

In August 2003, McMillan commenced an action for legal malpractice against KK & D and another lawyer who was not part of KK & D . [FN6] McMillan alleged that KK & D was negligent in not filing the action against Sears before the expiration of the statute of repose. [FN7]

> FN6. *David McMillan v. James P. Keane, Thomas W. Duffey, Alice J. Klein, et al.,* Suffolk Superior Court, C.A. No. 03-4046. In addition the malpractice claim, McMillan alleged breach of fiduciary duty, infliction of emotional distress and vicarious liability. McMillan also named Leslie Bloomenthal, Esq. as a defendant.

> FN7. KK & D began to represent McMillan in September of 1995, and the suit against Sears was filed in March of 1996. It was later discovered that March 1996 was six years and three months after the work Sears had done on the bathroom was complete, so that the six year statute of repose had already run when suit was filed. McMillan claimed in the malpractice action that KK & D should have filed the action against Sears by December 1995.

On November 26, 2003, approximately three months after initiating the malpractice action against KK & D and while that case was in discovery, McMillan through counsel sent a demand letter to Westport pursuant to G.L. c. 93A. The letter claimed that Westport was engaged in a knowing violation of G.L. c. 176D, § 3(9)(f), the statute that requires insurance companies to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. McMillan demanded the full amount of the

Westport policy limit, $500,000, for the wrongful death claim and $500,000 for the personal injury claim for a total of $1,000,000. [FN8] The demand letter stated that because the malpractice suit involved a missed limitations period, liability was clear, and that KK & D's malpractice had caused him to forego a lawsuit valued at over $3.5 million. In a response letter dated December 23, 2003, Westport maintained that liability on the part of KK & D appeared "to be questionable at best" because McMillan had provided the inaccurate factual information on which KK & D relied to file the suit. Furthermore, Westport asserted that even if KK & D breached the standard of care, McMillan ultimately could not have succeeded on the underlying wrongful death and personal injury claims against Sears. McMillan then filed the present action against Westport on December 30, 2003, restating the claims outlined in his 93A demand letter.

> FN8. Prior to settlement, McMillan maintained that the policy limits was $1,000,000, $500,000 for the wrongful death claim and $500,000 for the personal injury claim. Westport maintains that the terms of the policy explicitly state that "two or more claims arising out of a single wrongful act ... or a series of related or continuous wrongful acts shall be a single claim." (Westport Ex. P). At this point, McMillan appears to accept that the maximum coverage available under the policy for his entire claim was $500,000.

**\*2** The parties entered into an unsuccessful mediation in January and February of 2004 attempting to resolve both the malpractice case against KK & D and the c. 93A case against Westport. McMillan claims that during those settlement discussions that Westport acted in bad faith by threatening litigation in the context of a declining limits policy. [FN9]

> FN9. A declining limits policy deducts defense expense from the policy limits.

In April of 2004, KK & D filed a motion for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 2004 WL 3106733 (Mass.Super.)

**(Cite as: 2004 WL 3106733 (Mass.Super.))**

Page 3

summary judgment on McMillan's malpractice claim asserting two main defenses. [FN10] First, KK & D claimed that the malpractice claim itself was barred by the statute of limitations because McMillan consulted with another attorney in May/June of 2000 after he had learned that his claim had been dismissed. McMillan responded that the doctrine of continuing representation tolled the statute of limitations because KK & D represented McMillan through the entire appeals process that ended with the Supreme Judicial Court's decision denying review in October of 2002. Second, KK & D argued that it reasonably relied on information provided by McMillan in miscalculating the limitations period. Specifically, McMillan recalled the spring of 1990 as the approximate date of construction and supported the recollection with a copy of a check to Sears in the amount of $500 dated April 6, 1990. In addition, McMillan's son stated that he recalled that Sear's completed the renovation in 1991. (Frederick McMillan Dep. p. 46). McMillan argues that he told KK & D at the time he conveyed the information that his memory was bad and that the records were incomplete.

