UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TRICORE, INC.                                           :          CIVIL ACTION NO.
                                                        :          04-12393 (JGD)
                                                        :
VS.                                                     :
                                                        :
SAFECO INSURANCE COMPANY OF                             :
AMERICA and R.P. IANNUCCILLO &                          :
SONS CONSTRUCTION CO.                                   :          November 4, 2005

**STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF SAFECO INSURANCE COMPANY OF AMERICA'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant and Crossclaim Defendant Safeco

Insurance Company of America submits its Statement of Undisputed Material Facts in

Support of its Motion for Summary Judgment.

1.     Information provided to Surety showed that on or about January 2002,

Tricore was engaged by Sherrill House, Inc. to act as the construction manager/general

contractor ("CM") with respect to the renovation and expansion of a nursing home

facility in Boston, Massachusetts (the "Project").  Jacobson Aff., ¶ 4. [1]

2.     Information provided to Surety showed that as part of its duties as CM,

Tricore was responsible for retaining all the various subcontractors engaged to work on

the Project.  Jacobson Aff., ¶ 5.

3.     Information provided to Surety showed that Tricore was required to post,

and the Surety did post, Payment Bond Number 6007619 ("Tricore's Payment Bond") in

the amount of $16,958.226.00, which secured the payment of subcontracts under the

---

[1] References to the "Jacobson Aff." are to the Affidavit of Bruce Jacobson in Support of Motion for
Summary Judgment.

1

HARTFORD 128509v2

Project. Tricore's Payment Bond was issued by Safeco Insurance Company of America (the "Surety"). Jacobson Aff., ¶ 6; Jacobson Aff., Ex. 1.

4.      Information provided to Surety showed that on or about April 25, 2002, Tricore and RPI entered into a subcontract involving the Project (the "Subcontract"). Jacobson Aff., ¶ 8; Jacobson Aff., Ex. 2.

5.      Information provided to Surety showed that Tricore engaged RPI as the principal concrete subcontractor responsible for forming and placement of all concrete foundations, slabs, and other concrete portions of the Project for the original sum of $863,497.00.   Jacobson Aff., ¶ 10.

6.      Information provided to Surety showed that during the course of RPI's performance of the Subcontract, Tricore, among others, increasingly became dissatisfied with the quality of RPI's work. Jacobson Aff., ¶ 11.

7.      Information provided to Surety showed that the quality issues were not limited to a single portion of the Project, or isolated incidences requiring repair, but rather were numerous and all-encompassing.   Jacobson Aff. ¶ 12.

8.      Information provided to Surety showed that RPI's quality problems were the rule, not the exception, and ultimately proved to be unacceptable.   Jacobson Aff., ¶ 13.

9.      Information provided to Surety showed that some of the issues related to RPI's substandard performance under the Subcontract included: (1) walls being "out of plumb" (i.e. concave and/or convex rather than straight) and floors having recesses (i.e. curvature or waviness, rather than flat); (2) honeycoming and voids (i.e. concrete with pock-marks or large holes); (3) unacceptable trowel marks and footprints embedded in

2

the concrete; cracks, peeling and flacking in the concrete; (4) unacceptable variations in the placement of concrete, resulting in (a) uneven wall heights, (5) overly wide stairs, and (6) misalignment of concrete; (7) improper relief cuts in concrete that were uneven and not to the depth required by the specifications, which resulted in stress cracking and of the concrete slabs; (8) improper reglet cutting of concrete, which necessitated hand-cutting and chipping to remedy the work; and (9) concrete spillage and staining and variations in the poured concrete.   Jacobson Aff., ¶ 14;   Jacobson Aff., Ex. 3.

10.    Information provided to Surety showed that RPI was required under the Subcontract to provide "finished" concrete work, which was not to be painted or otherwise covered.    Jacobson Aff., ¶ 16.

11.    Information provided to Surety showed that RPI's substandard performance—including its failure to adhere to required specifications under the Subcontract—resulted in numerous other problems downstream from the concrete work, which in turn delayed the Project and delayed its completion. Jacobson Aff., ¶ 17.

12.    Information provided to Surety showed that RPI's gross mismanagement of its portion of the Project was the primary cause of the delay, confusion and additional costs to the Project. Jacobson Aff., ¶ 18.

13.    Information provided to Surety showed that RPI's involvement in the Project was plagued by high turnover among its employees and subcontractors, including that a total of three flatwork cement finishing subcontractors and two reinforcing subcontractors were utilized in succession by RPI during the approximately 14 months they were involved in the Project.   Jacobson Aff., ¶ 19.

HARTFORD 128509v2

14.    Information provided to Surety showed that during this same period, several of the subcontractors complained that RPI was not providing them with adequate direction regarding the Project and routinely failed to pay them for work the subcontractors performed on a timely basis.   Jacobson Aff., ¶ 20.