> FN10. KK & D's summary judgment motion on the malpractice claim also addressed other issues that McMillan had raised, including an alleged breach of fiduciary duty, an alleged violation of G.L. c. 93A for the delay in the filing of the wrongful death suit, claims of negligent and intentional infliction of emotional distress and a claim stating that Attorney Duffey was not liable because he was not in the partnership agreement at the time of the alleged malpractice.

After KK & D filed the motion for summary judgment in April of 2004, Westport authorized a settlement where McMillan was paid the remaining policy limits of $370,000 in exchange for a dismissal with prejudice of the pending lawsuit and release of all claims against KK & D. As part of the settlement, KK & D assigned to McMillan "all rights or claims they have or may have against Westport ... for Westport's breach of contract, breach of duty to indemnify, breach of the

provisions of M.G.L. Chapters 93A, Chapter 176D, and for any other and all rights whatsoever the Defendant's have, had, have had, or ever had against Westport ... as a result of the position taken by Westport regarding the litigation, defense and settlement of [McMillan]'s claims against [KK & D] and the declination of coverage for Defendant Keane." The remaining issue is McMillan's 93A claim against Westport where McMillan alleges that Westport failed to make a reasonable settlement offer in response to his November 26, 2003 demand letter.

*DISCUSSION*

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass. R. Civ. P. 56(c); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); *Community Nat'l Bank v. Dawes,* 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time Inc.,* 404 Mass. 14, 16-17 (1989). The nonmoving party's failure to prove an essential element of its case mandates summary judgment in favor of the moving party. *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991). The nonmoving party cannot defeat the motion for summary judgment by resting on its pleadings and mere assertions of disputed fact. *Lalonde v. Eissner,* 405 Mass. 207, 209 (1989). Once the moving party has established the absence of a triable issue, the party opposing judgment must respond and allege specific facts establishing the existence of a genuine issue of material fact. *Pederson,* 404 Mass. at 17.

**\*3** General Laws c. 176 D, § 3(9)(f), governs the duty of fair dealing in insurance settlement negotiations. *Clegg v. Butler,* 424 Mass. 413, 419 (1997). Chapter 93A, § 9(1) provides that "any person whose rights are affected by another" party's violation of G.L. c. 176D is entitled to bring an action under G.L. c. 93A, § 9. *Clegg,* 424 Mass. at 418. The legislature enacted Chapter 176D to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

encourage settlements of insurance claims when "liability has become reasonably clear" and to discourage insurers from forcing claimants into unnecessary litigation to obtain relief. *Bobick v. United States Fidelity Guaranty Trust,* 439 Mass. 652, 661 (2003). Liability encompasses both fault and damages. *Clegg,* 424 Mass. at 421. The court applies an objective test examining "whether under the circumstances, and in light of the complainants demands, the offer is reasonable." *Bobick,* 439 Mass. at 659, citing *Clegg,* 424 Mass. at 420. The court analyzes the reasonableness of an insurer's response in light of the whole situation. *Bobick,* 439 Mass. at 661-662.

Probable fault is not sufficient to satisfy the "reasonably clear" standard. *Id.* at 660. [FN11] Review of the record here indicates that liability was never reasonably clear as a matter of law. In its motion for summary judgment filed in the malpractice case in April of 2004, the defenses that KK & D advanced--that the statute of limitations barred the malpractice claim itself, and that KK & D reasonably relied on the factual information supplied by McMillan (and McMillan's son) in calculating the statute of limitations and should not be held liable for relying on information provided by the client-- had both factual and legal support, as seen in the memorandum filed in support of that motion. (Berman affidavit, exhibit L). At a minimum, the erroneous factual information supplied by McMillan raised issues of comparative negligence. [FN12] As in *Bobick* where the G.L. c. 176D claim failed because of uncertain percentages of fault, at the very least, McMillan's comparative negligence represented an area of legitimate dispute in this case.