15.    Information provided to Surety showed that Tricore also learned through the shop steward on the Project that RPI had failed to pay benefits packages to the proper union jurisdiction.  Jacobson Aff., ¶ 21.

16.    Information provided to Surety showed that the high turnover rate among RPI's personnel and subcontractors was impacting its ability to perform under the Subcontract and that the high turnover rate resulted in inadequate communications, confusion, and chronic delays in all phases of the concrete work and severely impacted the quality of work performed.   Jacobson Aff., ¶ 22.

17.    Information provided to Surety showed that RPI failed to order sufficient materials to accomplish its responsibilities with regard to the Project and proceeded as if the Project schedule did not exist.   Jacobson Aff., ¶ 23.

18.    Information provided to Surety showed that in accordance with the provisions of the Subcontract, RPI was required to warrant and guarantee that title to all work would pass to Tricore free and clear of all liens and claims.  Under this provision, RPI was required to submit partial lien waivers and/or affidavits showing that payments had been made in full for labor and materials and on account of all work covered in any application for payment; and that several times during the course of the Project, the interim certificates submitted by RPI disclosed that it had paid all of its subcontractors in full for the value of the work performed.   Jacobson Aff., ¶ 24.

4

HARTFORD 128509v2

19.     Information provided to Surety showed that in direct reliance upon the interim certificates, Tricore reimbursed RPI specified sums of money that RPI allegedly had paid to its subcontractors; and RPI falsified many of these interim certificates, and had not paid its subcontractors, as certified.  Jacobson Aff., ¶ 25.

20.     Information provided to Surety showed that RPI repeatedly failed to provide Tricore adequate and timely wage reporting documentation, including release of lien forms, which was in clear breach of the terms of the Subcontract.  Jacobson Aff., ¶ 26.

21.     Information provided to Surety showed that as a result, Tricore was unable to accurately verify RPI's performance and progress and was prevented from submitting progress and other reports to the Project owner and architect.  Jacobson, Aff., ¶ 27.

22.     Information provided to Surety showed that RPI was also obligated under the Subcontract to complete the work on the Project in a good and workmanlike manner and to the full satisfaction of the Project architect.  Jacobson Aff., ¶ 28.

23.     Information provided to Surety showed that this required RPI to supply an adequate number of skilled workmen to complete the concrete component of the Project. RPI failed to do this; and RPI continually failed to man the Project with employees or subcontractors who had the necessary skills to properly perform the required work; and as a result, a substantial portion of the work performed by RPI was defective and not performed in a timely manner.  Jacobson Aff., ¶ 29.

24.     Information provided to Surety showed that RPI was also prohibited under the Subcontract from subletting or assigning any of the work at the Project without first obtaining Tricore's written consent; and RPI unilaterally and in direct contravention of

5

HARTFORD 128509v2

the plain language of the Subcontract, retained certain subcontractors to aid in the performance of RPI's work under the Subcontract.   Jacobson Aff., ¶ 30.

25.     Information provided to Surety showed that this conduct adversely affected the progress of the entire Project and on one occasion, caused delays.  Jacobson Aff., ¶ 31.

26.     Information provided to Surety showed that as a result of RPI's continual deficient conduct and complete disregard of the terms and conditions of the Subcontract, Tricore notified RPI that RPI was in default due to various violations of the Subcontract. Jacobson Aff., ¶ 33.

27.     Information provided to Surety showed that ultimately, RPI's deficient performance and multiple breaches of the Subcontract were simply too numerous and extensive to remain involved in the Project. _Jacobson Aff.,¶ 34.

28.     Information provided to Surety showed that on July 1, 2003, with the full consent and agreement of both the Project Owner and Architect, Tricore terminated the Subcontract effective July 3, 2003.  Jacobson Aff., ¶ 35; Jacobson Aff., Ex. 5.

29.     Information provided to Surety showed that on July 3, 2003, Tricore sent a follow up notice of default and termination for cause, as required by the Subcontract, and again notified RPI and its bonding companying that RPI was immediately to vacate the project and the bonding company was to arrange for completion of RPI's work pursuant to the obligation under RPI's performance bond ("RPI Performance Bond").  Jacobson Aff., ¶ 37.

30.     Information provided to Surety showed that RPI disputed the termination on July 8, 2003 (several days after being terminated) made demand on Tricore under

6

Tricore's Payment Bond for a total payment of $124,368.44, which included $47,025.09, the amount RPI claimed was the entire remaining balance due on its subcontract, plus the purported outstanding unearned retainage of $77,343.35.   Jacobson Aff., ¶ 39.

31.    Information provided to Surety showed that Tricore responded on July 30, 2003 to the Surety's investigation and request for information regarding RPI's claim with a detailed, three-page letter with supporting documentation articulating the basis of its termination of RPI.   Jacobson Aff., ¶ 40; Jacobson Aff., Ex. 7.