> FN11. In *Bobick,* the insurer acknowledged the insured's probable fault, but indicated the burden of liability should be shared among other parties. *Bobick v. United States Fidelity Guaranty Trust,* 439 Mass. 652, 659 (2003). The court concluded that because there was a good faith disagreement over the percentage of damages attributable to the insurer, liability was not clear as a matter of law. *Id.*

In contrast, the court ruled that liability was reasonably clear in the *Clegg* case where the insurer's own reports consistently acknowledged one hundred percent liability. *Clegg v. Butler,* 424 Mass. 413, 421 (1997) (noting undisputed police report clearly established fault). In *Clegg* the exact amount of damages remained in dispute, however, the court held that the insurer had sufficient documentation that damages far exceeded the policy limit in question and the insurer's liability up to the policy limits was clear. *Id.*

> FN12. The record indicates that McMillan inaccurately provided the date of construction to KK & D along with a supporting check made out to Sears dated April 6, 1990. McMillan's deposition indicates that he made his uncertainty clear to KK & D. However, McMillan's son, Frederick McMillan, also testified that recalled that Sear's completed the renovation sometime in 1991. Thus, the erroneous information, albeit inadvertent, was coming from sources in addition to McMillan himself.

In sum, as Westport argues, McMillan's claim was not "reasonably clear" as a matter of law when McMillan sent his c. 93A demand letter in late November 2003. Moreover, Westport's actions in this case must be examined in light of the whole picture. McMillan commenced his malpractice case against KK & D in August of 2003, and sent his demand letter to Westport in late November 2003. Westport authorized the settlement of the malpractice case in April or May of 2004, between seven and eight months after the case was filed, and approximately five months after the demand letter was sent. The settlement was for the entire policy limit, minus the amount that had been spent on defense costs and fees up to that point. In the circumstances of this case, Westport's response and settlement of the claim against its insured must be seen as reasonably prompt and fair. Westport is entitled to summary judgment in its favor. [FN13]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d

Not Reported in N.E.2d, 2004 WL 3106733 (Mass.Super.)

**(Cite as: 2004 WL 3106733 (Mass.Super.))**

> FN13. McMillan has opposed this motion on the basis that he needs additional discovery, and has filed through counsel an affidavit under Mass. R. Civ. P. 56(f). He also opposes the motion on the grounds that there are material issues of fact in dispute. I conclude that no additional discovery is called for before the motion for summary judgment may properly be considered. Cf. *E.A. Miller, Inc. v. South Shore Bank,* 405 Mass. 95, 99-102 (1989). On the question of facts in dispute, McMillan's submission contains letters filled with opinion and argument as "fact." I do not accept these materials as raising genuine issues of material fact.

*ORDER*

**\*4** For the foregoing reasons, it is hereby ordered the defendant Westport Insurance Corporation's motion for summary judgment is allowed.

Not Reported in N.E.2d, 2004 WL 3106733 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2660636 (D.Mass.)

**(Cite as: 2004 WL 2660636 (D.Mass.))**

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Jon B. GILLESPIE, D.C. Plaintiff,
v.
ALLIANZ LIFE INSURANCE COMPANY OF
NORTH AMERICA, and Jardine Group Services
Corporation, Defendants.
**No. Civ.A. 03-10298-GAO.**

Nov. 18, 2004.
Robert C. Gabler, Boston, MA, for Plaintiff.

Amber R. Anderson, Bernard J. Bonn, III, Dechert LLP, Boston, MA, John M. Sheran, Leonard, Street and Deinard, Minneapolis, MN, for Defendants.

*MEMORANDUM AND ORDER*

OTOOLE, J.

**\*1** The plaintiff, Jon B. Gillespie, D.C., filed this action for breach of contract and violation of Mass. Gen. Laws ch. 93A seeking damages for unpaid disability benefits he claims he is due under a disability insurance plan underwritten by Allianz Life Insurance Company of North America ("Allianz") and administered by Jardine Group Services Corporation. The defendants jointly moved for summary judgment and oral argument was scheduled for October 25, 2004. The defendants' counsel appeared and was heard at oral argument, but for reasons unknown to the Court, the plaintiff's counsel did not appear, though it appears from the docket that electronic notice of the hearing was sent to the e-mail address of the plaintiff's counsel. For

the following reasons, I conclude that the motion for summary judgment ought to be granted.