32.    Information provided to Surety showed that the letter set forth approximately sixteen (16) items of deficiency that led to RPI's termination.  Jacobson Aff., ¶ 42.

33.    Information provided to Surety showed that Tricore also proposed escrowing, and did escrow, the outstanding balance under the Subcontract of $47,025.09 to pay RPI in the event that Tricore's cost to complete did not exceed the outstanding balance. Jacobson Aff., ¶ 43.

34.    Information provided to Surety showed that Tricore's damages exceeded the remaining balance of the Subcontract by approximately $400,000.00, which was far in excess of any balance remaining on the Subcontract. Jacobson Aff., ¶ 44.

35.    Information provided to Surety showed that Tricore's damages include $451,023.38 in completion costs and $107,070.80 in corrections costs.   Jacobson Aff., ¶ 46; Jacobson Aff. Ex. 8.

36.    Information provided to Surety showed that Tricore had declared RPI in default on at least four (4) separate occasions prior to its termination of the Subcontract

7

HARTFORD 128509v2

and, ultimately, had terminated the Subcontract for cause, and had declared a default on RPI's performance bond. Jacobson Aff., ¶ 49.

37.    Upon receipt of the claim, the Surety followed the usual, industry standard protocol in investigating the claim. Within a week of receiving RPI's claim, the Surety contacted the Claimant, RPI, to acknowledge receipt of the claim, and to advise that it would be contacting Tricore for the Principal's response. Sussman Aff., ¶5.[2]

38.    The Surety also investigated with Tricore as to Tricore's position regarding RPI's demand.    Sussman Aff., ¶ 7.

39.    On August 19, 2003, the Surety forwarded correspondence from Tricore, with supporting documentation to RPI. The Surety asked RPI to respond. In response, RPI provided the Surety a general denial without *any* articulation.    Sussman Aff., ¶ 8.

40.    Based on the facts and the law, the Surety denied RPI's claim on the basis of a good faith dispute between Tricore and RPI. Sussman Aff., ¶ 9.

41.    Over the next several months the Surety was advised that Tricore and RPI continued to negotiate regarding the resumption of the completion of the Subcontract and the completion of the work. Sussman Aff., ¶ 11.

42.    At no time during this process did RPI ever substantiate that it was not in default under the Subcontract or that Tricore wrongfully terminated RPI. Sussman Aff., ¶ 12.

---

[2] References to the "Sussman Aff." are to the Affidavit of Ira E. Sussman in Support of Motion for Summary Judgment.

HARTFORD 128509v2

43.    In fact, RPI made no further demands on the Surety under the Tricore

Payment Bond until after RPI was sued by Tricore in the instant action and filed a

crossclaim against the Surety.    Sussman Aff., ¶ 13.

44.    Payment Bond 600617 was issued by Safeco Insurance Company, as

surety, to RPI as a condition precedent to entering into the Subcontract with Tricore.

Sussman Aff., ¶ 14.

45.    RPI cannot make a claim on Payment Bond 600617, as that bond does not

obligate Safeco to pay RPI for the labor and materials provided by RPI under the

Subcontract.    Sussman Aff., ¶ 15.

46.    Payment Bond 600617 provides a mechanism for payment by Safeco

Insurance Company to RPI's subcontractors and material suppliers if RPI (not Tricore),

as Principal, does not pay for labor or materials provided pursuant to a direct contract

between RPI and it's subcontractors, and those claimants timely make demand on

payment bond 600617.    Sussman Aff.,¶ 16.

> CROSSCLAIM DEFENDANT,
> SAFECO INSURANCE COMPANY
> OF AMERICA
>
>
> BY _____
> Dennis C. Cavanaugh
> Patrick M. Birney (Admitted in CT only)
> Brown Raysman Millstein Felder &
>     Steiner LLP
> 185 Asylum Street
> Hartford, CT 06103
> (Phone) 860-275-6457
> (Facsimile) 860-275-6400
> Its Attorneys

9

HARTFORD 128509v2

## CERTIFICATION

This is to certify that on November 4, 2005, a copy of the foregoing was mailed, postage pre-paid or delivered electronically or by facsimile to the following:

Edward Kutchin
Kerry R. Northup
Kutchin & Rufo, PC
155 Federal Street, 17th Floor
Boston, MA 02110-1727
**Tricore, Inc.**

David M. Campbell
Visconti& Boren, LTD
55 Dorrance Street
Providence, RI 02903
**R. P. Iannuccillo & Sons Construction Co.**

Bradford R. Carver, Esq.
Jonathan C. Burwood, Esq.
Hinshaw & Culbertson, LLP
One International Place, 3rd Floor
Boston, MA 02110
**Safeco Insurance Company of America**

Dennis C. Cavanaugh

10