I. Summary of Facts

From approximately June 1990 through March 15, 1994, Gillespie operated a private chiropractic practice in Cohasset, Massachusetts. Around the time he opened his own practice, Gillespie applied for disability insurance through the American Chiropractic Association. In March 1993, Allianz became the underwriting insurer for the membership disability insurance policy Gillespie had selected. The policy was effective from March 1, 1993 through February 28, 1998. As of March 1, 1998, Allianz no longer underwrote the policy.

Under the terms of the policy, a member was considered totally disabled if he was "completely unable, due to Sickness or Injury or both, to perform the substantial and material duties of (1) his own occupation during the first 24 months of disability; and (2) any gainful occupation for which he is reasonably fitted by education, training, or experience after the first 24 months of disability and that he is not in fact engaged in any occupation for wage or profit, and is under the care of a physician." The policy also provided for the payment of "Residual Disability Benefits" if, after a period of total disability, the same or a related injury continues, the member is unable to perform substantial and material duties of his own occupation, and the member suffers a continuous reduction of his pre-disability monthly earnings.

Gillespie suffered an injury to his left shoulder on February 16, 1994, which precluded him from practicing chiropractic care. On March 15, 1994, Gillespie closed his chiropractic practice and filed a claim for disability benefits with Allianz. The defendant Jardine Group Services Corporation, the plan administrator, referred all decision-making authority for Gillespie's claim to Allianz. Allianz

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 2660636 (D.Mass.)

**(Cite as: 2004 WL 2660636 (D.Mass.))**

reviewed the claim and determined that Gillespie was totally disabled because he was unable to perform the material duties of his own occupation. Allianz contends that its determination of total disability was based upon injury to both Gillespie's left *and* right shoulders, as referenced by his treating physicians. Gillespie admits that he complained of both left and right shoulder pain during the 1990s, but he contends that Allianz based its disability determination exclusively on his *left* shoulder injury, and it was not until April 1997, when Gillespie filed a separate disability claim for injury to his right shoulder, that Allianz indicated that their initial determination of disability had been based on the combined conditions of his left and right shoulders.

*2 After the first twenty-four months of total disability, Allianz continued to pay Gillespie total disability benefits, but sought opinions from various physicians, chiropractors, and a disability management consultant on whether Gillespie suffered from any medical limitations or restrictions that would impact his ability to be gainfully employed in any occupation for which he is reasonably fitted by education, training, or experience. Based on the information it collected from these sources, Allianz determined that Gillespie no longer qualified as "totally disabled" under the terms of the policy because he was able to participate in "any gainful occupation for which he is reasonably fitted by education, training, or experience." On February 18, 1997, the plan administrator sent written notice to Gillespie informing him of the results of the investigation and advising him that, based on those results, his total disability benefits would be terminated in thirty days. On March 15, 1997, Allianz terminated Gillespie's total disability benefits.

At various times in 1997, 1998 and 1999, Gillespie worked as a security guard, substitute teacher, "Ed. Tech.", and an insurance salesman. He admits that he was not disabled from performing any of these occupations or a wide variety of other unspecified occupations in which he could have participated.

On March 21, 1997, and on three additional occasions in 1998, Allianz sent written correspondence to Gillespie advising him that he might be entitled to collect residual disability benefits under the terms of the policy. In 2000, Gillespie applied for and was awarded residual disability benefits in the amount of $66,686.18. At the same time, he continued to maintain that he was entitled to total disability benefits because of his right shoulder injury. On April 22, 1997, Gillespie notified Allianz in writing that he was "totally disabled due to an unrelated cause" (i.e. his right shoulder injury was "unrelated" to his left shoulder injury). [FN1] On August 27, 2002, Gillespie underwent arthroscopic surgery on his right shoulder, and between the fall and winter of 2002 he tried, to no avail, to have Allianz reinstate payment of total disability benefits. After recuperating from his surgery, Gillespie began practicing chiropractic services on a limited basis in April 2004.

> FN1. In paragraph 18 of his First Amended Complaint, Gillespie alleges: "In or around June *2002* [he] developed a disability in his right shoulder, unrelated to his earlier disability in the left shoulder, according to his doctor." (emphasis added). In opposition to the defendants' summary judgment motion, he now claims that the right shoulder injury occurred in the summer of 1996 and worsened in 1997. *See* Gillespie Aff., ¶ 14. Since the Allianz policy terminated in 1998, a disability that arose in 2002, as alleged in the complaint, would not have been covered by the policy.

II. Discussion

The only arguably disputed material issues are (i) whether Allianz's initial total disability determination was based only on the injury to Gillespie's left shoulder or rather on an injury to both his left and right shoulders, and (ii) whether Gillespie suffered an "unrelated," totally disabling right shoulder injury during the summer of 1996. Viewing the record in the light most favorable to the plaintiff, the defendants are entitled to judgment as a matter of law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2660636 (D.Mass.)

**(Cite as: 2004 WL 2660636 (D.Mass.))**

Page 3

## A. *Gillespie's Left Shoulder Injury*

Assuming that Allianz's initial disability determination was based only on Gillespie's left shoulder injury, as he suggests, its termination of Gillespie's total disability benefits in March 1997 was proper because the record shows that he was able to participate in "any gainful occupation for which he [was] reasonably fitted by education, training, or experience after the first 24 months of [total] disability." After Allianz terminated his total disability benefits, Gillespie took jobs as a security guard, substitute teacher, "Ed. Tech.", and insurance salesman for various periods between 1997 and 1999. He admitted at his deposition that from 1997 through 1999 he was not disabled from performing any of the above occupations or a wide variety of other unspecified occupations in which he could have participated. Physicians' reports, a labor market survey, and a transferrable skills analysis confirmed this. Though not in his chosen profession, these jobs were "of a substantial and not merely trifling character." *Adamaitis v. Metro. Life Ins. Co,* 295 Mass. 215, 3 N.E.2d 833, 835-36 (Mass.1936). Furthermore, the disability policy protected job *income,* not *status.* It provided for residual disability benefits after total disability if the insured remained unable to perform his own higher paying occupation but could perform lesser paying work.

## B. *Gillespie's Right Shoulder Injury*

**\*3** In his First Amended Complaint and during his deposition, Gillespie did not claim a specific, "unrelated," totally disabling right shoulder injury occurring in the summer of 1996, which might serve as the basis for an independent claim for total disability benefits. In fact, he specifically alleged that he developed a right shoulder disability, unrelated to his left shoulder disability, in or around June 2002. First Am. Compl. ¶ 18. It appears that it was not until the defendants filed their summary judgment motion that Gillespie chose to advance a 1996 right shoulder injury as a basis for recovery in this action. *See* Gillespie Aff. ¶¶ 14-19. A party cannot create a genuine issue of material fact by filing an affidavit that contradicts his earlier

deposition testimony without giving a satisfactory explanation for why the testimony has changed. *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4-5 (1st Cir.1994). Although Gillespie has not offered any explanation for the apparent inconsistency between the dates of injury in his complaint and deposition, on the one hand, and his affidavit submitted in opposition to summary judgment, on the other, his deposition testimony and his April 22, 1997 letter to Allianz do not clearly and unambiguously eliminate the possibility that he had previously complained in some manner to Allianz of a 1996 disabling right shoulder injury. *See Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 26-27 (1st Cir.2002). (It is clear, however, that Gillespie did not submit a claim for benefits under the policy for a 2002 right shoulder injury, and that even if he had, he would not be entitled to benefits because the policy terminated in 1998.)

Even if I accept as true Gillespie's assertion that he suffered a disabling right shoulder injury in 1996, he would not be entitled to recovery because he failed timely to file a claim for benefits under the policy. The policy required Gillespie to file a written notice of his claim to the administrator "within 30 days after commencement of any loss ... or as soon as reasonably possible." It also required him to furnish written proof of loss to Allianz "within 90 days of the loss." In April 1997, in response to a letter sent by Gillespie referencing his prior complaints of right shoulder pain, Allianz reviewed Gillespie's medical records. Gillespie thereafter sent his April 22, 1997 letter notifying Allianz that he had become "totally disabled due to an unrelated cause," i.e., the injury to his right, as opposed to his left, shoulder. Gillespie's April 1997 correspondence came well after the expiration of the thirty day claim-filing period established under the policy. Nor was it sent "as soon as reasonably possible" after the putative onset of the right shoulder disability in the summer of 1996. Under these circumstances, even if the right shoulder injury was separate and unrelated to the left shoulder injury, the disability claim for that separate claim was considerably tardy under the terms of the policy. In the absence of any reason to excuse the tardiness, none appearing, the purported claim for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

Not Reported in F.Supp.2d, 2004 WL 2660636 (D.Mass.)

**(Cite as: 2004 WL 2660636 (D.Mass.))**

benefits for the separate right shoulder injury was properly denied.

C. *Violation of Massachusetts Unfair Practices Statute*

*\*4 In his complaint, Gillespie does not allege that Allianz failed to conduct a reasonable investigation of his right shoulder disability claim, but rather bases his claim under Mass. Gen. Laws ch. 93A solely on Allianz's alleged failure to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. *See* Mass. Gen. Laws ch. 176D, § 3(9)(f); First Am. Compl. ¶¶ 24, 30. As Allianz's termination of Gillespie's benefits under the policy was legally correct, and the record shows that liability to pay total disability benefits for a right shoulder injury was not reasonably clear, Allianz is entitled to summary judgment on Gillespie's unfair practices claim, assuming in his favor that such a claim would lie. *See Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.,* 169 F.3d 43, 56 (1st Cir.1999); *Van Dyke v. St. Paul Fire and Marine Ins. Co.,* 388 Mass. 671, 448 N.E.2d 357, 362 (Mass.1983).

III. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (Docket No. 23) is GRANTED.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 2660636 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23651117 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Reasons in Support of His Motion to Amend Complaint to Add A Claim (Dec. 05, 2003)

• 2003 WL 23651123 (Trial Pleading) First Amended Complaint and Demand for Jury Trial (Dec. 05, 2003)

• 2003 WL 23651113 (Trial Pleading) Answer of Defendants Allianz Life Insurance Company of North America and JLT Services Corporation (Jun. 25, 2003)

• 2003 WL 23651104 (Trial Pleading) Jury Trial Demanded Complaint (Feb. 14, 2003)

• 1:03cv10298 (Docket)

(Feb. 14, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT F

Westlaw.

Not Reported in N.E.2d                                                                    Page 1

Not Reported in N.E.2d, 2003 WL 22700352 (Mass.Super.)

**(Cite as: 2003 WL 22700352 (Mass.Super.))**

Only the Westlaw citation is currently available.

Superior Court of Massachusetts, Worcester County.
Paul J. ROSSI et al.,
v.
The NORFOLK & DEDHAM GROUP A
DIVISION OF DORCHESTER MUTUAL
INSURANCE COMPANY et
al.
**No. 012587B.**

July 17, 2003.
Howard J. Potash, Esq., for the Plaintiff.

Anna K. Bennett, Esq. (Dolbec, McGrath and
Bennett), for the Defendant Dorchester Mutual
Insurance.

Memorandum of Decision, Findings, Rulings and
Order

JOHN S. McCANN, Justice.

FACTUAL BACKGROUND
*1    Defendant    Dorchester    Mutual    Insurance
Company     ("Dorchester     Mutual")     issued     an
insurance     policy     to     plaintiffs     Paul     and
Elisabeth-Ann Rossi ("Rossis") for their new home
which was under construction at 181 North Street in
Shrewsbury, Massachusetts ("North Street home").
The effective policy period was March 24, 2000 to
March 24, 2001.

While the North Street home was being built, the
Rossis sold their old home and moved to a
temporary    residence    at    50    Commons    Drive,
Shrewsbury,    Massachusetts    ("Commons    Drive
apartment"). At the time of the move to the
Commons Drive apartment, the Rossis placed the
majority of their furniture and personal belongings
in storage with the Worcester Storage Company. An
affidavit provided by the plaintiffs states that the

Worcester Storage Company has filed for Chapter 7
liquidation under the United States Bankruptcy Act.

The Rossis obtained a second insurance policy
from Dorchester Mutual covering the Commons
Drive apartment with an effective policy period
from May 25, 2000 to May 25, 2001. Both policies
covered losses to the Rossis' personal property on a
"named perils" basis and listed the sixteen covered
perils in the "Perils Insured Against" section. The
Rossis acknowledge receiving the policies from
their insurance agent, Earl Atchue, and state they
looked at the policies but admit that they did not
read the policies in their entirety.

On October 30, 2000, the Worcester Storage
Company attempted to deliver the Rossis' furniture
to their new North Street home. As items were
being removed from the truck, Mrs. Rossi noticed
that many items were soaking wet and damaged.

Email communications between the Rossis and the
Worcester    Storage    Company    indicate    that    a
representative from Worcester Storage Company
told the Rossis that their property was damaged
when the moving truck their belongings were
loaded on leaked. Around November 15, 2000, the
Rossis submitted a claim to Dorchester Mutual for
damaged furniture and personal property.

On the basis of the email communications between
the Rossis and the Worcester Storage Company,
Dorchester Mutual denied the Rossis' claim because
the Rossis could not prove that the damage was
caused by one of the sixteen named perils listed in
their insurance policies.

The Rossis assert that they do not know in fact how
their property was damaged, just that it was
delivered to their home soaking wet. They further
claim they are not obligated to determine the cause
of the damage. The Rossis claim that they instructed
their agent, Earl Atchue, to provide them with a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d, 2003 WL 22700352 (Mass.Super.)

**(Cite as: 2003 WL 22700352 (Mass.Super.))**

policy that covered all of their personal property against damage for any reason whatsoever. The Rossis argue that they are relieved of their responsibility to read their policies in their entirety, as they should be able to rely on their instructions to Mr. Atchue to obtain a policy that provided full and complete coverage for their belongings without exceptions.

The Rossis brought suit under breach of contract, and for deceptive practices under Chapter 93A and Chapter 176D.

### Discussion

*2 Dorchester Mutual moves for summary judgment because: (1) the Rossis cannot demonstrate that their claim falls within the sixteen named perils covered by their insurance policies; (2) Chapter 176D does not create a private cause of action; (3) even if Dorchester Mutual's position in refusing to pay the claim turns out to be wrong, that is not an unfair or deceptive act within the meaning of Chapter 93A

The pertinent section of the Rossis' policies with respect to water damage reads as follows:
SECTION I, COVERAGE C-PERSONAL PROPERTY, 12. Accidental Discharge or overflow of water or steam from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from a within a household appliance.
The Rossis provided an email from a representative of Worcester Storage Company approximately two weeks after the damage was discovered in which the source of the water was identified as a leaking moving truck. If that is the case, then in fact the source of damage is not a listed peril for which the Rossis have coverage for their property. Further, in an affidavit the Rossis state that they do not now, or ever, know conclusively how or where their property was damaged. Dorchester Mutual contends that the Rossis have the burden of showing that the claim is covered by their policies.

The Rossis do have the burden of showing the claim is covered by their policies, and this they

cannot do. *Tumblin v. American Insurance Co.,* 344 Mass. 318, 320, 182 N.E.2d 306 (1962); *Hakim v. Mass. Insurers' Insolvency Fund,* 424 Mass. 275, 283, n. 13, 675 N.E.2d 1161 (1997).

The Rossis must demonstrate through affidavits in response to the motion for summary judgment that they can reasonably expect to prove at trial that the cause of the damage was one of the sixteen listed perils. This they cannot do; at best, the Rossis can only show that their property was damaged by a truck that leaked. This is not a covered peril. The evidence, taken in the light most favorable to the plaintiff, at best demonstrates that the Rossis do not know how the damage occurred other than by a leaking truck or a non-covered peril.

Dorchester Mutual had a reasonable basis for denying coverage. Therefore, the additional claims under Ch. 93A and Ch. 176D also fail.

### Order
The Motion for Summary Judgment by defendant Dorchester Mutual Insurance Company is allowed.

Not Reported in N.E.2d, 2003 WL 22700352 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.